BUCHALTER
A Professional Corporation
STEVEN M. SPECTOR (SBN: 51623)
OREN BITAN (SBN: 251056)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
Email: sspector@buchalter.com; obitan@buchalter.com

OLSHAN FROME WOLOSKY LLP
THOMAS J. FLEMING (NYBN: 1454123)
1375 Avenue of the Americas
New York, NY 10019
Telephone: 212.451.2213
Fax: 212.451.2222
Email: tfleming@olshanlaw.com

Attorneys for Plaintiff
8TH WONDER PICTURES, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 8ᴛʜ WONDER PICTURES, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>CLEAR DISTRIBUTION, LLC, a California limited liability company; CLEAR ENTERTAINMENT, LLC, a Wyoming limited liability company; SPECTER ENTERTAINMENT, LLC, a Wyoming limited liability company; and DAVID RAYMOND BROWN, an individual,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**1.  BREACH OF CONTRACT (PROMISSORY NOTE);**<br>**2.  BREACH OF CONTRACT (LOAN AGREEMENT);**<br>**3.  BREACH OF GUARANTY;**<br>**4.  RECOVERY OF PERSONAL PROPERTY (CLAIM AND DELIVERY); AND**<br>**5.  ACCOUNTING** |

Plaintiff, 8ᵗʰ Wonder Pictures, LLC ("Plaintiff"), for its Complaint, alleges as follows:

///

## NATURE OF THE ACTION

1. This is an action that arises out of non-payment of a Promissory Note dated June 17, 2020 made by Defendant Clear Distribution, LLC ("Clear Dist.") in the original principal amount of $1,650,000 (the "Note"). The Note evidenced a loan (the "Loan") made for the purpose of providing Clear Dist. with funds needed for it to acquire the right to distribute that certain motion picture called "Son of the South" (the "Motion Picture") from the company that owned these distribution rights. The Note is annexed hereto as **Exhibit A**.

2. Payment of the Note is secured by certain personal property (the "Collateral"). This is reflected in that certain Security Agreement between Plaintiff and Clear Dist. pursuant to which Clear Dist. pledged and granted to Plaintiff a security interest in every and all aspects of the Motion Picture and, in particular, Exhibit A thereto. The Security Agreement and Collateral (as described in Exhibit A to the Security Agreement) is fully described in **Exhibit B** annexed hereto.

3. Payment of the Note is guaranteed by Defendants Clear Entertainment, LLC ("Clear Ent."), Specter Entertainment, LLC ("Specter Ent.") and David Raymond Brown ("Brown") pursuant to the terms of a Guaranty, dated June 17, 2020 (the "Guaranty") annexed hereto as **Exhibit E**.

4. Several events of default under the Note have occurred. Most importantly, the Note matured by its terms on September 15, 2020. Demand for payment of the Note was made but was unavailing.

5. As a result, by this action, Plaintiff seeks a judgment for failure to pay the Note and recovery of the Collateral.

6. This action also arises as a result of Clear Dist. breaching its agreements and obligations under that certain Term Sheet, also dated June 17, 2020 (the "Term Sheet") and under that certain Loan, Guaranty and Security Agreement, along with Clear Ent. and Specter Ent. (the "Loan Agreement"). The Term Sheet is annexed hereto as **Exhibit C** and the Loan Agreement is annexed hereto as **Exhibit D**. The

Term Sheet and the Loan Agreement provide that Plaintiff shall have a "Continuing Participation" in certain fees, shares and costs respecting the distribution of the Motion Picture, less certain expenses.  The Term Sheet and Loan Agreement also provide that all receipts of the Motion Picture (the "Proceeds") are to be accounted for and administered by an independent collection manager (the "Collection Manager") who is to provide accounting statements to Plaintiff.  Finally, as a part of the Continuing Participation, Clean Dist. agreed that all Proceeds must be paid to the Collection Manager and applied to Clear Dist.'s outstanding obligations under the Note and Loan Agreement in a specific manner agreed to by Plaintiff and Clear Dist.

7.     Payment of the amounts due under the Loan Agreement was likewise guaranteed by Defendants Clear Ent., Specter Ent. and Brown (collectively, the "Guarantors") pursuant to the terms of the Guaranty annexed as Exhibit E.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this Complaint pursuant to 15 U.S.C. §§ 1338 *et seq.* This Court has supplemental jurisdiction over the remaining claims alleged herein pursuant to 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over Defendants, and each of them, because they are present, doing business in and/or residing in this District.

10.    In the agreements discussed below, each Defendant irrevocably submitted to personal jurisdiction in this Court and the venue of this Court for any legal action filed by pursuant to the agreements.

11.    Plaintiff is informed and believes and, based thereon, alleges that the Collateral is located within this District.

12.    Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1391(b) and (c).

## THE PARTIES

13.    Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware.  Plaintiff maintains its principal place of business at

1805 West Avenue, Austin, TX 78701. Andrew Townsend is the sole member of Plaintiff and is a citizen of Texas.

14.    Plaintiff is informed and believes and, on that basis, alleges that Clear Dist. is a California limited liability company, with its principal place of business, according to the California Secretary of State records, at 11846 Ventura Blvd. #130, Studio City, CA 91604. Plaintiff is informed and believes, and on that basis, alleges, that Defendant Brown is an officer, a managing member, manager and/or principal of Clear Dist. and a citizen of California.

15.    Plaintiff is informed and believes and, on that basis, alleges that Clear Ent. is a Wyoming limited liability company, with its principal place of business, according to the California Secretary of State records, at 11846 Ventura Blvd. #130, Studio City, CA 91604. Plaintiff is informed and believes and, on that basis, alleges that Defendant Brown is an officer, a managing member, manager and/or principal of Clear Ent. and is a citizen of California.

16.    Plaintiff is informed and believes and, on that basis, alleges that Specter Ent. is a Wyoming limited liability company, with its principal place of business, according to the California Secretary of State records, at 11846 Ventura Blvd. #130, Studio City, CA 91604. Plaintiff is informed and believes and, on that basis, alleges that Defendant Brown an officer, a managing member, manager and/or principal of Specter Ent. and is a citizen of California.

17.    Plaintiff is informed and believes and, on that basis, alleges Defendant Brown was, and is, an individual residing and domiciled in the County of Los Angeles, State of California.

18.    At all times mentioned herein, the entity Defendants, and each of them, provided Defendant Brown with actual and/or ostensible authority to act on their behalf and contractually obligate each of them to enter into the agreements at issue herein.  At all times mentioned herein, Defendant Brown was a principal, officer, managing agent, owner, and/or employee of each of the entity Defendants, who was

authorized to act on their behalf. Each of the entity Defendants was aware that Defendant Brown was acting on their behalf, received benefits as a result of Defendant Brown's actions taken on their behalf, and/or ratified Defendant Brown's actions, as alleged herein. Accordingly, each of the entity Defendants is legally bound by the actions taken by Defendant Brown.

19.   Each of the entity Defendants are interrelated, share common ownership, and conduct business for and with one another.

### THE SECURITY INTEREST

20.   Also on June 17, 2020, Plaintiff entered into a Security Agreement (Exhibit B hereto) pursuant to which Defendants Clear Dist., Clear Ent., and Specter Ent. granted to Plaintiff a security interest in certain personal property of each as security for payment of the Note (the "Security Agreement" and with the Note, Guaranty, Term Sheet and the Loan Agreement, the "Loan Documents"). The Security Agreement is broad in scope and the Collateral described therein encompasses substantially all of the personal property assets of these parties.

21.   The security interest described in the Security Agreement with respect to Clear Dist. was perfected as required by law by the filing of a Financing Statement (Form UCC-1) with the California Secretary of State. This Financing Statement (Form UCC-1) was so filed on June 17, 2020. The filed Financing Statement as well as filed Financing Statements respecting Clear Ent. and Specter Ent. are annexed hereto as **Exhibit F**.

### USE OF LOAN PROCEEDS

22.   Clear Dist. used the proceeds of the Loan to acquire the motion picture distribution rights to the full length feature film entitled "Son of the South" pursuant to an Acquisition Agreement between Clear Dist. and an entity called Son of the South Owner LLC.  Pursuant to the Acquisition Agreement, Clear Dist. acquired the exclusive right to distribute the Motion Picture. The film was originally scheduled for release on August 26, 2020, but is now scheduled for release on February 5, 2021.

The Acquisition Agreement is annexed hereto as **Exhibit G**.

## **DEFAULT**

23.     By its terms, the Note matured on September 15, 2020.  On that date, Clear Dist. was required to repay all principal and accrued interest owing on account of the Note.  Clear Dist. failed to do so. In addition, despite their obligation to do so, none of the Guarantors have paid their obligations under the Guaranty.

24.     The Loan Documents also require Clear Dist. to provide Plaintiff with regular status reports and other information no less than monthly.  Clear Dist. failed to do so.  This is an additional Event of Default under the Loan Documents.  Plaintiff alleges the failure to provide these reports is part of a deliberate plan to conceal the income received to date from the distribution of the Motion Picture.

25.     The Loan Documents also require that all Proceeds from distribution of the Motion Picture be sent to the Collection Manager for accounting and administration and applied to Clear Dist.'s outstanding obligations under the Loan Documents.  Clear Dist. breached this obligation by diverting Proceeds to itself to the detriment of Plaintiff.

26.     On November 16, 2020, Plaintiff provided Clear Dist. and each of the Guarantors with written Notice of Default and demanded immediate payment of all obligations owing to Plaintiff (including principal, interest, costs and expenses). A copy of the Notice of Default is annexed hereto as **Exhibit H**. Clear Dist. and the Guarantors have failed to make any payments on account of their obligations.

27.     Pursuant to the Security Agreement, if an Event of Default exists, then, following "notice to the Borrower and reasonable opportunity to cure such Default," Plaintiff may, inter alia, (a) after at least five business days, declare all obligations of Clear Dist. "to be immediately due and payable" without additional notice or demand, (b) take possession of, <u>appoint a receiver to take possession of, or sell, lease, license or dispose of, the collateral granted to it as security for the Loan</u>, and (c) pursue any other remedies under other loan documents, and applicable law.

28.     The Obligations (as defined in the Loan Agreement (annexed as Exhibit F)) accrue interest as defined in the Loan Agreement at a rate equal to the "Prime Rate" plus 2% per annum, except in the event of default. Upon default, interest accrues at an additional 2% per annum above the non-default rate.

### FIRST CLAIM FOR RELIEF

**(Breach of Contract Against Clear Dist.)**

**(Promissory Note)**

29.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 28, inclusive, of this Complaint and incorporates the same hereat by reference.

30.     The Note matured on September 15, 2020 and was, therefore, due and payable on that date.

31.     Plaintiff has heretofore made demand upon Clear Dist. for payment of the amounts owed under the Note.

32.     Clear Dist. has failed and refused to pay to Plaintiffs the amount owing under the Note plus interest thereon.

33.     Based on the foregoing, Clear Dist. owes Plaintiff the principal sum of $1,650,000 plus non-default interest thereon as defined in the Note from June 15, 2020 through September 15, 2020 and default interest thereon as defined in the Note from September 16, 2020 through the date of judgment.

34.     As a result of Clear Dist.'s breaches of its obligations, Plaintiff has engaged counsel to enforce its rights and pursue its remedies. Based thereon, as set forth in the Note, Plaintiff is entitled to recover its attorney's fees and all costs of collection.

### SECOND CLAIM FOR RELIEF

**(Breach of Contract Against Clear Dist.)**

**(Loan Agreement)**

35.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1

through 34, inclusive, of this Complaint and incorporates the same hereat by reference.

36.     Paragraph 4.2 of the Loan Agreement requires that: (i) all Proceeds be sent to the Collection Manager for accounting to Plaintiff on a regular basis; and that (ii) any Proceeds be immediately applied to Clear Dist.'s outstanding obligations to Plaintiff as set forth in the Loan Agreement, including repayment of any accrued interest owed to Plaintiff, the outstanding balance of the Note, and payment of Plaintiff's Continuing Participation interest in the Motion Picture as defined in the Loan Agreement.

37.     Paragraph 8.2 of the Loan Agreement requires Clear Dist. to provide to Plaintiff regular status reports and other information including but not limited to information (including executed copies) regarding distribution agreements involving the Motion Picture.

38.     Clear Dist. breached its obligations under the Loan Agreement by: (i) failing to send all Proceeds to the Collection Manager and instead diverting Proceeds to itself; (ii) failing and refusing to send the Proceeds to Plaintiff for immediate application to Clear Dist.'s outstanding obligations as set forth in the Loan Agreement; and (iii) failing to provide Plaintiff with regular status reports regarding the existence of distribution agreements Clear Dist. executed for the Motion Picture. Instead, Clear Dist. concealed the existence of Motion Picture distribution agreement until after it received the Proceeds of these distribution agreements.

39.     Clear Dist.'s breaches of Paragraphs 4.2 and 8.2 of the Loan Agreement constituted Events of Default under the Loan Agreement.

40.     Clear Dist. has failed and refused to pay to Plaintiff the amount owing under the Loan Agreement.

41.     Based on the foregoing, Clear Dist. owes Plaintiff the Proceeds.

42.     As a result of Clear Dist.'s breaches of its obligations, Plaintiff has engaged counsel to enforce its rights and pursue its remedies. Based thereon, as set

forth in the Note, Plaintiff is entitled to recover its attorney's fees and all costs of collection.

## THIRD CLAIM FOR RELIEF

### (Breach of Guaranty Against Clear Ent., Specter Ent. and Brown)

43.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 42, inclusive, of this Complaint and incorporates the same hereat by reference.

44.     Pursuant to the Guaranty, the Guarantors guaranteed payment of the Note and performance of Clear Dist.'s obligations to Plaintiff.

45.     Clear Dist. owes to Plaintiff the sums hereinabove set forth (the "Debt"). As a result, the Guarantors owe Plaintiff the Debt.  Plaintiff has heretofore made demand upon the Guarantors for payment of the Debt.

46.     The Guarantors, and each of them, have failed and refused to pay the amount of the Debt or any part thereof.

47.     Plaintiff is entitled to recover its legal fees and costs of collection from the Guarantors.

## FOURTH CLAIM FOR RELIEF

### (Recovery of Personal Property - Against Clear Dist., Clear Ent., Specter Ent. and Brown)

48.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 47, inclusive, of this Complaint, and incorporates the same hereat by reference.

49.     The Security Agreement provides, among other things, that upon a breach of the terms thereof, Plaintiff is entitled to take possession of the Collateral and exercise all remedies of a secured creditor. In addition, the Security Agreement provides that, upon a default, Plaintiff is granted a power of attorney by each defendant to pursue its rights in the Collateral.

50.     As a result of the defaults alleged hereinabove, Plaintiff is entitled to

immediate possession of the Collateral. Plaintiff has heretofore demanded of the Clear Dist. that it turn over the Collateral to Plaintiff. Clear Dist. has failed and refused, and continues to fail and refuse, to turn over the Collateral to Plaintiff.

51.     Plaintiff is informed and believes and thereon alleges that the fair market value of the Collateral is sufficient to pay the Note/Debt in full or some other amount owing to be determined at time of trial according to proof. Plaintiff is informed and believes and thereon alleges that the Collateral has not been taken for a tax, assessment or fine pursuant to a statute or seized under an execution order. Plaintiff is informed and believes and thereon alleges that the Collateral is in immediate danger of destruction, serious harm, concealment, transfer, and/or removal from its existing location.

## **FIFTH CLAIM FOR RELIEF**

### **(Accounting – Against Clear Dist.)**

52.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 51, inclusive, of this Complaint, and incorporates the same hereat by reference.

53.     As part of its distribution of the Motion Picture, Clear Dist. has received monies and other valuable consideration that constitute the Proceeds of the Motion Picture.

54.     All or a portion of the Proceeds are the rightful property of Plaintiff.

55.     The full amount of the Proceeds is currently unknown because Clear Dist. has failed to provide Plaintiff with status reports regarding its efforts to distribute the Motion Picture.  As a result, the full amount of the Proceeds cannot be ascertained without an accounting.

56.     Despite Plaintiff's demands, Clear Dist. has failed and refused to provide Plaintiff with all information regarding the distribution of the Motion Picture.

//

//

# PRAYER FOR RELIEF

## AS TO THE FIRST AND SECOND CLAIMS FOR RELIEF:

1.      Judgment in favor of Plaintiff and against Defendants, and each of them, jointly and severally, for the principal sum of $1,650,000, plus accrued and accruing interest and other charges according to proof at time of trial or entry of judgment.

## AS TO THE THIRD CLAIM FOR RELIEF:

2.      Judgment in favor of Plaintiff and against Defendants, and each of them, jointly and severally, for all Proceeds of the Motion Picture, plus accrued and accruing interest and other charges according to proof at time of trial or entry of judgment.

## AS TO THE FOURTH CLAIM FOR RELIEF:

3.      Judgment for turn over of the Collateral of Plaintiff, including for an order of the Court appointing a receiver to protect, preserve and dispose of the Collateral; and for a temporary restraining order and/or preliminary and permanent injunctions restraining and enjoining Defendants, and their respective agents, representatives, and all persons acting under, in concert with, or for them, from:

(a)      Committing or permitting any waste of the Collateral or any part thereof, or suffering or committing or permitting any act on the Collateral or any part thereof in violation of law, or removing, transferring, encumbering or otherwise disposing of any of Collateral or any part thereof;

(b)      Directly or indirectly interfering in any manner with the discharge of the Receiver's duties under his Order or the Receiver's possession of and operation or management of the Collateral;

(c)      Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, concealing or in any manner whatsoever dealing in or disposing of the whole or any part of the Collateral without a prior specific Court Order;

(d)      Withholding possession of any Collateral from the Receiver; and

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

(e)     Doing any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Collateral.

**AS TO THE FIFTH CLAIM FOR RELIEF:**

4.     For an accounting of the Proceeds of the Motion Picture and the imposition of a constructive trust on the Proceeds.

**AS TO ALL CAUSES OF ACTION:**

5.     For attorney's fees.

6.     For costs of suit herein incurred.

7.     For such other and further relief as this Court may deem just and proper.


DATED:  January 26, 2021          BUCHALTER
                                  A Professional Corporation



                                  By:  _____
                                       STEVEN M. SPECTOR
                                       OREN BITAN
                                       Attorneys for Plaintiff
                                       8TH WONDER PICTURES, LLC

# EXHIBIT A

*Execution Version*

## PROMISSORY NOTE
### "SON OF THE SOUTH"

$1,650,000

Los Angeles, California
As of June 17, 2020 (the "**Effective Date**")

FOR VALUE RECEIVED, the undersigned, Clear Distribution LLC, a California limited liability company (together with its successors and assigns, "**Borrower**"), hereby promises to pay to the order of 8th Wonder Pictures, LLC, a Delaware limited liability company, or to the holder of this Note, (together with its successors and assigns, "**Lender**") up to the principal amount of One Million Six Hundred Fifty Thousand Dollars ($1,650,000) in lawful money of the United States (as it may amended, modified, supplemented, amended and restated, renewed or replaced from time to time, the "**Note**"), plus all accrued and unpaid interest, on or before the Maturity Date as determined pursuant to that certain Term Sheet among Borrower, Lender and the guarantors party thereto (as it may be amended, modified, supplemented, amended and restated, renewed or replaced from time to time, the "**Term Sheet**") or as otherwise provided herein or in the Term Sheet.

This Note is provided pursuant to the Term Sheet with respect to the motion picture presently entitled "*Son of the South*", as such Term Sheet may be amended, supplemented or otherwise modified from time to time. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Term Sheet. The Term Sheet, and all terms set forth therein, are incorporated herein by this reference.  In the event of any conflict between the terms of this Note and the terms of the Term Sheet, the terms of the Term Sheet shall prevail.

Borrower promises to pay Interest on the principal amount of all loans made by Lender to Borrower pursuant to the Term Sheet from June 17, 2020 until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Term Sheet, as well as any and all other costs, fees, expenses or charges payable to Lender pursuant to the Term Sheet, this Note, or any other agreement between Lender and Borrower.

All payments in respect of this Note shall be made to Lender, via wire transfer pursuant to the wire transfer details provided by Lender to Borrower or at such other place as may be timely and reasonably designated in writing by Lender with sufficient prior notice.

Borrower waives protest, diligence, presentment, and notice of dishonor in connection with the delivery, acceptance, performance and enforcement of this Note. Lender shall at all times have the right to proceed against any portion of the security held for this Note in such order and in such manner as Lender may deem fit, without waiving any rights with respect to any other security.  No delay or omission on the part of Lender in exercising any right hereunder or under this Note or the Term Sheet shall operate as a waiver of such right or of any other right under this Note or any other agreement or document relating to this Note.

No covenant, condition, right or remedy in this Note may be waived, or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or modification is specifically agreed to in writing and signed by Lender.  Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting with respect to the terms of this Note shall constitute a waiver of any breach, default or failure of a condition under this Note.

In accordance with the terms of the Term Sheet, Borrower agrees to pay all costs of collection when incurred, including reasonable outside attorneys' fees, whether or not suit or any other action is filed, and all reasonable third party, out-of-pocket costs and reasonable outside attorneys' fees incurred in realizing upon any collateral securing this Note as well as all such amounts incurred in connection with enforcement of any award, order or judgment. If an action is filed, including arbitration, and Lender is determined under such proceeding to have prevailed, Borrower promises to pay all reasonable third party, out-of-pocket costs and expenses incurred in connection therewith,

including any expert fees or expenses any fees and expenses incurred in connection with any appeal or confirmation or enforcement of any award or judgment.

No extension of the time for the payment of this Note or any installment hereof made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability under this Note if Lender or the Note holder are not a party to such agreement.

Failure to pay any part of the principal, interest, or any other sums due under this Note when due, or failure to carry out any of the material terms, material covenants, or material conditions of the Term Sheet, the Security Agreement or this Note, or the occurrence of any default or any event of default, under the Term Sheet, the Security Agreement or this Note, shall constitute an immediate event of default hereunder and shall authorize Lender to accelerate and declare as immediately due and payable the then-unpaid principal, interest and all other amounts due to Lender and to exercise any and all of the rights and remedies provided by the Term Sheet, the Security Agreement, this Note, any other agreement between Borrower and Lender, as well as all other rights and remedies either at law or in equity possessed by the Lender.

This Note is secured by the "Collateral," as such term is defined in the Security Agreement among Lender, Borrower and the other parties thereto dated as of June 17, 2020 (as it may be amended, modified, supplemented, amended and restated, refinanced or replaced from time to time, the "**Security Agreement**"). Reference is hereby made to the Term Sheet and the Security Agreement for a description of the Collateral, the nature and extent of the security for this Note and the rights of the holder of this Note in respect to such security.

The failure to exercise any such rights, powers and remedies or the acceptance by Lender of any payment hereunder which is less than payment in full shall not constitute a waiver of the right to exercise any of Lender's rights, powers or remedies at that time or any subsequent time.

In case any provision in this Note, the Term Sheet, the Security Agreement or any other accompanying document or agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby.

This Note may not be changed, modified, amended or terminated, except by a writing signed by Borrower and Lender.  This Note shall bind and inure to the benefit of the respective successors and assigns of Borrower and Lender.

This Note is executed under and shall be governed by and construed in accordance with the laws of the state of New York without reference to conflicts of law principles in the state of New York.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has executed this Note as of the Effective Date.

**CLEAR DISTRIBUTION LLC**

By: _____

Name:   David Brown

Its:   Owner/Authorized Signer

*Signature Page to Promissory Note*

# EXHIBIT B

*Execution Version*

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "<u>Agreement</u>") is entered into effective as of June 17, 2020, by Clear Distribution LLC, a California limited liability company ("<u>Clear Distribution</u>") Clear Entertainment LLC, a Wyoming limited liability company ("<u>Clear Entertainment</u>"), Specter Entertainment LLC, a Wyoming limited liability company ("<u>Specter</u>, and together with Clear Distribution and Clear Entertainment, the "<u>Debtors</u>" and each, a "<u>Debtor</u>") and 8th Wonder Pictures, LLC, a Delaware limited liability company (the "<u>Secured Party</u>").

## RECITALS

1.       Clear Distribution is party to (i) that certain Term Sheet, dated as of the date hereof, between Clear Distribution and the Secured Party (as it may be amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, the "<u>Term Sheet</u>"), (ii) that certain Promissory Note, dated as of the date hereof, made by Clear Distribution in favor of the Secured Party (as it may be amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time the "<u>Promissory Note</u>") and (iii) that certain Guaranty among the Debtors and the Secured Party (as it may be amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, the "<u>Guaranty</u>").

2.       The Term Sheet requires that Debtors and Secured Party enter into (i) a loan agreement executed no later than June 24, 2020 (as it may be amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time the "<u>Loan Agreement</u>") and (ii) certain other ancillary agreements, documents and instruments in connection with the motion picture currently entitled "Son of the South" based on the screenplay written by Barry Alexander Brown (the "<u>Picture</u>") (collectively with the Term Sheet, Promissory Note, Guaranty and Loan Agreement, and as such agreements, documents and instruments may be amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time, the "<u>Financing Documents</u>").

3.       The Term Sheet requires, inter alia, that each Debtor shall grant to the Secured Party a security interest in all of each Debtor's interest in the Picture, and to enter into such documents in connection therewith as the Secured Party may require, which each Debtor acknowledges is in its best interest.

4.       The Debtors desire to enter into this Agreement to secure the Secured Obligations.

NOW THEREFORE, in accordance with the Financing Documents and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor and the Secured Party hereby agree as follows:

Section 1.       <u>Definitions</u>. When used herein, (i) capitalized terms that are not defined have the meanings assigned to such terms in the UCC or the Term Sheet, as applicable and (ii) the following terms have the following meanings:

"<u>Acquisition Agreement</u>" means that certain acquisition agreement, dated as of June 17, 2020, between Clear Distribution and Son of the South Owner LLC.

1

"Collateral" as used herein, has the meaning given to such term in Exhibit A attached hereto, wherever located, whether now in existence or hereafter created, and whether now owned or hereafter acquired.

"Collateral Proceeds" means all (i) all "proceeds", as such term is defined in the Uniform Commercial Code and (ii) all amounts acquired, paid to, derived by or payable directly and indirectly to the Debtors or any third Persons on account of the same, lease, licensing, exchange, distribution, exploitation or other disposition of the Collateral, including, without limitation, money, royalties, fees, commissions, charges, payments, proceeds of any letter of credit, advances, income, profit and other forms of payment, proceeds of any insurance for any of the Collateral, and any sums payable to the Debtors or any other third Persons or any of their respective Affiliates under or in relation to the Distribution Agreements, as applicable.

"Event of Default," as used herein, means the occurrence of an "Event of Default" under the Term Sheet.

"Person" means an individual, corporation, partnership, association, joint stock company, trust, unincorporated organization or joint venture, or a court or governmental unit or any agency or subdivision thereof, or any other legally recognizable entity.

"Secured Obligations" means any and all obligations of the Debtors to the Secured Party under the Financing Documents.

"State," as used herein, means the State of New York.  All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions herein as specified therein.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

Section 2.      Grant of Security Interest.   Each Debtor hereby irrevocably and unconditionally grants and assigns to the Secured Party a first priority security interest, copyright mortgage and lien (collectively, the "Security Interest") in and to all of its rights, titles and interests in and to the Collateral, whether now in existence or hereafter created, and whether now owned or hereafter acquired, to secure the repayment, performance and discharge in full of all of the Secured Obligations.

Section 3.      Authorization to File Financing Statements and Other Documents.   Each Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction and the United States Copyright Office, and any similar or analogous governmental office or agency in any jurisdiction, any financing statement, copyright mortgage or other document or instrument, and amendments thereto or continuations thereof, that: (a) indicate the Collateral; and (b) provide any other information required by the Uniform Commercial Code of the State, the laws of the United States or the laws of any such other jurisdiction for the sufficiency, or acceptance for filing or recording, of any financing statement, copyright mortgage or amendment or other document or instrument.

Section 4.      Other Actions.  To further the attachment, perfection and priority of, and the ability of the Secured Party to enforce, the Security Interest in the Collateral, and without

limitation on each Debtor's other obligations in this Agreement or the Financing Documents, each Debtor shall take any and all actions the Secured Party may determine to be necessary, appropriate or useful for the attachment, perfection, priority of, and the ability of the Secured Party to enforce, the Security Interest in any and all of the Collateral including, without limitation: (a) executing, delivering and, where appropriate, filing and recording financing statements, copyright mortgages and amendments, documents and instruments relating thereto under the Uniform Commercial Code, the laws of the United States and any other applicable law, to the extent, if any, that each Debtor's signature thereon is required therefore; (b) complying with any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Security Interest in such Collateral; and (c) obtaining governmental and other third party waivers, consents and approvals, in form and substance satisfactory to the Secured Party, including, without limitation, any consent of any other person obligated on any of the Collateral.

Section 5.    <u>Representations and Warranties of Debtors</u>. (a) each Debtor is a limited liability company duly organized and now existing in good standing formed under the laws of the state of organization referenced herein and has the corporate power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business; (b) no Debtor has any corporate, partnership, limited liability company or other name, and no trade names, fictitious names, assumed names or "doing business as" names in the United States or in any other jurisdiction in the past five years other than its name referenced herein; (c) each Debtor has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and all documents, instruments and agreements to be executed and/or delivered by each Debtor hereunder, and has taken all necessary corporate action to authorize the execution, delivery and performance thereof; (d) the execution, delivery and performance of this Agreement and all other documents, instruments and agreements to be executed or delivered pursuant hereto and thereto, and the consummation of the transactions herein contemplated, and compliance with the terms and provisions hereof and thereof, will not violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency of the United States, the State of California, the State of Wyoming or the State of New York; (e) as of the date hereof, there are no actions, suits or proceedings, pending or, to the best of its knowledge, threatened, against, affecting or relating to any Debtor before any court or governmental or administrative body or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition, financial or otherwise, of any Debtor; (f) in connection with the execution, delivery, performance, validity and enforceability of this Agreement, and any other instrument, agreement or document to be executed and delivered hereunder, no consent of any person, and no consent, license approval, authorization, registration, or declaration with any governmental authority, bureau or agency of the United States, the State of California, the State of Wyoming or the State of New York is required, except for the filing of UCC financing statements, copyright mortgage and other instruments necessary to perfect the security interests granted hereunder.

Section 6.    <u>Representations and Warranties Concerning Collateral, etc</u>.  The Debtors further represent and warrant to the Secured Party as follows: (a) Except as otherwise disclosed to Secured Party, the Collateral is and will be free from any right or claim of any Person or any adverse lien, security interest or other encumbrance of any kind or nature whatsoever; (b) all other information set forth herein pertaining to each Debtor is accurate and complete in all material respects; (c) there has been no change in any such information provided herein since the date on

which it was executed by each Debtor; (d) each Debtor has the full power, authority and legal right, and all requisite governmental licenses, permits and franchises, to own the Collateral and grant a security interest in the Collateral; and (e) this Agreement is effective to grant to Secured Party a valid security interest in the Collateral securing payment and performance of the Secured Obligations, enforceable against each Debtor in all of each Debtor's right, title and interest in and to the Collateral, subject to no security interest, copyright mortgage, mortgage, lien, pledge, charge, encumbrance, limitation, restriction, right, claim, license, lease, sale, purchase or assignment in, to, of or upon any of the Collateral, other than liens permitted by the Financing Documents.

Section 7.     Covenants Concerning Collateral, etc. Each Debtor further covenants with the Secured Party as follows: (a) except for the security interest herein granted, the Collateral is and at all times shall be free from any right, title, interest, claim, lien, security interest or other encumbrance and each Debtor shall (at such Debtor's expense) defend the Collateral against all claims and demands of all Persons in any way adverse to the Secured Party; (b) no Debtor shall pledge, mortgage or create, or suffer to exist any right of any Person in or claim by any Person to the Collateral, or any security interest, lien or encumbrance in the Collateral (except for, in the case of the Collateral other than the Picture, existing liens and purchase money liens created after the date hereof) in favor of any Person, other than the Secured Party; (c) each Debtor shall operate and continuously operate its business in compliance with all applicable federal, national, provincial, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, if applicable; (d) no Debtor shall sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except to the extent specifically permitted by the Financing Documents, if at all; (e) each Debtor shall pay all taxes, assessments or other charges that may be levied or assessed against the Collateral; (f) each Debtor shall promptly give written notice to Secured Party (and, upon request, furnish a copy to Secured Party) of any litigation filed against the Collateral. Each Debtor shall, at its own expense, appear and defend any and all actions and proceedings affecting any of the Collateral, or otherwise affecting the Security Interest and shall obtain and furnish to Secured Party from time to time, upon demand, such releases and subordinations of claims and liens, which may be required to maintain the priority of Secured Party's rights and liens hereunder; (g) No Debtor shall make a change to its (i) jurisdiction of organization, (ii) corporate name or (iii) place of business (or, if it has more than one place of business, its chief executive office) and the offices where such Debtor keeps its records, unless Secured Party has received written notice of such change at least thirty (30) days prior to the effective date of such change, and, prior to the effective date of such change, such Debtor shall execute and deliver to Secured Party such documents for filing with the United States Copyright Office, and shall authenticate such financing statements for filing in such jurisdictions as Secured Party may reasonably deem necessary to preserve the perfection of the Security Interest, and (h) no Debtor shall agree to amend the Acquisition Agreement or consent to any departure by any other party therefrom if (i) such amendment or consent would change the amount or timing of any payments to be made to any Debtor (including any calculation of the amounts to be paid to or retained by any Debtor, or (ii) would otherwise be adverse to the Secured Party or materially adverse to any Debtor..

Section 8.     Power of Attorney. After the occurrence and during the continuance of an Event of Default, in order for the Secured Party to better exercise its rights hereunder, each Debtor hereby irrevocably and unconditionally names, constitutes, authorizes, and appoints the Secured Party, its agents, employees, successors and assigns, to be such Debtor's true and lawful agent and

4

attorney-in-fact and with full powers of substitution, transfer and delegation, to ask, demand, sue for, collect, receive, compound, and give acquittance for the monies due or to become due in connection with any of the Collateral and to execute, acknowledge and deliver such further agreements, documents and instruments, and to use such measures, legal or equitable, as in the discretion of the Secured Party or any such Person, may be proper or necessary for the enforcement of any rights in or to the Collateral.  This is an irrevocable power of attorney coupled with an interest and shall survive the subsequent incapacity of such Debtor for any reason.

       Section 9.    <u>Further Assurances</u>.    Each Debtor shall from time to time at the reasonable request of Secured Party execute, acknowledge, have witnessed or otherwise formalize, and deliver, or cause to be executed, acknowledged, witnessed or otherwise formalized, and delivered, to Secured Party any and all documents and/or instruments consistent herewith, and otherwise take such actions, that Secured Party deems reasonably necessary or appropriate to further perfect, protect, evidence, effectuate, renew, terminate and/or continue the Security Interest consistent herewith. If such Debtor fails to execute, acknowledge, have witnessed or otherwise formalize, and deliver any such documents or instruments within ten (10) business days after Secured Party's written request therefor, Secured Party may execute, acknowledge, have witnessed or otherwise formalize, and deliver such documents and instruments consistent herewith as such Debtor's appointed attorney-in-fact, which appointment for such purposes is hereby made irrevocably and coupled with an interest with full rights of substitution and delegation to execute, acknowledge, have witnessed or otherwise formalize, and deliver, any such documents consistent herewith in the name of such Debtor. Secured Party shall promptly furnish to such Debtor copies of any documents or instruments executed pursuant to the foregoing power of attorney.

       Section 10.    <u>Rights and Remedies</u>.    Upon the occurrence of an Event of Default, the Secured Party shall have, without any other notice to or demand upon the Debtors, in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State and any additional rights and remedies which may be provided to a secured party in any jurisdiction in which Collateral is located including, without limitation, the right to: (i) take possession of the Collateral and demand and receive such possession from any Person who has possession thereof, and take such measures as it may deem reasonably necessary or proper for the care or protection thereof, including the right to remove, keep and/or store all or any portion of the Collateral or put a custodian in charge thereof; (ii) with or without taking possession, sell, lease, license, or otherwise dispose of, at any time, and from time to time, as Secured Party may determine, any or all of the Collateral, in its present condition or following any commercially reasonable preparation or processing, in its entirety or in parcels, either at public or private disposition, at such price and on such terms as Secured Party may deem best.  Secured Party may be the purchaser, lessee, licensee or acquirer of any or all of the Collateral at any such disposition and shall be entitled, for the purpose of bidding and making settlement or payment of the price for all or any portion of the Collateral disposed of at any such disposition, to use and apply any of the Secured Obligations as a credit on account of the price of any Collateral payable by Secured Party at such disposition; (iii) institute any proceeding at law, in equity, or otherwise for the foreclosure of the Collateral or any part thereof.  To the extent permitted by law, any disposition thereof shall be held in the same manner, with the same effect and subject to the same terms and conditions as specified in Section 10(ii) hereof; (iv) in its name or in the name of any Debtor or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for or make any compromise or settlement deemed desirable with respect to any of the Collateral;

and (v) petition any court for the appointment of a receiver for any part of or all of the Collateral, for the purpose of preserving, protecting and retaining the Collateral and the value of the Collateral, and for the purpose of facilitating Secured Party's exercise of any other of Secured Party's rights and remedies under this Agreement, the New York Uniform Commercial Code and/or any other applicable law.

Section 11.    Right of Redemption. No Debtor shall have any right of redemption subsequent to such disposition described in Section 10(ii) hereof or Secured Party's entering into a contract for any such disposition, and Debtors hereby expressly waive any such right.

Section 12.    Release of Collateral.  Upon the full performance of all of the obligations owed to Secured Party under the Financing Documents, Secured Party shall, promptly upon any Debtor's request therefor, release and reassign to such Debtor (or its designee) all of its rights in and to the Collateral and this Agreement shall thereupon terminate.

Section 13.    Expenses and Fees. The Debtors shall pay on demand all reasonable actual out- of-pocket  outside attorneys' expenses, incurred by the Secured Party in connection with this Agreement, the other Financing Documents and the Picture, at all times consistent with the Term Sheet. The Debtor shall pay on demand all reasonable actual out-of-pocket costs and expenses related to necessary amendments to the Financing Documents and this Agreement, costs and expenses of preserving and protecting the Collateral, costs and expenses (including reasonable outside attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Secured Obligations, enforce the Secured Party's liens, sell or otherwise realize upon the Collateral and otherwise enforce the provisions of the Financing Documents or to defend any claims made or threatened against Secured Party arising out of the transactions contemplated hereby, and in connection with the enforcement of the rights of the Secured Party hereunder or in connection with the realization upon any Collateral.

Section 14.    Governing Law; Dispute Resolution.   This Agreement and the other Financing Documents and all other documents provided for therein and the rights and obligations of the parties thereto shall be governed by and construed and enforced in accordance with, the laws of the State of New York without reference to its conflict or choice of law principles.

Section 15.    Jurisdiction. Any legal action or proceeding with respect to this Agreement, the other Financing Documents or any other agreement, document or other instrument executed in connection herewith or therewith, or any action or proceeding to execute or otherwise enforce any judgment obtained against any Debtor or any of its properties, may be brought in the state or federal courts of the State of New York, as the Secured Party may elect, provided always that suit also may be brought in the courts of any country or place where such Debtor or any of its assets may be found, and, by execution and delivery of this Agreement, each Debtor irrevocably submits to each such jurisdiction. Each Debtor irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding, arising out of or relating to this Agreement, the other Financing Documents or any other agreement, document or other instrument executed in connection herewith brought in the state or federal courts of the State of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, New York shall be the sole venue for any dispute any Debtor initiates against the Secured Party.

Section 16.   <u>Waiver of Jury Trial. Etc.</u> TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE DEBTORS AND THE SECURED PARTY HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY. THE DEBTORS FURTHER WAIVE ANY RIGHTS OF SETOFF, AND THE RIGHT TO IMPOSE COUNTERCLAIMS (OTHER THAN THOSE RIGHTS OF SETOFF AND COUNTERCLAIMS ARISING SOLELY AND DIRECTLY FROM THE PICTURE OR THIS AGREEMENT) IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN ANY DEBTOR, ON THE ONE HAND, AND THE SECURED PARTY ON THE OTHER HAND. Each of the parties expressly agrees that service of process in any judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in accordance with the provisions of <u>Section 14</u> and shall be deemed effective as provided therein.

Section 17.   <u>Miscellaneous</u>.

17.1   <u>Notices</u>.   Except as otherwise expressly provided herein, any notice or communications provided for hereunder must be in writing and delivered by hand delivery, receipt confirmed e-mail or receipt confirmed facsimile transmission, or postage prepaid delivery service with delivery confirmation (e.g., certified mail, registered mail, FedEx, etc.) to the following addresses for the receiving party (or to such other address as such party may hereafter specify by like notice) and shall be conclusively deemed to have been received by such party and to be effective on the earliest of the day on which it is hand delivered to such address, or if sent by receipt confirmed facsimile or e-mail transmission, on the day on which it is transmitted, or if sent by registered or certified U.S. mail, on the fifth business day after the date on which it is mailed, postage prepaid, addressed to such party at such address, or if sent by overnight courier, on the first business day after the date on which it is mailed to such address, or regardless of how delivered, on the day actually received by such party:

For Debtors:

Clear Horizon
11846 Ventura Blvd. Suite 130
Studio City, CA 91604
Tel: 818-308-7822
Email: notice@clearhorizonent.com

With a courtesy copy to:
Creativ Law P.C.
Attn: Harry Finkel, Esq.
8730 Wilshire Blvd suite 350
Beverly Hills, CA 90211
Tel: 323-892-0550
Email: harry@creativlaw.com

For Secured Party:

8th Wonder Pictures, LLC

7

Attn: Andrew Townsend
1805 West Avenue
Austin, TX 78701
Email: Andrew@ocelotcapital.com

With a courtesy copy to:
Winston & Strawn LLP
Attn: Warren Loui
333 South Grand Avenue
Los Angeles, CA 90071
Email: wloui@winston.com

17.2   Enforceability and Severability.  If any provision of this Agreement is or becomes unenforceable for any reason, the Debtors and the Secured Party shall promptly meet and negotiate a substitute provision thereof, but all of the remaining provisions of this Agreement shall remain in full force and effect. In the event of a conflict between any provision herein and the Term Sheet the terms of the Term Sheet shall prevail.

17.3   Reliance.  The Secured Obligations shall conclusively be presumed to have been entered into in reliance upon this Agreement.  All dealings between the Debtors and the Secured Party shall be conclusively presumed to have been had or consummated in reliance upon this Agreement.

17.4   Assignment.  Without the prior written consent of the Secured Party, no Debtor shall assign or delegate any rights, duties or obligations hereunder.  The covenants and agreements herein contained by or on behalf of the Debtors shall bind the Debtors, and the Debtors' legal representatives, successors and permitted assigns and shall inure to the benefit of the Secured Party, and its respective successors and assigns.

17.5   Continuing Security Agreement.   This Agreement shall constitute a continuing security agreement.  Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties.

17.6   Counterparts and Amendments.  This Agreement and any amendment or addendum hereto may be signed in any number of counterparts and delivered with original signature, by email transmission/PDF and/or facsimile, each of which shall be deemed an original, but all of which taken together shall constitute one Agreement.  This Agreement shall become effective upon the execution hereof by the Debtors and delivery of the same to the Secured Party, and it shall not be necessary for the Secured Party to execute any acceptance hereof or otherwise signify or express its or their acceptance hereof.  This Agreement may be amended only by an instrument in writing executed jointly by the Debtors and the Secured Party and may be supplemented only by documents delivered or to be delivered in accordance with the express terms hereof.

IN WITNESS WHEREOF, intending to be legally bound, the undersigned have caused this Agreement to be duly executed as of the date first above written.

**CLEAR DISTRIBUTION LLC**

By: _____
Name: _David Brown_____
Its: _Owner/Authorized Signer_____

**CLEAR ENTERTAINMENT LLC**

By: _____
Name: _David Brown_____
Its: _Owner/Authorized Signer_____

**SPECTER ENTERTAINMENT LLC**

By: _____
Name: _David Brown_____
Its: _Owner/Authorized Signer_____

*Signature Page to Security Agreement*

ACCEPTED:

**8ᵗʰ WONDER PICTURES, LLC**

By:  _____

Name: Andrew Townsend

Its:  Managing Member

# EXHIBIT A

All of each Debtor's right, title, and interest in the following (collectively, the "**Collateral**"), wherever located, whether now or hereafter existing or acquired:

1. Accounts;

2. Chattel Paper (including Electronic Chattel Paper);

3. Computer Hardware and Software;

4. Deposit Accounts;

5. Documents;

6. General Intangibles;

7. Goods (including all its Equipment, Fixtures and Inventory), together with all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

8. Instruments;

9. Intellectual Property;

10. Investment Property (including Commodity Accounts, Commodity Contracts, Securities (whether Certificated Securities or Uncertificated Securities), Security Entitlements and Securities Accounts);

11. Money (of every jurisdiction whatsoever);

12. to the extent not included in the foregoing, other personal property of any kind or description;

13. all of each Debtor's right, title and interest in the Acquisition Agreement, whether now owned or hereafter acquired and wheresoever located, including, without limitation, all accessions thereto and Collateral Proceeds thereof, and all of the properties thereof, tangible and intangible, and all domestic and foreign copyrights and all other rights therein and thereto, of every kind and character, whether now in existence or hereafter to be made or produced, and whether or not in possession of such Debtor, including with respect to the Picture, distribution and exploitation rights in the Picture and without limiting the foregoing language, each and all of the following particular rights and properties of the Picture referenced in clauses "(a)" through "(bb)" below to the extent they are now owned or hereafter created or acquired by or otherwise licensed to any Debtor:

    a. Intentionally Omitted;

b.  all rights in and to any literary, musical, dramatic or other material upon which the Screenplay and/or the Picture is/are based or which is used or included in the Picture, and all other preliminary and final scripts, scenarios, screenplays (including the Screenplay), bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature, and all rights pursuant to any and all documents pursuant to which any Debtor secured any right, title or interest in and to any of the foregoing (collectively, the "**Literary Property**");

c.  all Picture Elements;

d.  all collateral, allied, ancillary, subsidiary, publishing and merchandising rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation, or reissue, remake, sequel, serial or production rights by any means and in any medium now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof; all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters, and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture, all remakes or sequels thereof and/or said Literary Property;

e.  all rights of every kind or nature, present and future, in and to all agreements and understandings (whether or not evidenced in writing) relating to the Screenplay, the Picture, and the development, production, completion, delivery, distribution and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast, producers, special effects personnel, personnel, animators, cameramen and other creative, artistic and technical staff and agreements for the use of studio space, equipment, facilities, locations, animation services, special effects services and laboratory contracts, and any and all rights derived therefrom or relating thereto;

f.  all materials and items prepared in connection with the pre-production of the Picture, including the following:  budget, production schedule, location scouting reports, set designs, research, and all other tangible and intangible materials prepared during pre-production of the Picture;

g.  all tangible personal property and physical properties of every kind or nature whatsoever of or relating to the Picture (including, without limitation, (A) all exposed film, developed film, positives, negatives, prints, answer prints, trailers, soundtracks, music and effects tracks, video masters, video and audio

recordings (collectively, the "**Physical Elements**"), and (B) copies of all (1) continuity lists, (2) dialogue lists, (3) spotting lists, (4) synchronization licenses, (5) composers agreements, (6) contracts relating to the acquisition and production of the Picture, (7) cast lists, (8) still photographs and artwork, (9) press books, (10) story synopses, (11) credit requirements lists, (12) posters, (13) advertising, and (14) publicity materials), and all versions thereof (including, without limitation, all foreign language versions) and all of each Debtor's rights of access to and use of the foregoing (collectively and together with the Physical Elements, the "**Physical Properties**");

h. all rights (including without limitation all motion picture, television and other production rights) in and to any and all lyrics, music and musical compositions created for, used in or to be used in connection with the Picture, including, without limitation, all copyrights therein, and further including, without limitation, all rights to record, rerecord, produce, reproduce and/or synchronize all of said lyrics, music and musical compositions in and in connection with motion picture, television and other productions (collectively, the "**Music Rights**");

i. the title of the Picture and all marks and devices connected with or related to the Picture or used or to be used in connection with the exploitation of the Picture, and all rights of each Debtor to the use of all of the foregoing, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition and/or the rules and principles of law pertaining thereto or to any other applicable statutory, common law, or other rule or principle of law;

j. all insurance and insurance policies heretofore or hereafter placed upon the Picture, the Physical Properties or the insurable properties thereof and/or upon any individual, corporation, trust, estate, partnership, joint venture, company, association, league, group, government bureau, agency or subdivision thereof or other entity of whatsoever kind or nature (incorporated or unincorporated) or Persons engaged in the development, production, completion, delivery, distribution or exploitation of the Picture and the Collateral Proceeds thereof;

k. all rights in and to all agreements and commitments relating to the development, production, completion, delivery, distribution and exploitation of the Picture, including, without limitation, all agreements and commitments for personal services, including the services of all members of the casts and crews;

l. all statutory and common-law copyrights, domestic and foreign, and all renewals and extensions of any such copyrights, and all rights and interests in such copyrights, renewals and extensions, obtained or to be obtained on the Picture, the Literary Property and/or the Music Rights, together with any and all copyrights, domestic and foreign, and all renewals and extensions of any such copyrights, and all rights and interests in such copyrights, renewals and extensions, obtained or to be obtained in connection with the Picture or any underlying or component elements of the Picture, including without limitation the Literary Property and the Music Rights, together with the right to copyright

and all rights to renew or extend such copyrights and the right to sue in the name of any Debtor, or in Secured Party's name, for past, present and future infringements of copyright, upon the Picture, and/or the Literary Property and/or the Music Rights and/or any part thereof;

m. all rent, revenues, income, compensation, products, increases, proceeds (including the proceeds of letters of credit) and profits or other property obtained or to be obtained from the production, release, sale, distribution, sub distribution, lease, sublease, marketing, licensing, sublicensing, exhibition, broadcast, transmission, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Literary Property (or any rights therein or part thereof), in any and all media, including, without limitation, the properties thereof and of any collateral, allied, ancillary, merchandising and subsidiary rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights, or derived therefrom in any manner whatsoever;

n. all accounts, accounts receivable, contract rights and general intangibles (as such terms are defined in the UCC) in connection with or relating to the Picture and to the Physical Properties, including all rights to receive the payment of money under present or future contracts or agreements (whether or not earned by performance) from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing and other exploitation of the Picture or the Literary Property or any part thereof or any rights therein in any medium, whether now known or hereafter developed, by any means, method, process or device in any market;

o. any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture and any element thereof;

p. all rights to produce, acquire, release, sell, distribute, sub distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize or otherwise exploit the Picture, the Literary Property and any and all rights therein in perpetuity, without limitation, in any manner and in any media whatsoever throughout the universe, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining subscription, sponsored and direct satellite broadcast), in theaters, non- theatrically, on the internet, on cassettes, cartridges and discs and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

q. all rights of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, sub distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize,

or otherwise exploit the Picture, or any rights in the Picture, including, without limitation, pursuant to agreements between the Debtor and any Affiliate of the Debtor which relate to the ownership, production or financing of the Picture;

r.  all rights under contract or any other commitment or agreement which grant to any Person (including without limitation all rights under contract or any other commitment or agreement which grant to Secured Party) any right to produce, acquire, finance, release, sell, distribute, subdistribute or otherwise exploit the Picture or any rights in or to the Picture, and all accounts and general intangibles arising out of the exploitation of the Picture or otherwise associated with or relating to the Picture, including without limitation all rights to receive any sums payable under any such contract, commitment, agreement, accounts or general intangibles and all right to distribute the Picture throughout the Territory (as defined in the Acquisition Agreement) for the Term (as defined in the Acquisition Agreement);

s.  all tax rebates, credits and/or other incentives issued, to be issued or issuable in connection with the Picture (whether federal, state, city or otherwise) and all rights relating to any such tax rebates, credits and incentives, including the right to receive the Collateral Proceeds thereof;

t.  all of each Debtor's accounts and payment intangibles now owned and hereafter created or acquired, including without limitation all rights now owned and hereafter created or acquired to receive commissions and other payments in connection with or relating to motion pictures, and licenses, leases and distribution agreements relating to motion pictures and/or rights in motion pictures, and all rights related to all of the foregoing under collection account management agreements, payment directions, notices of assignment, intercreditor agreements, interparty agreements and any and all other agreements, documents and instruments of any kind or nature whatsoever;

u.  all general intangibles, accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, and money;

v.  any security interest, copyright mortgage, mortgage, lien, pledge, charge, encumbrance, limitation, restriction, right, claim, license, lease, sale, purchase or assignment of any kind or nature in, to, of or upon any of the foregoing;

w.  all of Debtor's right, title and interest in any and all other agreements relating to the exploitation of the Picture, including the Debtor's rights to receive payments thereunder, and all other rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description including, without limitation, from (1) theatrical exhibitors, non-theatrical exhibitors, television networks and stations and airlines, cable television systems, pay television operators, whether on a subscription, per program charge basis or otherwise, and other exhibitors, (2) distributors, sub distributors, lessees, sublessees, licensees and sublicensees and (3) any other

Person that distributes, exhibits or exploits the Picture or the Literary Property or elements or components of the Picture or the Literary Property or rights relating thereto;

x.   all of each Debtor's right, title and interest in and to any and all sums paid or payable to the Debtors now due or which hereinafter may become due to the Debtors by any state, federal, provincial, or other governmental body or authority directly or indirectly as a tax credit, tax refund, tax rebate, tax subsidy, production credit or similar government benefit, or by any tax shelter, or pursuant to any sale and leaseback transaction, any co-production structure, or any similar transaction, and any and all allied, ancillary and subsidiary rights therein;

y.   all rights of Clear Distribution under the Acquisition Agreement, including rights under any security held by the Debtors to secure the obligations of Son of the South Owner LLC to Clear Distribution under the Acquisition Agreement;

z.   all cash and cash equivalents of the Debtors and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings or negotiable instruments which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or necessary assignment whether now owned or hereafter acquired;

aa.   all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights relating to the Picture, and the right (but not the obligation) to register claim under trademark or patent and to renew and extend such trademarks or patents and the right (but not the obligation) to sue in the name of any Debtor in the name of Secured Party for past, present or future infringement of trademark or patent; and

bb.   all title or titles of the Picture, all of each Debtors' rights to the exclusive use thereof including rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity.

For the avoidance of doubt for each of items 1 through 13 above, together with all of such Debtor's right, title and interest in all books, records, writings, data bases, information and other property relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defects or infringements of rights in, or damage to, any of the foregoing, and all Collateral Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing.

The security interest in items 1 through 12 of the Collateral is expressly subject to any now-existing or future purchase money liens by third party creditors of Debtor.

# EXHIBIT C

**CONFIDENTIAL**

8th Wonder Pictures, LLC
Attn: Andrew Townsend
Email: Andrew@Ocelotcapital.com

Clear Distribution, LLC
Attn: David Brown
Email: david@clearhorizonent.com

June 17, 2020 (the "Effective Date")

Re:     **Distribution Minimum Guarantee Loan Term Sheet: terms and conditions ("Term Sheet") for the loan for the motion picture currently entitled, "Son of the South" (the "Picture").**

| | |
|---|---|
| 1.   Borrower: | Clear Distribution, a California limited liability company. |
| 2.   Lender: | 8th Wonder Pictures, LLC, a Delaware limited liability company, or its assignees (together, Lender and Borrower are referred to as the "Parties") |
| 3.   Nature of Loan: | A customary secured term loan in the amount of $1,650,000, the proceeds of which Borrower will use solely to pay (a) $1,500,000 of the "Advance" (as defined by the Acquisition Agreement) to the rights-holder in connection with that certain acquisition agreement in relation to the Picture between Borrower and Son of the South Owner LLC ("Acquisition Agreement"), and (b) a nonrefundable facility fee payable to Lender upon closing of the transaction of $150,000.

Further, subject to the Acquisition Agreement, and as specifically provided in the concurrently dated security agreement between the Parties ("Security Agreement"), Lender shall have a perfected first position lien against all assets of the Borrower, Clear Entertainment LLC and Spector Entertainment LLC, including the Picture, tangible, intangible, including all rights, proceeds, tax credits, and receivables related to the Picture (the "Collateral"), subject, in the case of the Collateral other than the Picture, to existing liens and current and future purchase money liens,  until such time that this Term Sheet is terminated.

In addition, Clear Entertainment LLC, Spector Entertainment LLC and David Brown, individually, shall guaranty repayment of the Obligations (as defined below).

"Continuing Participation" shall be defined as: (i) 33 1/3% of the Distribution Fee (as defined in the Acquisition Agreement) after deduction of the Deductible Costs (as defined in the Acquisition Agreement) subject to the cap described below, (ii) 33 1/3% of the Grantor's Share (defined in the Acquisition Agreement) after deduction of the Grantor's Share Deductions (defined in the Acquisition Agreement), subject to the cap on Deductible Costs described below, (iii) 33 1/3% of Deductible Costs (defined in the Acquisition Agreement) in excess of the cap described below, provided that if a higher cap is approved in writing by Lender, any amounts up to that higher cap will not be calculated as part of the Continuing Participation, and (iv) 33 1/3% of any amounts received by Borrower under the Acquisition Agreement or at law as damages |

or claims representing amounts described in clauses (i)-(iii) above . The Continuing Participation shall be a simple payment obligation to Lender and shall not be secured.

Borrower agrees that all receipts of the Picture shall be received by, accounted for and administered by a Gettleson, Witzer & O'Connor ("Collection Manager") and such Collection Manager shall provide accounting statements to Lender as required by this Term Sheet. Borrower shall repay the Obligations (as defined below) from first dollar revenues received by Borrower from the Picture which Borrower is entitled to retain pursuant to the Acquisition Agreement. Proceeds received by Borrower from the Picture shall be applied as follows:

(i)      first, to Lender to pay the Additional Obligations (defined below);

(ii)      second, to Lender to pay accrued and outstanding Interest (including any Default Interest);

(iii)      third, to Lender to pay the outstanding Principal of the Loan;

(iv)      fourth, to Borrower to pay the "Deductible Costs" (as defined in the Acquisition Agreement) up to the cap described below;

(v)      fifth, to the Lender, the Continuing Participation; and

(vi)      sixth, to the Borrower, all amounts remaining after the distributions in clauses (i) through (v) above.

The Deductible Costs shall be capped at (i) $250,000 for all costs that fall under paragraph 9(b)(vi) in the Acquisition Agreement, and (ii) $75,000 for all other Deductible Costs.

Upon Borrower repaying to Lender the Obligations ("Repayment"), this Term Sheet will automatically terminate and Lender will release all security, liens and/or other encumbrances in relation to Borrower and the Picture.  The parties shall agree upon the covenants (e.g., the audit right) to survive repayment of principal, interest, fees, costs and expenses of the Loan. Additionally, upon termination of all of Lender's security, liens and encumbrances, Distributor agrees to obtain an acknowledgement from any subsequent lender that any lien on Distributor's rights under the Acquisition Agreement would be subject to Lender's right to the Continuing Participation.

| | |
|---|---|
| 4.    Loan Amount: | US$1,500,000 of the $1,650,000 loan will be deposited to Borrower's designated account upon (i) execution of this Term Sheet; (ii) execution of the Security Agreement; (iii) execution of the promissory note in connection herewith ("Promissory Note"), (iv) execution of the guaranties referred to above, and (v) filing of the UCC financing statements and copyright mortgages to perfect Lender's security interests, and satisfaction of the conditions precedent contained in the Financing Documents (as defined below). Together, (i), (ii), (iii), (iv) and (v) are referred to as the "Financing Documents".   $150,000 of |

2

| | |
|---|---|
| | the $1,650,000 loan shall be retained by Lender as a nonrefundable facility fee. |
| | Lender's failure to fund any portion of the Loan within 2 business days of the full execution of the Financing Documents and satisfaction of the conditions precedent contained in the Financing Documents will be a material breach of this Term Sheet. |
| | The parties agree to enter into a Long-Form Agreement reflecting the terms of this Term Sheet and other provisions substantially similar to the Loan and Security Agreement previously entered into between the parties or, as applicable, the draft Loan and Security Agreement delivered to Borrower prior to the execution of this Term Sheet, within seven (7) days after the funding of the Loan. |
| 5. Legal Fee: | The Parties will each bear their own legal fees through the closing of the Financing Documents (including the Long-Form Agreement referred to above).  Other than legal fees, Borrower shall on demand directly pay or reimburse Lender for its reasonable actual out-of-pocket search and filing costs and expenses incurred in connection with the closing of the Loan. |
| | Borrower shall pay on demand all of Lender's reasonable actual out-of-pocket costs and expenses incurred after the closing of the Loan, including (a) those related to necessary amendments to the Financing Documents, (b) costs and expenses of preserving and protecting the Collateral in the event of Borrower's default hereunder, and (c) reasonably necessary costs and expenses (including reasonable outside attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce Lender's Liens, sell or otherwise realize upon the Collateral and otherwise enforce the provisions of the Financing Documents or to defend any claims made or threatened against Lender arising out of the transactions contemplated hereby, and in connection with the enforcement of the rights of the Lender thereunder or in connection with the realization upon any Collateral (including the costs of any "workout" of the Borrower's obligations and Lender's enforcement of its rights in any bankruptcy proceeding) ("Additional Obligations"). |
| 6. Intentionally Omitted | |
| 7. Maturity/Interest: | "Maturity Date": the date that is 90 days from Lender's tender of the Loan to Borrower. |
| | "Interest":  Prime plus 2%, non-compounded, accruing on the unpaid balance of the Loan (other than the portion of the Loan representing the Facility Fee; with any payments of principal of the Loan being applied first to the portion of the Loan not bearing interest), calculated on the basis of a year of 360 days and actual days elapsed, on an annualized basis for the period from Lender's tender of the Loan to Borrower until the Maturity Date |
| | "Default Interest": Prime plus 4%, calculated on an annualized basis on the unpaid balance of the Loan (including the portion of the Loan representing the Facility Fee), non-compounding, which shall begin to accrue after (i) the Maturity Date, or (ii) an "Event of Default" (as further defined below). |

| | |
|---|---|
| | The Loan, the Interest and Default Interest shall be referred to as the "Obligations." |
| | There shall be no pre-payment penalty. In no event shall the Obligations be repaid in full later than 6 months after the Maturity Date. |
| | If the provisions of this Term Sheet or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount. |
| 8.   Reports: | Until repayment of the Obligations, Borrower shall provide regular status reports containing meaningful and reasonable detail on material sales and distribution activities, including gross revenues and an accounting of Distribution Expenses. |
| 9.   Audit Rights: | Lender shall have the right to audit the books and records of Borrower, on a annual basis, subject to at least thirty (30) days prior written notice to Borrower, at Lender's expense (or at Borrower's expense if such audit is at least 30 days after the Maturity Date and principal of or interest on the Loan is still outstanding), until the Obligations are repaid, and on a 2 year basis thereafter. In the event the audit uncovers a discrepancy unfavorable to Lender in an amount in excess of 7.5% of the amount reported by Borrower, Borrower shall pay the reasonable third party costs of any such audit, limited to the amount of such underpayment. |
| 10.  Credit, One-Sheet; Premiere Tickets; Press: | Lender shall be entitled to the following credits in connection with the Picture: <br><br> A bug logo in the end credits of the Picture, as well as in paid ads <br><br> Two (2) executive producer credits (to persons designated by Lender in Lender's sole discretion), on screen, shared only with themselves, in the main titles of the Pictures, and in paid ads. <br><br> All credits are on a more favored nations basis with other companies and executive producers with regard to size, type and manner. <br><br> Borrower will provide Lender with five (5) high quality "one-sheets" (or an electronic file thereof) for the Picture, which Lender may use to promote, market and advertise its business. <br><br> Borrower will use commercially reasonable good faith efforts to provide Lender with at least four (4) invitations to the Picture's domestic premiere and festival screening, if any. |
| 11.  Assignment: | This Term Sheet is not assignable by Borrower.  The provisions of section 10 above shall not survive assignment of this Term Sheet by Lender (other than an affiliate of the Lender that is wholly or majority-owned by Ocelot Capital). |
| 12.  Events of Default: | If at any time after execution of the Financing Documents, any of the following "Events of Default" have occurred (as determined by Lender in its sole discretion), the Obligations shall immediately |

4

|  | become due and payable: |
|---|---|
|  | i.)     Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due; |
|  | ii.)     Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements and/or obligations of Borrower contained in the Term Sheet or in any agreement relating to the Loan and/or the Picture which would materially adversely affect the value of the Loan; |
|  | iii.)     Borrower's failure to perform or observe, in a due and timely manner, any of the material terms, provisions, covenants, conditions, agreements or obligations contained in the Financing Documents or in any other agreement, contract, indenture, document, or instrument executed, or to be executed, by Borrower in connection with the Financing Documents which would have a materially adverse effect on the ability of Borrower to perform its obligations pursuant to the Financing Documents; or Lender fails to have a perfected first priority Lien in the Picture and the proceeds thereof, or a perfected lien (subject only to existing Liens) on any of the other Collateral. |
|  | iv.)     Suspension by Borrower of its business operations; |
|  | v.) Borrower or any Guarantor becomes subject to a bankruptcy proceeding; or |
|  | vi.) the parties fail to enter into the Long-Form Agreement within 7 days after funding of the Loan (other than as a result of Lender failing to negotiate in good faith). |
| 13.  Conditions Precedent to Closing: | The funding of the Loan is subject to Borrower's compliance with each of the following conditions: |
|  | i.)     Execution and approval of the Financing Documents; |
|  | ii.)     Borrower providing to Lender a copy of the executed Acquisition Agreement; |
|  | iii)     There being, prior to the time of funding, no material adverse change in Borrower's condition, financial or otherwise, or financial business prospects from that represented in any financial statement or other information submitted to Lender or upon which Lender has relied; |
|  | iv.)     Lender shall have received, in form and substance reasonably satisfactory to Lender, copies of all agreements or documents, and all amendments thereto, relating to the formation, existence, power, authority and governance of Borrower. |
| 14.  Representations and Warranties: | The Borrower hereby represents and warrants to Lender that: |
|  | (i) It is duly organized, validly existing and in good standing. It has the power and all necessary rights and title to enter into and perform this Agreement and the transactions contemplated hereby or referred to herein. It has taken all necessary action to authorize the entry into and performance of this Agreement and such transactions. |

5

(ii) This Term Sheet constitutes a legal, valid and binding obligation of the Borrower and is in proper form for enforcement against it.

(iii) The entry into and performance of this Term Sheet and the transactions contemplated hereby do not and will not conflict with: (a) any existing law or regulation or any official or judicial order, or (b) its articles of creation, or (c) any agreement or document to which it is a party or which is binding upon it or any of its assets. Without limiting the generality of the foregoing, the Borrower represents and warrants that there are not now any liens, claims, encumbrances, legal proceedings, restrictions, agreements or understandings which might conflict or interfere with, limit, derogate from, or be inconsistent with or otherwise affect any of the provisions of this Agreement or any of the representations or warranties of the Borrower contained herein, including without limitation, any U.C.C. filings, copyright assignments or other liens, inconsistent herewith or offsets or other costs charged against the Picture by any party pursuant to cross-collateralization agreements or otherwise except for customary guild liens.

(iv) All authorizations, approvals, consents, licenses, exemptions, filings, registrations, notarizations and other matters, official or otherwise, required by the Borrower or advisable in connection with the entry into, performance, validity and enforceability of this Agreement and the transactions contemplated hereby the Borrower have been obtained or effected and are in full force and effect (other than the registration of security interests to be created pursuant hereto).

(v) No litigation, arbitration or administrative proceedings are threatened or, to its knowledge, pending which call into question the validity or performance of its obligations hereunder.

(vi) All information which might be material to a person assuming the obligations and acquiring the rights assumed and acquired by the Lender pursuant to this Agreement has been disclosed in writing to the Lender and there are no facts or circumstances which might make such information misleading or inaccurate.

(vii) The Borrower's warranties, representations and agreements are of the essence of this Agreement and shall survive the early termination hereof. None of the Borrower's warranties, representations or agreements shall in any way be limited by reason of any investigation made by the Lender or on behalf of the Lender regarding said warranties, representations or agreements.

The Lender represents and warrants that it has the power and all necessary rights and title to enter into and perform this Term Sheet and the transactions contemplated hereby or referred to herein. The Lender has taken all necessary action to authorize the entry into and performance of this Term Sheet and such transactions and is properly organized and in good standing in the jurisdiction of its formation.

| | |
|---|---|
| 15.  Indemnification: | The Borrower shall, at all times, defend and indemnify and hold the Lender (which for the purposes of this paragraph shall include the shareholders, partners, members, officers, directors, employees, representatives, attorneys and agents of Lender) harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, settlements, judgments or recoveries resulting from |

| | |
|---|---|
| | any alleged or actual breach of the warranties, agreements or covenants made by the Borrower herein, and from any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with the transactions contemplated by the Financing Documents or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to Lender hereunder, or any rights otherwise granted to Lender, including reasonable outside attorneys' fees and costs and expenses incurred by Lender, all of which shall be charged to and paid by the Borrower and shall be secured by the Collateral hereunder; provided, however, the Borrower shall have no obligation under this Section with respect to any such event resulting from Lender's gross negligence or willful misconduct (as determined by the final, non-appealable order of a court of competent jurisdiction). |
| 16. Confidentiality: | The terms of this Term Sheet are strictly confidential and the Parties agree not to disclose the terms contained herein to any third party without the prior written consent of the other party except that the Parties may disclose such terms to its officers, directors, members, managers, attorneys, other secured financiers, and other lenders or investors, also governmental entities and other parties with a right to access such information, including guilds or parties, or as otherwise required by law or judicial process (including any litigation between the parties), or to the extent such terms are or become public other than due to a breach by the disclosing Party or any of its officers, directors, members, managers, attorneys, other secured financiers, and other lenders or investors. |
| 17. Survival | Provisions 5, 6, 8, 9, 10, and 15 through 20 shall survive termination of this Term Sheet, except to the extent superseded by the Long Form Agreement |
| 18. Notice: | Lender<br><br>8TH Wonder Pictures, LLC<br>1805 West Avenue<br>Austin, TX 78701<br>Attention: Andrew Townsend<br>Email: andrew@ocelotcapital.com<br><br>With a courtesy copy to:<br><br>Winston & Strawn LLP.<br>Attention: Warren Loui, Esq.<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>Email: warren.loui@winston.com<br><br>Borrower<br>Clear Horizon<br>Attn: Legal Affairs<br>11846 Ventura Blvd. Suite 130<br>Studio City, CA 91604<br>Tel: 818-308-7822<br>Email: notice@clearhorizonent.com<br><br>With a copy to:<br><br>Creativ Law P.C.<br>8730 Wilshire Blvd. # 350 |

| | |
|---|---|
| | Beverly Hills, CA 90211<br>Attn: Harry Finkel, Esq.<br>Email:harry@creativlaw.com |
| 19.  Insurance: | Lender shall be named an additional insured of the Errors and Omissions insurance policy for the Picture. |
| 20.  Miscellaneous: | Governing Law. The Financing Documents and all other documents provided for therein and the rights and obligations of the parties thereto shall be governed by and construed and enforced in accordance with, the laws of the State of New York without reference to its conflict or choice of law principles.<br><br>Jurisdiction. Any legal action or proceeding with respect to the Financing Documents or any other agreement, document or other instrument executed in connection herewith or therewith, or any action or proceeding to execute or otherwise enforce any judgment obtained against the Borrower or any of its properties, may be brought in the state or federal courts of the State of New York, as the Lender may elect, provided always that suit also may be brought in the courts of any country or place where the Borrower or any of its assets may be found, and, by execution and delivery of this Agreement, the Borrower irrevocably submits to each such jurisdiction. The Borrower irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding, arising out of or relating to the Financing Documents or any other agreement, document or other instrument executed in connection herewith brought in the state or federal courts of the State of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, New York shall be the sole venue for any dispute the Borrower initiates against the Lender.<br><br>Waiver of Jury Trial. Etc. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER AND THE LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY. THE BORROWER FURTHER WAIVES ANY RIGHTS OF SETOFF, AND THE RIGHT TO IMPOSE COUNTERCLAIMS (OTHER THAN THOSE RIGHTS OF SETOFF AND COUNTERCLAIMS ARISING SOLELY AND DIRECTLY FROM THE PICTURE OR THE FINANCING DOCUMENTS IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THE FINANCING LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN THE BORROWER, ON THE ONE HAND, AND THE LENDER ON THE OTHER HAND. Each of the parties expressly agrees that service of process in any |

8

|  | judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in accordance with the notice provisions of this Term Sheet and shall be deemed effective as provided therein.<br><br>This Term Sheet shall be deemed to have been drafted jointly by the parties, notwithstanding that one party or the other may have performed the actual drafting hereof.  No waiver by either party hereto of any failure by the other party to keep or perform any covenant or condition of the Term Sheet shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other covenant or condition.  The provisions of this Term Sheet are severable.  If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision.  This Term Sheet may be executed by facsimile or PDF signatures and in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Unless and until modified, amended or superseded by the Financing Documents in writing, this Term Sheet sets forth the legally binding Term Sheet of the parties with respect to the subject matter hereof. |
|  |  |

9

Sincerely,

8th Wonder Pictures, LLC

By: _____
Name: Andrew Townsend
Its: Managing Member

*Signature Page to Term Sheet*

AGREED AND ACCEPTED:
Clear Distribution, LLC

By: David Brown
Its: Authorized Signatory

*Signature Page to Term Sheet*

# EXHIBIT D

EXECUTION COPY

LOAN, GUARANTY AND SECURITY AGREEMENT

dated as of

June 29, 2020

between

CLEAR DISTRIBUTION LLC,
as the Borrower,

Certain other Guarantors party hereto,

and

8TH WONDER PICTURES, LLC,
as the Lender

TABLE OF CONTENTS

Page

ARTICLE 1 - DEFINITIONS .................................................................................. 1
    1.1    Defined Terms ........................................................................... 1
    1.2    Approval and Consent................................................................ 8
    1.3    Accounting Terms..................................................................... 8
    1.4    Other Rules of Interpretation and Construction......................... 8
ARTICLE 2 - LOAN .............................................................................................. 9
    2.1    Acknowledgement of Loan ....................................................... 9
ARTICLE 3 - INTEREST, FEES, AND OTHER CHARGES ................................... 9
    3.1    Interest Rate ............................................................................. 9
ARTICLE 4 - PAYMENTS AND REPAYMENTS ................................................. 10
    4.1    Repayment of Loans ............................................................... 10
    4.2    Mandatory Prepayments ......................................................... 10
    4.3    Voluntary Prepayments........................................................... 11
    4.4    Payments and Computations.................................................... 11
    4.5    Indemnity for Returned Payments ........................................... 11
    4.6    Books and Records; Periodic Statements ................................. 11
    4.7    Increased Costs ...................................................................... 11
ARTICLE 5 - CONDITIONS................................................................................ 12
    5.1    Conditions Precedent .............................................................. 12
ARTICLE 6 - PICTURE COVENANTS ................................................................ 14
    6.1    Picture Production .................................................................. 14
    6.2    Picture Credits; Print Advertising; Posters Premier and Festival Screenings....... 14
    6.3    Residuals; Contingent Compensation; Fees.............................. 14
ARTICLE 7 - COLLATERAL ............................................................................... 14
    7.1    Grant of Security Interest........................................................ 14
    7.2    Perfection and Protection of the Lender's Security Interest ...... 14
    7.3    Assignment of Rights.............................................................. 15
    7.4    Acquisition Agreement ........................................................... 15
    7.5    Jurisdiction of Organization; Chief Office; Production Activities; and Physical Properties......................................................... 15
    7.6    Title to and Liens on Collateral .............................................. 16
    7.7    Access and Examination ......................................................... 16

| | | |
|---|---|---|
| 7.8 | Attorney-in-Fact | 17 |
| 7.9 | The Lender's Rights | 18 |
| 7.10 | Copyrights | 18 |
| ARTICLE 8 - BOOKS, RECORDS, FINANCIAL REPORTING AND NOTICES | | 19 |
| 8.1 | Books and Records | 19 |
| 8.2 | Financial Information | 19 |
| 8.3 | Notice of Certain Events | 19 |
| ARTICLE 9 - GENERAL REPRESENTATIONS AND WARRANTIES | | 20 |
| 9.1 | Authorization | 20 |
| 9.2 | Validity and Priority of Liens | 20 |
| 9.3 | Organization and Qualification | 20 |
| 9.4 | Financial Statements | 21 |
| 9.5 | Solvency | 21 |
| 9.6 | Rights in the Picture and Collateral | 21 |
| 9.7 | Required Payments | 21 |
| 9.8 | Litigation | 21 |
| 9.9 | No Defaults | 21 |
| 9.10 | ERISA | 21 |
| 9.11 | Taxes | 22 |
| 9.12 | Margin Stock; Investment Company; and Public Utility Holding Company | 22 |
| 9.13 | Disclosure | 22 |
| 9.14 | Material Agreements | 22 |
| 9.15 | Affiliate Transaction | 22 |
| 9.16 | Patriot Act | 22 |
| 9.17 | The Foreign Assets Control Regulations and Anti-Money Laundering | 22 |
| 9.18 | Survival of Warranties | 23 |
| ARTICLE 10 - AFFIRMATIVE AND NEGATIVE COVENANTS | | 23 |
| 10.1 | Taxes and Other Liabilities | 23 |
| 10.2 | Legal Rights and Facilities | 23 |
| 10.3 | Compliance | 24 |
| 10.4 | Maintenance | 24 |
| 10.5 | Insurance | 24 |
| 10.6 | Related Agreements | 24 |
| 10.7 | Approvals | 24 |

| 10.8 | [Reserved] | 24 |
| 10.9 | Dissolution and Sale of Assets | 24 |
| 10.10 | Use of Proceeds | 24 |
| 10.11 | Consolidation or Merger | 25 |
| 10.12 | Liens | 25 |
| 10.13 | Hedge Agreements | 25 |
| 10.14 | Further Assurances | 25 |
| 10.15 | [Intentionally Omitted] | 25 |
| 10.16 | Corporate Separateness | 25 |
| ARTICLE 11 - EVENTS OF DEFAULT; REMEDIES | | 25 |
| 11.1 | Events of Default | 25 |
| 11.2 | Remedies | 27 |
| 11.3 | Cumulative Remedies; No Prior Recourse to Collateral | 29 |
| 11.4 | Failure or Indulgence Not Waiver | 29 |
| 11.5 | Performance of Obligations by Lender | 29 |
| ARTICLE 12 - TERM AND TERMINATION | | 30 |
| 12.1 | Termination | 30 |
| ARTICLE 13 - THE GUARANTEES | | 30 |
| 13.1 | The Guarantees | 30 |
| ARTICLE 14 - MISCELLANEOUS | | 31 |
| 14.1 | Severability | 31 |
| 14.2 | Governing Law | 31 |
| 14.3 | Jurisdiction | 31 |
| 14.4 | Waiver of Jury Trial | 31 |
| 14.5 | Expenses and Fees | 31 |
| 14.6 | Taxes | 32 |
| 14.7 | Notices | 32 |
| 14.8 | Assignments: Participations | 33 |
| 14.9 | Indemnification | 33 |
| 14.10 | USA Patriot Act et al | 34 |
| 14.11 | Final Agreement | 34 |
| 14.12 | Counterparts | 34 |
| 14.13 | No Beneficiaries | 34 |
| 14.14 | Amendments | 34 |

iii

14.15   Relationship of Parties ........................................................................ 34

14.16   WAIVER WITH RESPECT TO DAMAGES ..................................................... 35

EXECUTION COPY

## LOAN, GUARANTY AND SECURITY AGREEMENT

This Loan, Guaranty and Security Agreement is made and entered into as of June 29, 2020 by and among CLEAR DISTRIBUTION LLC, a California limited liability company (the "Borrower"), CLEAR ENTERTAINMENT, LLC, a California limited liability company, SPECTER ENTERTAINMENT, LLC, a Wyoming limited liability company, DAVID BROWN, an individual, and 8TH WONDER PICTURES, LLC, a Texas limited liability company (the "Lender").

### RECITALS

This Agreement is entered into in reference to the following facts:

The Borrower requested that the Lender provide the Borrower with a non-revolving credit facility in the aggregate original principal amount of up to $1,650,000 (One Million Six Hundred Fifty Thousand USD) for (i) for the purpose of financing a portion of the Acquisition Advance pursuant to the Acquisition Agreement, dated as of the date hereof, by and among the Borrower, Son of the South Owner LLC, a New York limited liability company (the "Son of the South Owner"), and certain other parties party thereto (the "Acquisition Agreement")) pursuant to which the Borrower is acquiring the right to distribute the Picture throughout the Territory for the Term (each as defined in the Acquisition Agreement); and (ii) financing the Facility Fee (as defined below).

The Lender provided the Loan (as defined below) pursuant to the Term Sheet dated June 17, 2020 between the Borrower and the Lender.

The parties hereto desire to enter into this Agreement to further evidence the terms and conditions on which the Loan was made and the Loan and the Continuing Participation (as defined below) are to be paid.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Borrower, each Guarantor and the Lender each hereby agree as follows.

### ARTICLE 1 - DEFINITIONS

1.1     Defined Terms. Capitalized terms used herein shall have the following meanings:

"Acceptable Distribution Agreement" means a Distribution Agreement approved by the Lender as an "Acceptable Distribution Agreement" and that at all times meets all of the following criteria:

(a)     The Lender has received an original or copy thereof and an original Assignment therefor, that have been duly executed and delivered by each party thereto;

(b)     The terms thereof are acceptable to the Lender in its reasonable discretion);

(c)     The Distribution Agreement complies with all of the Borrower's representations, warranties, and covenants under the Loan Documents with respect to Distribution Agreements; and

(d)     The distributor thereof is not subject to any Bankruptcy Proceedings.

"Accounting Statement" has the meaning assigned thereto in Section 8.2.

"Acquisition Advance" means the "Advance" as defined in the Acquisition Agreement.

"Acquisition Agreement" has the meaning assigned thereto in the recitals hereto.

"Advance" has the meaning assigned thereto in Section 2.1

"Affiliate" means, as to any Person, any other Person who directly or indirectly, controls, is controlled by, or is under common control with such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise. In addition, a Person, ten percent (10%) of more of whose equity securities are owned by another Person, shall be deemed to an "Affiliate" of such Person.

"Agreement" means this Loan, Guaranty and Security Agreement.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 *et seq.*).

"Bankruptcy Proceeding" means, for any Person, (a) that such Person shall generally not pay its debts as they become due or shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or such Person shall commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property or shall file an answer or other pleading in any such case, proceeding or other action admitting the material allegations of any petition, complaint or similar pleading filed against it or consenting to the relief sought therein; or such Person shall take any action to authorize, or in contemplation of, any of the foregoing, or (b) any involuntary case, proceeding or other action against such Person shall be commenced seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action (i) results in the entry of any order for relief against it, or (ii) shall remain undismissed for a period of thirty (30) days.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banks in Los Angeles, California or Austin, Texas, are required or permitted to be closed.

"Chain of Title Documents" means all documents evidencing the chain of title for the Picture.

"Change in Control" shall mean (i) David Brown shall cease either (a) to own, directly or indirectly, all of the equity interests in the Borrower or (b) to have managerial control of the Borrower.

"Change in Law" shall mean the occurrence after the date of this Agreement of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any governmental authority or (iii) compliance by the Lender with any request, guideline, requirement or directive (whether or not having the force of law) of any governmental authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign

2

regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, issued or implemented.

"Closing Date" means June 17, 2020.

"Collateral" has the meaning assigned thereto in the Security Agreement.

"Collateral Proceeds" has the meaning assigned thereto in the Security Agreement.

"Collateral Account" means the bank account administered by Collection Manager.

"Collection Manager" means Gettleson, Witzer & O'Connor.

"Commitment Amount" means $1,650,000.

"Continuing Participation" means: (i) 33 1/3% of the Distribution Fee (as defined in the Acquisition Agreement) after deduction of the Deductible Costs up to the Deductible Costs Cap, (ii) 33 1/3% of the Grantor's Share (defined in the Acquisition Agreement) after deduction of the Grantor's Share Deductions (defined in the Acquisition Agreement), subject to the Deductible Costs Cap, (iii) 33 1/3% of Deductible Costs (defined in the Acquisition Agreement) in excess of the Deductible Costs Cap, and (iv) 33 1/3% of any amounts received by Borrower under the Acquisition Agreement or at law as damages or claims representing amounts described in clauses (i)-(iii) above.

"Copyright Mortgage and Assignment" means the Copyright Mortgage and Assignment, dated as of the Closing Date from the Borrower in favor of Lender.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Deductible Costs" has the meaning assigned thereto in the Acquisition Agreement.

"Deductible Costs Cap" means Deductible Costs up to the aggregate amount of (a) $250,000 for all costs that are described in paragraph 9(b)(v) of the Acquisition Agreement, and (b) $75,000 for all other Deductible Costs, or such higher amount as may be approved by the Lender in its sole discretion.

"Default" means any event, act or condition that with the giving of notice or the passage of time would constitute an Event of Default.

"Default Rate" means a rate of interest that equal to the Interest Rate plus two percent (2%) per annum.

"Distribution Agreement" means an agreement, meeting the Acceptable Terms, between the Borrower on behalf of the Borrower, on the one hand, and a Distributor, on the other hand, now or hereafter entered into, pursuant to which such Distributor has been granted, sold, conveyed, licensed, sub-licensed, leased, sub-leased, or otherwise transferred all or any part of those rights in the Picture, and any permitted amendments, modifications and supplements thereto.

"Distributor" means a Person (other than the Borrower) that entered into a Distribution Agreement.

"Dollars" or "$" means the lawful currency of the United States of America.

3

"Effective Date" means the date on which the conditions set forth in Article Five have been satisfied or waived by the Lender.

"Electronic System" means any electronic system, including e-mail, e-fax and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender or any other Person, providing for access to data protected by passcodes or other security system.

"Equipment" means (a) all "equipment", as such term is defined in the UCC, and (b) all machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description used or useful in connection with the Picture (including, without limitation, all wardrobe, props, mikes, scenery, sound stages, movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery) and all goods of like kind or type hereafter acquired by the Borrower in substitution or replacement thereof, and all additions and accessions thereto, wherever any of the foregoing is located.

"Event of Default" has the meaning specified in Article 11.

"Facility Fee" means the nonrefundable $150,000 fee paid by Borrower to Lender on the Closing Date.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable statue and authority within the US accounting profession) which are applicable to the circumstances as of the date of determination.

"Guarantors" means Clear Entertainment, LLC, a Wyoming limited liability company, Specter Entertainment, LLC, a Wyoming limited liability company, and David Brown, in his individual capacity.

"Guaranty" means the Guaranty dated the Closing Date entered into by the Guarantors in favor of the Lender

"Guild" means the Screen Actors Guild-American Federation of Television and Radio Artists, Directors Guild of America, Inc., Writers Guild of America, West, Inc., Writers Guild of America, East, Inc., and any other trade organization or union having jurisdiction over the employment and/or engagement of individuals providing services in connection with the Picture.

"Hedge Agreement" shall mean (a) any agreement, arrangement, device or instrument with respect to any swap, forward, future or derivative transaction, foreign or financial exchange transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, interest rate cap or collar protection agreements or interest rate options, puts and warrants and so-called "rate swap" and "hedging" agreements or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; and (b) any and all cancellations, buy-backs, reversals, terminations or assignments of any of the foregoing.

"Interest Rate" means the Prime Rate plus 2.00% per annum.

4

"<u>Laboratory</u>" means a laboratory, sound, post-production, or other similar facility that has been approved by the Lender and the Borrower and been engaged to perform transfers, telecine, or other services for the Picture or holds at any time the original Picture Elements (or any of them).

"<u>Laboratory Control Agreement</u>" means a Laboratory Control Agreement between the Borrower, and the applicable Laboratory, in a form reasonably approved by the Lender.

"<u>Lender</u>" has the meaning given in the introductory paragraph of this Agreement.

"<u>Lender Advance</u>" has the meaning given in <u>Section 2.2</u>.

"<u>Lien</u>" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute, or contract, and including without limitation, a security interest, charge, claim, or lien arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes, or other security device or arrangement of any kind or nature whatsoever (including, without limitation, any financing or similar statement or notice filed under the UCC, as in effect from time to time in the relevant jurisdiction, or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"<u>Literary Property</u>" means all rights of every kind and nature (including, without limitation, copyrights) in and to the Screenplay (including any and all drafts, versions and variations thereof) and any other literary, musical, dramatic or other literary material of any kind or nature upon which, in whole or in part, the Picture is or may be based, or from which the Picture has been or may be adapted or inspired, or which may be or has been used or included in the Picture, including, without limitation, all scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, characters, manuscripts, story boards or other properties or materials of any kind or nature (including, without limitation, electronic data wherever maintained, stored or otherwise located) in whatever state of completion and all drafts, versions and variations thereof.

"<u>Loan(s)</u>" has the meaning assigned thereto in <u>Section 2.1</u>.

"<u>Loan Documents</u>" means this Agreement, the Note, the Term Sheet, the Copyright Mortgage and Assignment, the Guaranty, the Security Agreement, the Chain of Title Documents, the Powers of Attorney, and all other agreements, instruments, and documents heretofore, now or hereafter evidencing, securing, guaranteeing, or otherwise relating to the Obligations, the Collateral or any collateral granted to Lender under the Security Agreement, the Lender's Lien, or any other aspect of the transactions contemplated by this Agreement and reasonably required by Lender.

"<u>Loan Parties</u>" means the Borrower and Guarantors.

"<u>Material Adverse Effect</u>" means a change or effect that (a) could have a material and adverse effect upon (i) the operations, business, properties, assets, liabilities (actual or contingent) or financial or other condition of any Loan Party, or (ii) the prospects of any Loan Party, (b) materially impairs the legal right, power or authority of any Loan Party or any of its respective Affiliates to perform their respective obligations under the Loan Documents to which they are a party, (c) materially impairs the ability of any Loan Party or any of its Affiliates to perform their respective obligations under any Loan Document to which they are a party, (d) materially impairs the legality, validity, binding effect or enforceability of, or materially impairs the rights, remedies and benefits available to Lender under the Loan Documents, (e) has a material adverse effect on the amount of revenue to be received by the Loan Party or any of respective

5

Affiliates taken as a whole (or the anticipated time of receipt of such revenue) to be used to satisfy the Obligations in an amount that could adversely affect the ability of the Loan Party to repay all or any portion of the Obligations in full when due, or (f) results in the Lender not having a first priority perfected Lien in all of the Collateral; provided, however, that any event or condition will be deemed to have a "Material Adverse Effect" if such event or condition when taken together with all other events and conditions occurring or in existence at such time (including all other events and conditions which, but for the fact that a representation, warranty or covenant is subject to a "Material Adverse Effect" exception, would cause such representation or warranty contained herein to be untrue or such covenant to be breached) could be expected to result in a "Material Adverse Effect" hereunder even though, individually, such event or condition would not do so.

"Maturity Date" means the date that is ninety (90) days after the Closing Date, or such earlier date upon which repayment of the Obligations are accelerated in accordance with the terms of this Agreement.

"Note" means the Note in the form attached hereto as Exhibit B.

"Obligations" means, collectively, (i) all present and future loans, advances, liabilities, obligations, covenants, duties, and indebtedness owing by the Borrower or any Loan Party to the Lender, whether or not arising under this Agreement or any of the other Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including, without limitation, all principal, interest (including interest accruing prior to and after the initiation of any Bankruptcy Proceeding, whether or not allowed), charges, expenses, fees, reasonable outside attorneys' fees, filing fees and any other sums chargeable to the Borrower or any Loan Party hereunder or under any other Loan Document, (ii) the Continuing Participation, and (iii) with regard to any other lender transactions whatsoever arising out of this Agreement between the Lender, on the one hand, and the Borrower, on the other hand, and the performance of all representations, warranties, agreements, covenants and other obligations of the Borrower or any Loan Party hereunder, under the Note, and under any other Loan Document entered into by any of the foregoing.

"Other Taxes" has the meaning assigned thereto in Section 14.6(b).

"Permitted Liens" means (a) the Liens of the Lender under this Agreement and the other Loan Documents, and (b) any Lien against Collateral other than the Picture Collateral that (i) was existing on the Closing Date, or (ii) secures an obligation incurred for the purpose of financing or refinancing the acquisition, production or exploitation (including the production or distribution of additional pictures) of property acquired by a Loan Party in the ordinary course of business.

"Person" means any natural person, corporation (including a business trust), partnership, limited liability company, joint venture, association, trust or unincorporated organization or any other business, legal or judicial entity, or a nation, state, government entity or any agency or political subdivision thereof.

"Physical Properties" means all physical properties of every kind or nature of or relating to the Picture in whatever state of completion and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Literary Property, and all Picture Elements.

"Picture" shall mean the motion picture currently entitled "Son of the South", by whatever title such motion picture is known at any time, including the sound recordings thereof, as well as trailers and

clips thereof, produced by means of any photographic, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, films, drawings, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on film, tape or any other material of any description (whether translucent or not) for later projection, exhibition or transmission by any means or media now known or hereafter devised, in such manner that the same are or appear to be in motion or in sequence on a screen, mirror, tube or other medium or device, whether or not accompanied by sound recording.

"Picture Collateral" means the items of Collateral specified in paragraph 13 of Exhibit A to the Security Agreement.

"Picture Collateral Proceeds" means (i) all "proceeds," as such term is defined in the UCC, and (ii) all amounts acquired, paid to, derived by or payable directly and indirectly to any Loan Party or any third Persons on account of the same, lease, licensing, exchange, distribution, exploitation or other disposition of the Picture Collateral, including, without limitation, money, royalties, fees, commissions, charges, payments, proceeds of any letter of credit, advances, income, profit and other forms of payment, proceeds of any insurance for any of the Picture Collateral and any sums payable to any Loan Party or any other third Persons or any of their respective Affiliates under or in relation to the Distribution Agreements, as applicable. Notwithstanding the foregoing, third party foreign withholding taxes from the payment of any Picture Collateral Proceeds shall not be included in the definition of Picture Collateral Proceeds (except to the extent received by any Loan Party as a credit, refund or rebate on its taxes)

"Picture Elements" means all physical, digital and electronic elements of the Picture, including all negatives, duplicate negatives, digital internegatives or interpositives, fine grain prints, soundtracks, positive prints (cutouts and trims excepted), and sound, all video formats (including PAL/NTSC), and other physical and/or digital properties in connection with the Picture, including, without limitation, all disc drives, digital storage devices of any description or nature, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims, non-analog recordings and tapes, including without limitation, any video digital recordings and HDTV format recordings, and any and all other physical and digital properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof.

"Powers of Attorney" means powers of attorney from any Loan Party to Lender to exercise various of such Loan Party's respective rights in connection with the Picture.

"Prime Rate" a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Lender) or any similar release by the Federal Reserve Board (as determined by the Lender), (b) the sum of 0.50% per annum and the Federal Funds Rate, and (c) 2.00% per annum. Any change in the Prime Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate, or the Federal Funds Rate.

"Secured Loan Parties" means the Loan Parties, other than David Brown.

"Son of the South Owner" has the meaning given thereto in the recitals hereto.

"Taxes" has the meaning assigned thereto in Section 14.6(a).

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) the date the credit facility provided hereunder is terminated by the Lender pursuant to Section 11.2, and (c) the date this Agreement is otherwise terminated for any reason whatsoever.

"UCC" means the Uniform Commercial Code - Secured Transactions (or any successor statute) of the State of New York or of any other state the laws of which are required thereof to be applied in connection with the issue of perfection of Liens.

1.2    Approval and Consent. The words "acceptance", "approval", "approved" and "consent" as used herein with reference to an acceptance, approval or consent right granted to Lender, or any action requiring the consent of Lender, means that Lender shall have the right in its sole and absolute discretion to accept, approve or consent, or to withhold acceptance, approval or consent, of the subject matter with respect to which the acceptance, approval or consent is required.

1.3    Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with GAAP and, except where otherwise specified, all financial data submitted in connection with this Agreement shall be prepared in accordance with GAAP.

1.4    Other Rules of Interpretation and Construction. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including," shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." The word "or" is not exclusive. Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any organizational or governing document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal property and tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    [Reserved].

8

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)    <u>Section Headings</u>. Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)    <u>Times of Day</u>. Unless otherwise specified, all references herein to times of day shall be references to Pacific time (daylight or standard, as applicable).

## ARTICLE 2 - LOAN

2.1    <u>Acknowledgement of Loan</u>.  Each Loan Party acknowledges that the Lender made the Loan in the amount of the Commitment Amount on the Closing Date and that the Loan is unconditionally owing by the Borrower to the Lender without setoff, defense, recoupment or counterclaim.

2.2    <u>Additional Advances</u>.

(a)    (i)    Notwithstanding anything to the contrary herein, the Lender is hereby authorized by the Borrower, from time to time in the Lender's sole and absolute discretion to make Advances to the Borrower that the Lender in its reasonable business judgment deems necessary or desirable (A) to preserve or protect the Collateral, or any portion thereof, (B) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (C) to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement or any other Loan Document, including, without limitation, costs, fees and expenses as described in Section 14.5 and upon the failure of the Borrower to pay any portion of the Advance under the Acquisition Agreement, to fund the remaining portion of the Acquisition Advance (the Advances described in this <u>Section 2.2(a)(i)</u> being hereinafter referred to individually as a "<u>Lender Advance</u>" and collectively as the "<u>Lender Advances</u>").

(ii)    The Lender Advances shall be repayable on demand and secured by the Collateral, shall constitute Loans and Obligations hereunder, may be in excess of the Commitment Amount, and shall bear interest at the Default Rate then applicable to the Loans. The Lender shall notify the Borrower in writing of each Lender Advance, which notice shall include a description of the purpose of the Lender Advance; provided that the Lender's failure to notify the Borrower of any Lender Advance shall not affect the validity, enforceability or collectability of any Lender Advance.

(b)    The Lender shall record in its register the principal amount of the Advances owing to the Lender from time to time. In addition, the Lender is authorized, at the Lender's option, to note the date and amount of each payment or prepayment of principal of the Advances in its books and records, including computer records, such books and records constituting rebuttable presumptive evidence, absent manifest error, of the accuracy of the information contained therein.

## ARTICLE 3 - INTEREST, FEES, AND OTHER CHARGES

3.1    <u>Interest Rate</u>.

(a)    Except as otherwise provided herein, all outstanding Obligations shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on interest thereon not paid when due) from the date made until paid in full in cash at a per annum rate equal to the Interest Rate;

provided, however, that upon the occurrence of a Default or Event of Default, and in any event commencing on the Maturity Date, all outstanding Obligations shall bear interest at the Default Rate.   Notwithstanding the foregoing, prior to the Maturity Date, interest on the portion of the Loan represented by the Facility Fee shall not bear interest; provided, however, that any payments of principal of the Loan shall be applied first to the portion of the Loan represented by the Facility Fee.

(b)      Except as otherwise provided herein, all interest shall be payable in arrears on the Maturity Date. All computations of interest (at the Interest Rate) hereunder shall be made on the basis of a year of three hundred sixty (360) days for the actual number of days (including the first day but, excluding the last day) elapsed.

## ARTICLE 4 - PAYMENTS AND REPAYMENTS

4.1      Repayment of Loans. The Borrower shall repay the outstanding principal balance of the Loans and all other Obligations in full, plus all accrued but unpaid interest thereon, on the Maturity Date or upon earlier acceleration hereunder and if not paid on the Maturity Date, shall be payable on demand; provided that, for the avoidance of doubt, in no event shall the Obligations be paid in full later than six (6) months following the Closing Date.

4.2      Mandatory Prepayments.

(a)      The Borrower shall prepay the Obligations (other than the Continuing Participation) by the following amounts, as and when received by or are payable to the Loan Parties, unless otherwise indicated herein: (a) all Collateral Proceeds (other than Picture Collateral Proceeds) arising from sales or other dispositions of assets outside of the ordinary course of business or constituting in the aggregate more than 10% of the combined assets of the Loan Parties as of the Effective Date; (b) all insurance proceeds to the extent such proceeds are derived from losses constituting in the aggregate more than 10% of the combined assets of the Loan Parties as of the Effective Date; (b) all Collateral Proceeds (other than Picture Collateral Proceeds) arising from licenses of assets in one transaction or series of transactions exceeding  25% of the value of the combined assets of the Loan Parties as of the Effective Date, and (c) as otherwise provided hereunder.

(b)      The Borrower agrees that all Proceeds of the Picture shall be received by, accounted for and administered by the Collection Manager and the such Collection Manager shall provide accounting statements to the Lender as required by the Loan Documents.

(c)      Each Loan Party agrees that immediately (and in any event within two Business Days) after receipt of Picture Collateral Proceeds, such proceeds shall be applied as follows:

(i)      first, to Lender to pay all costs, expenses and other Obligations (other than those described in clauses, (iii), (iv) and (vi) below);

(ii)      second, to Borrower for repayment of any overpayments of Obligations from prior periods (as set forth in the reports provided pursuant to Section 8.2);

(iii)      third, to Lender to pay accrued and outstanding Interest (including any default interest);

(iv)      fourth, to Lender to pay the outstanding Principal of the Loan;

(v)      <u>fifth</u>, to Borrower to pay the "Deductible Costs" up to the Deductible Costs Cap;

(vi)      <u>sixth</u>, to the Lender, the Continuing Participation; and

(vii)     <u>seventh</u>, to the Borrower, all amounts remaining after the distributions in clauses (i) through (vi) above.

4.3      <u>Voluntary Prepayments</u>. Upon at least one (1) Business Day's prior notice to Lender, the Borrower may at its option prepay the Obligations in full or in part in a minimum amount of $25,000 and integral multiples thereof, without premium or penalty. Once such notice of prepayment has been given, the principal amount of the Loan(s) specified in such notice shall become due and payable on the date specified in the notice.

4.4      <u>Payments and Computations</u>.

(a)      All payments to be made by the Borrower shall be made without reduction, reserve, discount, withholding, credit, set-off, recoupment or counterclaim, and irrespective of any claim that the Borrower may have against the Lender. Except as otherwise expressly provided herein, all payments made by the Borrower shall be made to the Lender at the Lender's address set forth in <u>Section 14.7</u>, shall be made in Dollars and in immediately available funds, no later than 1:00 p.m. (Los Angeles, California time) on the day specified herein. Any payment received later than 1:00 p.m. (Los Angeles, California time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue.

(b)      Whenever any payment is due on a day other than a Business Day, such payment shall be made on the following Business Day, without being subject to the assessment of a late charge, and such extension of time shall be included in the computation of interest or fees thereon, as the case may be.

4.5      <u>Indemnity for Returned Payments</u>. If, after receipt of any payment of, or proceeds applied to the payment of, all or any part of the Obligations, the Lender is for any reason compelled to surrender such payment or proceeds to any Person, because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continue and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender, and the Borrower shall be liable to pay to the Lender, and hereby does indemnify the Lender and hold the Lender harmless for, the amount of such payment or proceeds surrendered. The provisions of this <u>Section 4.5</u> shall be and remain effective notwithstanding any contrary action that may have been taken by the Lender in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Lender's rights under this Agreement and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable. The provisions of this <u>Section 4.5</u> shall survive the termination of this Agreement.

4.6      <u>Books and Records; Periodic Statements</u>. The Lender's books and records showing the Obligations and the transactions pursuant to this Agreement and the other Loan Documents shall be admissible in any action or proceeding arising therefrom, and shall, absent manifest error, constitute rebuttable presumptive proof thereof, irrespective of whether any Obligation is also evidenced by a promissory note or other instrument. The Lender shall provide to the Borrower a periodic statement of the Loans, payments, and other transactions pursuant to this Agreement.

4.7      <u>Increased Costs</u>.

(a) If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender;

(ii) subject the Lender to any Taxes (other than taxes imposed on the Lender's income or measured by the overall net income or gross receipts of the Lender, and franchise taxes imposed on it, by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on the Lender any other condition, cost or expense (other than Taxes) affecting this Agreement, any other Loan Document or the Loan;

and the result of any of the foregoing shall be to increase the cost to the Lender of making or maintaining the Loan, or to reduce the amount of any sum received or receivable by the Lender, (whether of principal, interest or any other amount) then, upon request of the Lender, the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b) <u>Capital Requirements</u>. If the Lender determines that any Change in Law affecting the Lender or the Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, if any, as a consequence of this Agreement, the Commitment Amount of such Lender or the Advances made by, the Lender, to a level below that which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

## ARTICLE 5 - CONDITIONS

The effectiveness of this Agreement shall be subject to satisfaction of all of the conditions of this <u>Article 5</u>.

5.1 <u>Conditions Precedent</u>. the following conditions precedent having been satisfied in a manner satisfactory to the Lender and its counsel:

(a) [intentionally omitted]

(b) The Lender has received, in an acceptable form and substance (as determined solely by the Lender), which are hereby acknowledged as received and accepted, fully executed Loan Documents;

(c) The Lender has received, in an acceptable form and substance (as determined solely by the Lender), which are hereby acknowledged as received and accepted, the fully executed Acquisition Agreement;

(d) All appropriate documents, which are hereby acknowledged as received and accepted, evidencing the Son of the South Owner's rights in and to the Picture and that the Borrower has

the present right to distribute the Picture throughout the Territory during the Term as provided in the Acquisition Agreement have been duly submitted to and accepted for recordation in all appropriate governmental offices, including the United States Registrar of Copyrights, accompanied by the required filing fees;

(e)    The Loan Parties shall have performed and complied with all covenants, agreements, and conditions contained herein and the other Loan Documents to which they are party that are required to be performed or complied with by them before or on the Effective Date;

(f)    No Default or Event of Default shall exist on the Effective Date, or would exist after giving effect to the Loans to be made on such date;

(g)    There shall exist no action, suit, investigation, litigation or proceeding affecting the Borrower, pending or threatened before any court, governmental agency, or arbitrator that might reasonably be expected to have a Material Adverse Effect;

(h)    All proceedings taken in connection with the execution of this Agreement and all other Loan Documents and all documents and papers relating thereto shall be satisfactory in form, scope, and substance to the Lender and its counsel;

(i)    The following statements shall be true, and the acceptance by the Borrower of any extension of credit shall be deemed to be a statement to the effect set forth in clauses (i) and (ii), with the same effect as the delivery to the Lender of a certificate signed by the president and chief financial officer of the Borrower, dated the Effective Date, stating that:

(i)    The representations and warranties contained in this Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of such extension of credit as though made on and as of such date (provided that any representation or warranty qualified by materiality shall be true and correct in all respects), except to the extent any representation or warranty is made as of a specific date, in which case such representation or warranty shall be true and correct as of such date; and

(ii)    No event has occurred and is continuing, or would result from such extension of credit, which constitutes a Default or an Event of Default;

(j)    The Lender shall have received such other approvals, opinions or documents as it may reasonably request;

(k)    No order, judgment or decree of any governmental authority and no law, rule or regulation applicable to the Lender shall purport by its terms to enjoin, restrain or otherwise prohibit the making of the Loan.

Unless waived in writing by the Lender, the acceptance by the Borrower of the Loan shall be deemed to be a representation and warranty made by the Borrower to the effect that all of the conditions to the making of such Loans set forth above in this Section 5.1 have been satisfied, with the same effect as delivery to the Lender of a certificate signed by the president and chief financial officer or manager or managing member of the Borrower, dated the Closing Date, to such effect. The waiver of any condition precedent by the Lender for the making of any Loan shall not operate as a waiver to the making of any subsequent Loan and shall not create a course of conduct or course of dealing between the Borrower and the Lender.

## ARTICLE 6 - PICTURE COVENANTS

The Borrower hereby warrants, represents, covenants and agrees as follows.

6.1     Picture Production. The Picture conforms to all of the Technical Specifications and is otherwise acceptable to the Borrower Delivery (as defined in the Acquisition Agreement) has occurred.

6.2     Picture Credits; Print Advertising; Posters Premier and Festival Screenings. The Borrower shall accord the Lender presentation credit (including any animated logo credit, as supplied by the Lender) on a most favored nations status with any other production company in all respects except as to position, and two (2) "Executive Producer" credits to the Lender's designee, on a single card, in the main title sequence of the Picture (i.e., where the director and writer credits appear, whether located at the beginning or end of the Picture) in all positive prints thereof and in all paid advertisements with respect to the marketing thereof, which credit shall be in such name as the Lender shall advise the Borrower prior to "Picture Lock", as such term is understood in the entertainment industry. Upon theatrical release of the Picture, Borrower shall promptly furnish Lender with five (5) one-sheet posters created in connection with the release of the Picture and with four (4) Blu-Ray copies of the Picture and as and when it becomes commercially available. The Borrower will use commercially reasonable and good faith efforts to provide the Lender with at least four (4) tickets to the domestic premiere of the Picture (if any) and all festival screenings of the Picture for which either the public or any of the producers, Director, and/or key cast are invited to attend.

6.3     Residuals; Contingent Compensation; Fees

Except for the expenses and fees required by any Guild, the Borrower shall not enter into any agreement to pay any Person from the Collateral Proceeds any residuals, profit participations, deferred compensation, contingent compensation, whether computed on the basis of the Collateral Proceeds, net receipts from exploitation of the Picture, or otherwise (whether in a fixed amount or computed on a percentage basis), unless all such payments are subordinated and subject to the rights of the Lender under the Loan Documents, and the Borrower shall not pay any such payments from the Collateral Proceeds until the principal of and interest on the Loan been satisfied in full, in each case unless approved by the Lender. The Lender shall not have any obligation to pay any such payments to any Person unless approved in advance by Lender in writing.

## ARTICLE 7 - COLLATERAL

7.1     Grant of Security Interest. Each Secured Loan Party acknowledges and confirms its grant of a security interest in the Collateral as security for all of the Obligations pursuant to the Security Agreement, and agrees that the "Secured Obligations", as defined in the Security Agreement, shall include the Obligations, and further agrees that the Security Agreement shall be amended to replace the definition of "Secured Obligations" therein with the definition of Obligations in this Agreement and to replace the definition of "Event of Default" therein with the definition of Event of Default in this Agreement...

7.2     Perfection and Protection of the Lender's Security Interest. Each Secured Loan Party shall at its expense perform all steps reasonably requested by the Lender within a reasonable time to perfect, maintain, protect, and enforce the Lender's Lien in the Collateral and the priority thereof (i.e., a first priority (except as set forth in the definition for "Permitted Liens") Lien), including, without limitation:

(a)     executing, filing, recording, and refiling such financing statements, continuation statements, copyright mortgages, and copyright assignments, and (b) taking such other steps as Lender may deem necessary or appropriate and wherever required or permitted by law in order to perfect or preserve

14

the Lender's first priority Lien in the Collateral. The Loan Parties, as applicable, shall do such further acts and things and execute and deliver to the Lender such additional conveyances, assignments, agreements, and instruments as the Lender may require or deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm to the Lender its rights, powers, and remedies hereunder. Each Loan Party appoints the Lender as such Loan Party's attorney-in-fact (with full powers of substitution and delegation), to: (a) file or record financing statements and amendments thereto (including filing such statements and amendments by electronic means with or without a signature as authorized or required by applicable law or filing procedures), copyright mortgages, copyright assignments, and any other documents in all appropriate governmental offices, including the United States Registrar of Copyrights, accompanied by the required filing fees, relative to all or any part of the Collateral; and

(b)     take all other steps necessary or desirable in the Lender's judgment to perfect, protect, enforce, preserve, or continue the first priority Lien granted herein without the signature of any Secured Loan Party where permitted by law; and (c) do such further acts and things and execute such additional conveyances, assignments, agreements, and instruments as the Lender may reasonably require or deem advisable to carry into effect the purposes of this Agreement and the other Loan Documents or to better assure and confirm to the Lender its rights, powers, and remedies hereunder and thereunder. The Lender shall provide each Secured Loan Party with a copy of each document executed by the Lender pursuant to the power of attorney set forth in this Section 7.2, provided that the Lender's failure to provide any such document to any Secured Loan Party shall not be deemed a breach hereunder or affect the validity or effectiveness of such document.

7.3     Assignment of Rights. The Lender shall have under this Agreement and the other Loan Documents a collateral assignment and assignment of proceeds of and Lien on only the benefits of and rights under the Distribution Agreements and the other Collateral, and shall not assume the obligations and duties thereunder. All such obligations and duties of the Loan Parties under the Distribution Agreements and the other Collateral shall be and remain enforceable only against the Loan Parties and shall not be enforceable against the Lender. Notwithstanding any provision hereof to the contrary, each Loan Party shall at all times remain liable to observe and perform all of its duties and obligations, if any, under the Distribution Agreements and the other Collateral, and the Lender's exercise of any of its rights with respect to the Collateral shall not release any Loan Party from any of such duties and obligations. The Lender shall not be obligated to perform or fulfill any Loan Party's duties or obligations, if any, under the Distribution Agreements or to make any payment thereunder, or to make any inquiry as to the nature or sufficiency of any payment or property received by it thereunder or the sufficiency of performance by any party thereunder, or to present or file any claim, or to take any action to collect or enforce any performance, any payment of any amounts, or any delivery of any property

7.4     Acquisition Agreement. The Loan Parties shall not amend the Acquisition Agreement in any manner that would be adverse to the Lender without the prior written consent of the Lender.

7.5     Jurisdiction of Organization; Chief Office; Production Activities; and Physical Properties. Each Secured Loan Party represents and warrants to the Lender that such Secured Loan Party's chief executive office, its books and records, and the Physical Properties (to the extent owned by or in the possession of the Loan Parties) are located at the address specified in Section 14.7, and its jurisdiction of organization is the jurisdiction indicated in its charter document delivered to the Lender prior to the Closing Date. Each Loan Party covenants and agrees that if (a) the jurisdiction of its organization, or the title or titles of the Picture, or the name, or any trade name of any Loan Party is to be changed or modified in any manner, (b) any Loan Party proposes to acquire or use a new trade name, (c) the chief executive office of any Loan Party is to be relocated to a place other than its present address as stated in Section 14.7, or (d) there is proposed to be a change in location or name of any laboratory, special effects studio, sound studio, other processing or storage entity or any sound studio, other processing or storage entity or any bailee that

15

holds, or that is expected to process, any Picture Elements, then the relevant Loan Party or Loan Parties shall so notify the Lender in writing at least 30 days prior to making any such change or modification and, prior to making any such change or modification, shall execute and deliver to the Lender such further documents and do such other acts and things as the Lender may request in order to carry out the purposes of this Agreement, including, without limitation, the execution and delivery of financing statements, amendments, copyright assignments and mortgages, and Laboratory Control Agreements, necessary or desirable to continue and/or perfect the Lender's Lien in the Collateral.

7.6     Title to and Liens on Collateral.

(a)     Each Loan Party represents and warrants to the Lender and agrees with the Lender that (i) all of the Collateral is and will continue to be owned by a Secured Loan Party, or the Secured Loan Party's rights in the Collateral are held by it, as the case may be, free and clear of all Liens, except for Permitted Liens, (ii) the Lender's Lien in the Collateral will not be subject to any prior Lien (except as set forth in the definition for "Permitted Liens"), and (iii) each Loan Party covenants that it will not sell, offer to sell, hypothecate or otherwise dispose of any Picture Collateral, or any part thereof or interest therein, at any time, except for Permitted Liens or with the prior written consent of the Lender, which consent may be withheld in the Lender's sole and absolute discretion.

(b)     Each Loan Party will appear in, contest and defend against any action or proceeding purporting to affect title to or any other interest in any portion of the Collateral, or the rights or powers of the Lender, its successors or assigns, or the right or interest of the Lender, legal or beneficial, in any portion of the Collateral; and will pay all reasonable costs and expenses, including costs of evidence of title and reasonable outside attorneys' fees, in any such action or proceeding in which the Lender may appear.

7.7     Access and Examination.

(a)     The Lender shall have the right to audit the books and records of Borrower, on an annual basis, subject to at least thirty (30) days prior written notice to Borrower, at the Lender's expense (or at the Borrower's expense if such audit is at least 30 days after the Maturity Date and principal of or interest on the Loan is still outstanding), until the Obligations are repaid, and on a 2-year basis thereafter. If the audit uncovers a discrepancy unfavorable to Lender in an amount in excess of 7.5% of the amount reported by Borrower, Borrower shall pay the reasonable third party costs of any such audit, limited to the amount of such underpayment.

(b)     Subject to paragraph (a) above, the Lender may, examine, make extracts from or copies of and inspect any and all of the Loan Party's books and records that pertain to the Picture and discuss any of the Loan Party's affairs with such Loan Party's officers and management and, upon prior notice to such Loan Party, its independent accountants.

(c)     If at any time when no Default or Event of Default has occurred and is continuing, the Lender wishes to confirm with account debtors and other payors the amounts and terms of any receivables constituting Picture Collateral, the Lender will notify the relevant Loan Party thirty (30) days prior to requesting such confirmation. The Lender agrees to have such confirmation made through the such Loan Parties' auditors. If for any reason such auditors fail to proceed with the confirmations in a timely manner, the Lender may proceed to make such confirmations directly with account debtors and other payors after prior written notice to the relevant Loan Parties.

(d)     The Loan Parties hereby agree that, upon the occurrence and during the continuance of a Default or Event of Default, the Lender shall be entitled to confirm directly with account

16

debtors and other payors, the amounts and terms of all accounts receivable and that Loan Parties shall pay the reasonable third party costs of any such audit.

      7.8    <u>Attorney-in-Fact</u>. Each Loan Party hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, in its place and stead and with full power of substitution, either in the Lender's own name or in the name of the relevant Loan Party, following the occurrence of Default or Event of Default after Lender has provided notice of such Default or Event of Default to any Loan Party and (other than in the case of an Event of Default pursuant to <u>Sections 11.1(a)</u>, <u>(b)</u>, <u>(g)</u>) allowed a reasonable period for such Loan Party to cure, in no event less than ten (10) Business Days to do the following at any time the Lender deems the taking of any such action or execution of any such document to be necessary and desirable for the distribution and exploitation of the Picture and the timely repayment of the principal of and interest on the Loan (this power being coupled with an interest and being irrevocable until the indefeasible payment in full of the principal of and interest on the Loan):

          (a)    Endorse any notes, checks, drafts, money orders, or other evidences of payment payable to a Loan Party relating to the Collateral that may come into the possession of the Lender and obtain, take possession of, substitute the Lender or any designee of the Lender for any Loan Party as the owner of, or signatory on, and otherwise apply in any manner, all deposit accounts, cash or cash equivalents, instruments and general intangibles of, relating to or derived from the Collateral, and all proceeds thereof including, without limitation, interest, chattel paper, notes, certificates, writings, distributions, dividends, profits, rights, benefits, premiums and other payments and rights to payment, held by any Person for or in the name of a Loan Party;

          (b)    Enforce all of the Loan Parties' rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of the Lender, and to enter into such other agreements as may be necessary or desirable to distribute and exploit the Picture;

          (c)    Enter into and perform such agreements as may be necessary or desirable in order to carry out the terms, covenants, and conditions of this Agreement which are required to be observed or performed by any Loan Party;

          (d)    Execute such other and further mortgages, pledges, and collateral assignment and assignment of proceeds with respect to the Collateral as the Lender may reasonably require solely for the purpose of protecting, maintaining, or enforcing the Lien granted to the Lender pursuant to this Agreement and the other Loan Documents;

          (e)    Lease, license, sell or otherwise dispose of (and entering into agreements to lease, license and/or dispose of) the Loan Parties' rights or interests in and to the Picture that have not been disposed of by such Loan Parties (or to engage others to do so), with the costs and expenses thereof to be recoupable by the Lender;

          (f)    Renegotiate agreements as the Lender has a Lien on pursuant to the terms of this Agreement and the other Loan Documents as the Lender in its sole and exclusive discretion deems proper;

          (g)    Require, demand, collect, receive, settle, adjust, compromise and to give acquittances and receipts for the payment of any and all money payable pursuant to agreements included in the Collateral and such licenses and agreements as the Lender may enter into as aforesaid;

          (h)    File any claims and/or proofs of claim, to commence, maintain or discontinue any actions, suits or other proceedings deemed by the Lender advisable for the purpose of collecting or enforcing payment of any such money;

(i)     Execute any and all such instruments, agreements or documents, and do all things as may be necessary or desirable to carry out the purposes of this Agreement and the other Loan Documents;

(j)     Apply any receipts so derived from the Lender's exercise of this power-of-attorney to the Obligations as herein provided;

(k)     Settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto and to sell, assign, pledge, transfer and make any agreement respecting, or otherwise deal with, the same; and

(l)     Do any and all other acts necessary and proper to carry out the intent of this Loan Agreement and the other Loan Documents;

provided, however, that nothing herein contained shall be construed as requiring or obligating the Lender to make any demand, or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or notice or take any action with respect to any of the Collateral or the money due or to become due thereunder or the property covered thereby, and no action taken or omitted to be taken by the Lender with respect to any of the Collateral shall give rise to any defense, counterclaim or setoff in favor of any Loan Party or to any claim or action against the Lender. Except for willful misconduct, intentional tort or gross (but not mere) negligence (as determined by a final and non-appealable judgment of a court of competent jurisdiction), each Loan Party ratifies and confirms all acts taken by the Lender as such attorney-in-fact or its substitutes by virtue of this power of attorney. This power, being coupled with an interest, is irrevocable until the Obligations have been fully satisfied and the Lender's commitment to make Loans hereunder has terminated. The Lender shall provide each Loan Party with a copy of each document executed by Lender on such Loan Party's behalf pursuant to this Section 7.8.

7.9     The Lender's Rights. Duties and Liabilities. Except for liabilities resulting from actions initiated by the Lender under its rights pursuant to Section 7.8, each Loan Party assumes all responsibility and liability arising from or relating to the use, sale or other disposition of the Collateral. Except for liabilities resulting from actions initiated by Lender under its rights pursuant to Section 7.8, neither the Lender nor any of its respective officers, directors, attorneys, employees or agents shall be liable or responsible in any way for the safekeeping of any of the Collateral, or for any loss or damage thereto, or for any diminution in the value thereof, or for any act of default of any carrier, forwarding agency or other person whomsoever. The Obligations shall not be affected by any failure of the Lender to take any steps to perfect the Lender's Liens or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral, except as a consequence of the willful misconduct, intentional acts or gross (but not mere) negligence (as determined by a final and non-appealable judgment of a court of competent jurisdiction) by the Lender and/or its attorneys or Affiliates, release any Loan Party from any of the Obligations. The Lender may (but shall not be required to), without notice to or consent from any Loan Party, sue upon or otherwise collect, extend the time for payment of, modify or amend the terms of, compromise or settle for cash, credit, or otherwise upon any terms, grant other indulgences, extensions, renewals, compositions, or releases, and take or omit to take any other action with respect to the Collateral, any security therefor, any agreement relating thereto, any insurance applicable thereto, or any Person liable directly or indirectly in connection with any of the foregoing, without discharging or otherwise affecting the liability of any Loan Party for the Obligations or under this Agreement or any Loan Document or any other agreement now or hereafter existing between the Lender, on the one hand, and any Loan Party, on the other hand.

7.10     Copyrights. As soon as it is reasonably practical, each Loan Party shall promptly take all actions necessary to register its copyright interests in the Picture in the name of a Loan Party for the United

18

States territory in conformity with the laws of the United States, and contemporaneously therewith shall execute and record a Copyright Mortgage and Assignment and power of attorney in favor of the Lender, granting to the Lender a Lien, which shall be perfected and of first priority (subject only to Permitted Liens) on such Loan Party's rights therein for the purpose of securing the Obligations, and immediately deliver to Lender written evidence of any and all such copyright registrations and mortgages.

## ARTICLE 8 - BOOKS, RECORDS, FINANCIAL REPORTING AND NOTICES

8.1     Books and Records.

(a)     The Loan Parties shall maintain, at all times, correct and complete books and records with respect to the Collateral that are as complete and comprehensive as those customarily maintained by others engaged in the production and distribution of first class motion pictures, including all books, records, contracts, and all other information and data of every kind relating to the Picture, the Collateral, and the production, distribution, or exploitation thereof.

8.2     Financial Information. The Borrower shall provide to the Lender regular status reports (no less frequently than monthly) containing meaningful and reasonable detail on material sales and distribution activities, including gross revenues and an accounting of distribution Expenses, and shall promptly furnish to the Lender, at the Lender's request, all financial and other information relating to the production, distribution, and exploitation of the Picture or the Collateral as the Lender may reasonably request.  The Borrower shall provide to the Lender, no later than sixty (60) days after (a) the end of the calendar quarter in which the Borrower first releases the Picture, (b) the end of each calendar quarter thereafter for the first two (2) years, (c) the end of each semi-annual period ending June 30 or December 31 for the next two (2) years, and (d) the end of each calendar year for the remainder of the Term and sell-off period thereafter, a written accounting statement (each, an "**Accounting Statement**") setting forth the amounts that were to be paid to the Lender in accordance with this Agreement during such periods, if any; provided, however, that no Accounting Statement shall be required for any period in which there are no amounts that are to be paid to the Lender, and further provided that if the Borrower receives more than US$25,000 for any quarter or semi-annual period, as the case may be, the Borrower shall provide the Lender with an Accounting Statement  and remittance with respect to such reporting period.  If any Accounting Statement evidences that the Lender has not been paid amounts that were required to be paid by the Borrower hereunder, then the Borrower shall immediately (and in no event later than two Business Days after delivery of such Accounting Statement) pay to the Lender the amount of all underpayments of Obligations from prior periods, together with interest on such amount at the Default Rate for the period from the date such amount was to be paid to the date of payment.

8.3     Notice of Certain Events. The Borrower shall promptly notify Lender in writing of the following matters: (a) any Material Adverse Effect, Event of Default or Default; (b) any material default under the Acquisition Agreement or any other agreement material to the business, prospects, assets, liabilities, financial or other condition or results of operations of the Loan Parties to which the is a party or by which the Loan Parties or any of their respective properties may be bound; (c) immediately after becoming aware thereof, any pending or threatened action, suit, proceeding, or counterclaim by any Person, or any pending or threatened investigation by a governmental authority, which action, suit, proceeding, counterclaim or investigation seeks damages in excess of $10,000 (which amount shall not be fully covered by insurance), or that relates to the Acquisition Agreement or that could reasonably be expected to have a

19

Material Adverse Effect; and (d) immediately after becoming aware thereof, any pending or threatened strike, work stoppage, unfair labor practice claim, or other labor dispute affecting the Loan Parties in a manner that could reasonably be expected to have a Material Adverse Effect.

<u>ARTICLE 9 - GENERAL REPRESENTATIONS AND WARRANTIES</u>

The Loan Parties (each as to such Loan Party only) warrant and represent to the Lender and (except with respect to any representation or warranty that is stated to be made as of a specific date which shall be deemed repeated as of such date), each Loan Party shall be deemed to have repeated each such representation and warranty on each date that any Obligation remains outstanding, as follows.

9.1    <u>Authorization, Validity, and Enforceability</u>.

(a)    Each Loan Party has the power and authority to execute, deliver and perform this Agreement and the other Loan Documents to which it is a party, to incur the Obligations, as applicable, and to grant to the Lender Liens upon and in the Collateral. Each Loan Party has taken all necessary action (including, without limitation, obtaining approval of its members and managers if necessary) to authorize its execution, delivery, and performance of this Agreement and the other Loan Documents to which it is a party. No consent, approval, or authorization of, or declaration or filing with, any governmental authority, and no consent of any other Person, is required in connection with each Loan Party's execution, delivery and performance of this Agreement and the other Loan Documents, except for those already duly obtained. The Lender has received copies of all agreements or documents requested by it, and all amendments thereto, relating to the formation, existence, power, authority and governance of the Loan Parties.

(b)    This Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by each Loan Party, and constitute the legal, valid and binding obligation of each Loan Party, enforceable against it in accordance with its terms without defense, setoff or counterclaim, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity.

(c)    Each Loan Party's execution, delivery, and performance of this Agreement, and the other Loan Documents to which it is a party do not and will not conflict with, or constitute a violation or breach of, or constitute a default under, or result in the creation or imposition of any Lien (other than Permitted Liens) upon the property of each Loan Party by reason of the terms of (i) any contract, mortgage, lease, agreement, indenture, or instrument to which such Loan Party is a party or which is binding upon it, (ii) any judgment, law, statute, rule or governmental regulation applicable to such Loan Party, or (iii) the certificate of formation or the operating agreement of such Loan Party.

9.2    <u>Validity and Priority of Liens</u>. The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of Lender and such Liens constitute perfected and continuing Liens on all the Collateral, having priority over all other Liens on the Collateral except for Permitted Liens, securing all the Obligations, and enforceable against each Secured Loan Party.

9.3    <u>Organization and Qualification</u>. Each Secured Loan Party (a) is duly formed and organized and validly existing in good standing under the laws its state of incorporation or organization, (b) is qualified to do business as a foreign limited liability company and is in good standing in each jurisdiction in which the failure to so qualify or be in good standing could reasonably be expected to have a material adverse

20

effect on such Loan Party's property, business, operations, prospects or condition (financial or otherwise) and (c) has all requisite power and authority to conduct its business and to own its property.

9.4     Financial Statements. All financial statements, projections, estimates, information, and other data furnished by the Borrower to Lender in connection with the Borrower's application for credit hereunder, if any, are, in all material respects, accurate and correct and accurately reflect, in all material respects, the financial condition of the Person to whom such statements relate as of the date thereof.

9.5     Solvency. The Loan Parties are each solvent prior to and will remain solvent after giving effect to the Loans on the Closing Date and shall remain solvent during the term hereof.

9.6     Rights in the Picture and Collateral.

(a)     The Loan Parties own (or have sufficient rights under license with respect to) all rights in the Picture and in the other Collateral necessary to enable the Loan Parties to fully perform all of its obligations, representations, warranties and agreements under this Agreement and the other Loan Documents to which they are a party.

(b)     The Loan Parties have acquired or been licensed, now own and will own or have rights under license continuing through satisfaction of all Obligations, all right, title and interest, including copyrights in and to the right to exploit the Picture pursuant to the Acquisition Agreement throughout the Territory and the Term.

(c)     All material or matter used in or in connection with the Picture, including dialogue, characters, titles, episodes and events, shall be original and owned by or licensed to the Loan Parties, or in the public domain, and will not infringe any copyrights, statutory or common law, or constitute a libel, slander or invasion of privacy of any Person, or otherwise infringe on or violate the rights or any other Person whomsoever, in any fashion whatsoever.

9.7     Required Payments. All rents, royalties and other amounts due and payable by any Loan Party under contracts, leases, license agreements and other instruments relating to the Collateral have been paid if due, if by reason of nonpayment thereof the value of any part of the Collateral or the Lien of Lender therein may be materially impaired, and such Loan Party is not in material default under any such contract, lease, license agreement or other instrument so that such material impairment has now occurred.

9.8     Litigation. There are no actions, suits or proceedings pending or, to the knowledge of the Loan Parties, threatened against or affecting the Loan Parties or before any court or governmental agency, arbitrator or instrumentality, domestic or foreign, relating to the Picture or rights therein or thereto or otherwise, which if determined adversely to such Person could reasonably be expected to have a Material Adverse Effect.

9.9     No Defaults. No Loan Party is in default under this Agreement, any of the other Loan Documents, in effect as of the date hereof, or any other documents affecting the Collateral.  No Loan Party nor Son of the South Owner is in default under the Acquisition Agreement.

9.10     ERISA. Neither the Loan Parties nor any member of a controlled group of corporations (as defined in Section 1563 of the Code), nor any trade or businesses which are under common control with any Loan Party (as provided in Section 414(c) of the Code) nor any member of any affiliated service group of any Loan Party (as provided in Section 414(m) of the Code) now has, nor will they have prior to repayment in full of the Obligations, any plan subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended, or any such plan to which any Loan Party, any member of a "controlled

group" or affiliated service group, or any trade or business under common control with the Loan Parties (as aforesaid) is required to contribute on behalf of its employees.

9.11    Taxes. The Loan Parties filed all tax returns and other reports which it was required by law to file on or prior to the date hereof and has paid all taxes, assessments, fees, and other governmental charges, and penalties and interest, if any, against it or its property, income, or franchise, that are due and payable (except to the extent that (a) any such taxes, assessments, fees, and other governmental charges, and penalties and interest are diligently contested in good faith by appropriate proceedings and proper reserves are established on the books of the Loan Parties as provided in GAAP, and (b) a stay of enforcement of any Liens arising from the nonpayment thereof when due is in effect).

9.12    Margin Stock; Investment Company; and Public Utility Holding Company. The Borrower shall use the proceeds of the Loan to pay the direct production costs of the Picture, and the fees and costs expressly identified herein, and for no other purpose. No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States), and no part of the proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. No Loan Party is an "investment company" nor an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended (15 U.S.C. §§80(a)(l), et seq.). No Loan Party is a "holding company" or a "subsidiary company" of a "holding company" or an Affiliate of a "holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

9.13    Disclosure. Neither this Agreement nor any document or statement furnished to the Lender by or on behalf of any Loan Party or any of their respective Affiliates contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained herein or therein not misleading.

9.14    Material Agreements. The Loan Parties have furnished to Lender all requested copies of all material agreements, indentures, and other instruments relating to the Picture, or pursuant to which is has incurred or may be obligated, whether directly or indirectly for borrowed money.

9.15    Affiliate Transaction. The Loan Parties have not entered into any agreements or other transactions with any of its Affiliates other than those contemplated by this Agreement and the Loan Documents.

9.16    Patriot Act. The Loan Parties are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations. No part of the proceeds of the Loan will be used directly or, to the knowledge of the Borrower, indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

9.17    The Foreign Assets Control Regulations and Anti-Money Laundering. The Loan Parties and each of their officers, directors, employees and agents are in compliance with and will remain in compliance in all material respects with all United States economic sanctions laws, executive orders and implementing regulations (collectively, "Sanctions") as promulgated by the United States Treasury Department's Office of Foreign Assets Control and the U.S. Department of State, and all applicable anti-

money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. The Loan Parties and each of their directors, officers, employees and agents (i) are not a Person designated by the United States government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a United States Person cannot deal with or otherwise engage in business transactions, (ii) are not a Person who is otherwise the target of United States economic sanctions laws such that a United States Person cannot deal or otherwise engage in business transactions with such Person and (iii) are not controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of United States economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under United States law (persons described in (i)- (iii) foregoing being "Sanctioned Persons"). Each Loan Party and each of its officers, directors, employees and agents is in compliance with all anti-corruption laws in all material respects and will remain in compliance in all material respects with such laws. Each Loan Party will maintain in effect and enforce policies and procedures designed to promote compliance in all material respects by each Loan Party and its directors, officers, employees and agents with such laws and applicable sanctions. No Loan Party will request any Loan, and the Borrower shall not use, the proceeds of any Loan, (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any anticorruption laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any country, region or territory which is itself the subject or target of any Sanctions, to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

9.18    <u>Survival of Warranties</u>. All covenants, agreements, representations and warranties made under this Agreement or in any of the other Loan Documents shall survive the execution and delivery of this Agreement, the making of the Loans hereunder, and the execution and delivery of the Note and shall continue in full force and effect until the full and final payment and performance of all the Obligations and termination of this Agreement.

## ARTICLE 10 - AFFIRMATIVE AND NEGATIVE COVENANTS

The Loan Parties (each as to such Loan Party only) covenant to the Lender, until all of the Obligations have been satisfied and Lender's commitment to make Loans hereunder has terminated, as follows.

10.1    <u>Taxes and Other Liabilities</u>. Each Loan Party shall pay and discharge, before the same become delinquent and before penalties accrue thereon, all taxes, assessments and governmental charges upon or against it or upon its income or profits or upon any of its properties, and all its other liabilities at any time existing, except to the extent and so long as: (a) the same are being contested in good faith and by appropriate proceedings in such manner as not to cause any Material Adverse Effect or the loss of any right of redemption from any sale thereunder; and (b) it shall have set aside on its books reserves (segregated to the extent required by GAAP) adequate with respect thereto; and further to pay all governmental charges or taxes (except income, franchise or other similar taxes on the Lender ) at any time payable or ruled to be payable in respect of the existence, execution or delivery of this Agreement or the other Loan Documents by reason of any existing or hereafter enacted federal or state statute.

10.2    <u>Legal Rights and Facilities</u>. Each Loan Party shall maintain and preserve its legal existence and all rights, privileges, franchises and other authority necessary for the conduct of its business.

10.3     Compliance. Each Loan Party shall materially comply with all laws, rules and regulations relating to, and shall pay prior to delinquency all license fees, registration fees, taxes, guild or union pension, health and welfare payments, supplemental market, reuse and other required payments and assessments, and all other charges, including, without limitation, nongovernmental levies or assessments, that may be levied upon or assessed against, or which may become a Lien on, the ownership, operation, possession, maintenance, exploitation, exhibition or use of, the Collateral, or that create or may create a Lien upon the Collateral, or any part thereof.

10.4     Maintenance. Each Loan Party shall maintain the Collateral and all other material properties, Equipment and facilities in good order and repair; conduct its business in an orderly manner without interruption; and refrain from any material change in the nature of its business.

10.5     Insurance.

(a)     The Borrower shall cause the Lender to be named an additional insured pursuant to insurance that satisfies the requirements of paragraph 26 of the Acquisition Agreement as in effect on the Closing Date (either by causing the Lender to be named as an additional insured under the insurance maintained by Son of the Owner that satisfies such requirements or by causing the Lender to be named as an additional insured under insurance obtained by the Borrower that satisfies such requirements).  The Borrower shall deliver to the Lender copies of any notices received by Son of the South Owner or the related insurance company of any cancellation, non-renewal or change in coverage of such insurance.

(b)     Upon request by the Lender, the Borrower Party shall furnish the Lender a certificate of an officer of the Borrower containing a detailed list of the insurance policies of such Loan Party required by or referred to in this Section 10.5 then outstanding and in force.

(c)     All insurance money received by the Lender shall be held by the Lender to secure the payment and performance by each Loan Party of the Obligations under this Agreement and the other Loan Documents and shall be applied against and reduce such Obligations as provided in this Agreement.

10.6     Related Agreements. Each Loan Party shall perform and observe all material agreements, covenants, representations and warranties of the Loan Parties under any document or agreement entered into in connection with or related to the production, completion, Delivery, or exploitation of the Picture, including the Acquisition Agreement.

10.7     Approvals. Each Loan Party shall obtain, from time to time, all approvals, permits and consents necessary to allow the Loan Parties to remit payments to Lender in Dollars from all appropriate governmental authorities having jurisdiction thereof.

10.8     [Reserved].

10.9     Dissolution and Sale of Assets. No Loan Party shall wind up, liquidate or dissolve its affairs, or sell, lease, license, transfer, or otherwise dispose of or grant an interest in any of the Picture Collateral or change its legal or trade name, other than the exploitation and distribution of the Picture in the ordinary course of business. No Loan Party shall not make any distributions or dividends to any of the holders of its equity in their capacities as such.

10.10     Use of Proceeds. No Loan Party shall use the proceeds of any Loan made by the Lender hereunder for any purpose or thing other than the items set forth in Section 2.2(d).

10.11   Consolidation or Merger, Investments and Capital Expenditures. No Loan Party shall consolidate with or merge into any other Person, unless such Loan Party (or if the Borrower is a party to the transaction, the Borrower) is the surviving entity and maintains a consolidated net worth of greater than or equal to such Loan Party's consolidated net worth prior to such merger. No Loan Party shall make any investments other than in the ordinary course of business. No Loan Party shall make any capital expenditures other than in the ordinary course of business.

10.12   Liens. The Loan Parties shall not directly or indirectly create, incur or suffer to exist, and shall promptly discharge or cause to be discharged, any Lien on or with respect to the Collateral other than Permitted Liens.

10.13   Hedge Agreements. No Loan Party shall enter into any Hedge Agreements, except Hedge Agreements approved by the Lender and entered into solely in order to effectively cap, collar or exchange foreign currency rates with respect to the Obligations.

10.14   Further Assurances. The Loan Parties shall, at any time or from time to time upon the request of the Lender, execute and deliver such further documents and do such other acts and things as the Lender may reasonably request in order to effect fully the purposes of this Agreement the other Loan Documents and to provide for the payment and performance of the Obligations of the Loan Parties in accordance with the terms of this Agreement and the other Loan Documents.

10.15   [Intentionally Omitted]

10.16   Corporate Separateness. Each Loan Party shall maintain its existence separate from that as each of its Affiliates, including, without limitation, by taking the following actions (except to the extent permitted by this Agreement and the other Loan Documents):

(a)      Not diverting any of its funds to any Affiliate or commingling any of its funds with the funds of any of its Affiliates;

(b)      Entering into all transactions each Loan Party and its Affiliates on an arm's length basis; and

(c)      Conducting its affairs in its own name and in accordance with its organization documents and observing all necessary, appropriate and customary corporate or equivalent formalities, including, but not limited to, holding all regular and special meetings necessary to authorize all its actions, keeping separate and materially accurate minutes of its meetings, passing all resolutions or consents necessary to authorize actions taken or to be taken, and maintaining, in all material respects, accurate and separate books, records and accounts including, but not limited to, payroll and intercompany transaction accounts.

## ARTICLE 11 - EVENTS OF DEFAULT; REMEDIES

11.1   Events of Default. It shall constitute an event of default ("Event of Default") if any one or more of the following shall occur for any reason:

(a)      Failure of the Borrower to pay the principal of or interest on any of the Obligations when the same becomes due;

(b)      Failure by the Borrower to pay any fees, expenses, or any other Obligation not otherwise specified in the foregoing clause "(a)" within five (5) Business Days beyond any grace period following the date such item is due, whether upon demand or otherwise;

(c)      Any representation or warranty made by any Loan Party in this Agreement or in any of the other Loan Documents to which it is a party, or any financial statement, or report furnished by any Loan Party at any time to Lender shall prove to be untrue in any material respect (or in the case of a representation and warranty qualified by materiality, untrue in any respect) as of the date on which made or furnished;

(d)      Failure of any Loan Party to comply with any other covenants on its part to be performed under the terms of this Agreement or the other Loan Documents;

(e)      Any Loan Party suspends its business operations;

(f)      Any money judgment, writ or warrant of attachment, or similar process shall be entered or filed against any of any Loan Party and shall remain unvacated, unbonded or unstayed for a period of thirty (30) days or in any event later than five (5) days before the date of any proposed sale thereunder;

(g)      Any Loan Party shall be subject to a Bankruptcy Proceeding;

(h)      There shall occur a Change in Control;

(i)      Any sale of, or agreement to sell, any of the Picture Collateral or any material portion of the other assets of any Loan Party without the Lender's reasonable approval, other than as expressly allowed under the Loan Documents, including compliance with Section 4.2(a);

(j)      This Agreement, any other Loan Document or any other instrument delivered hereunder or thereunder shall at any time after its execution and delivery and for any reason cease to be in full force and effect, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by any Loan Party, or any Loan Party shall deny that it has any further obligation under this Agreement, any other Loan Document or any other instrument delivered hereunder or thereunder;

(k)      The Acquisition Agreement shall at any time after its execution and delivery and for any reason cease to be in full force and effect, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by the Borrower, the Borrower is in default or breaches the Acquisition Agreement, the Borrower fails to accept Delivery (as defined in the Acquisition Agreement) prior to the release of the Picture, or otherwise ceases to have the right to distribute the Picture as provided in the Acquisition Agreement, or the Borrower shall deny that it has any further obligation under this Agreement, or any other instrument delivered hereunder or thereunder;

(l)      The Lender fails to have an enforceable first lien (except as set forth in the definition for "Permitted Liens") on or security interest in any property given as security pursuant to this Agreement and/or the Loan Documents;

(m)      Any Loan Party has given the Lender materially false or misleading information or representations;

(n)     Any non-frivolous lawsuit or lawsuits are filed on behalf of one or more trade creditors against any Loan Party in an aggregate amount of Fifty Thousand Dollars ($50,000.00) or more in excess of any insurance coverage of the Loan Parties;

(o)     Any government authority takes action that the Lender reasonably believes materially adversely affects any Loan Party's financial condition or ability to repay the Obligations;

(p)     A Material Adverse Effect occurs;

(q)     The occurrence of any one or more of the following events with respect to any Loan Party, provided such event or events could reasonably be expected, in the judgment of the Lender, to subject the Lender to any tax, penalty or liability (or any combination of the foregoing) which, in the aggregate, could have a Material Adverse Effect on the financial condition of such Loan Party with respect to any ERISA plan (if applicable);

(i)     A reportable event shall occur with respect to a plan which is, in the reasonable judgment of the Lender likely to result in the termination of such plan for purposes of Title IV of ERISA;

(ii)     Any plan termination (or commencement of proceedings to terminate a plan) or any Loan Party's full or partial withdrawal from a plan;

(r)     Any Loan Party shall default with respect to any payment of any indebtedness in excess of $10,000 in the aggregate at any one time outstanding when due, or in the performance of any other obligation incurred in connection with any such indebtedness if the effect of such non-payment default is to accelerate the maturity of such indebtedness or to permit the holder thereof to cause such indebtedness to become due prior to its stated maturity and such default shall not be remedied, cured, waived or consented to within the period of grace with respect thereto;

11.2     Remedies. If any Default exists, after notice to the Borrower and reasonable opportunity to cure such Default:

(a)     If an unremedied Default exists, Lender may, in the discretion of the Lender, without additional notice to or additional demand on the Borrower, restrict the amount of or refuse to make any Loan. If an unremedied Event of Default endures for five (5) Business Days or longer, the Lender may, in the Lender's sole and absolute discretion, do one or more of the following in addition to the actions described in the preceding sentence, at any time or times and in any order, without additional notice to or additional demand on the Borrower: (i) terminate this Agreement and all obligations of Lender to make any Loan hereunder; (ii) declare any or all Obligations to be immediately due and payable (provided that in the case of an Event of Default under Section 11.1(g). all of the Obligations shall automatically become due and payable), all without demand, presentment or notice, all of which are expressly and irrevocably waived; and (iii) pursue its other rights and remedies under the Loan Documents and applicable law. The foregoing shall not be construed to limit the discretion of the Lender to take any actions described above at any other time. If Default or Event of Default exists, the Lender shall have, in addition to all other rights of the Lender hereunder, the rights and remedies of a secured party under the UCC. The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at a place or places to be designated by the Lender.

(b)     If Default or Event of Default exists, the Lender may, in the Lender's sole and absolute discretion, in its name or in the name of any Loan Party, or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make

27

any compromise or settlement deemed desirable with respect to, any of the Collateral, but shall be under no obligation so to do, or the Lender may extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting the liability of, any Loan Party. The Lender will not be required to take any steps to preserve any rights against prior parties to the Collateral. If any Loan Party fails to make payment or take any action required under any Loan Document, or any other agreement or document that any Loan Party is party to, the Lender may make such payments and take all such actions as the Lender deem necessary to protect the Lender's Lien in the Collateral and/or the value thereof. The Lender is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any Liens which the Lender believe appear to be equal to, prior to or superior to the Lien of the Lender in the Collateral.

(c)     The Lender may take possession of the Collateral together with all additions and accessories thereto, demand and receive such possession from any person who has possession thereof, remove, keep and store the Collateral or any portion thereof, or put a custodian in charge thereof, and take such other measures as it may deem reasonably necessary or proper for the care or protection thereof.

(d)     The Lender may, with or without taking possession thereof, sell, lease, license, or cause to be sold, or otherwise disposed of, at such price or prices as the Lender shall in its sole and absolute discretion so determine, and for cash or on credit or for future delivery, without assumption of any credit risk, and in a commercially reasonable manner, all or any portion of the Collateral, at any public or private disposition thereof, without demand of performance or notice of intention to sell or of time or place of sale; provided, however, that unless the Collateral in the Lender's possession is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Lender shall give the Borrower notice of the time and place of any public disposition thereof or of the time after which any private disposition thereof is to be made. The requirement of notice shall be met if notice of disposition is delivered or mailed, by registered mail, postage prepaid, to the Borrower as set forth in Section 14.7 or such other address as the Borrower may by notice have furnished the Lender in writing for such purpose at least ten (10) days prior to the time of such disposition. Each acquirer at any such disposition (including, if applicable, the Lender) shall hold the property acquired absolutely free from any claim or right of whatever kind including any equity of redemption and the Loan Parties hereby waive (to the extent permitted by law) all rights of redemption, stay and/or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereafter enacted. Any public or private disposition of the Collateral or any part thereof shall be held at such time or times within ordinary business hours and at such place or places as the Lender may fix in the notice of disposition. At any such disposition, the Collateral, or any portion thereof, to be disposed of may be disposed of in one lot as an entirety or in separate parcels, as the Lender may (in the Lender's sole and absolute discretion) determine and, if permitted by law, the Lender may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for and purchase the Collateral or any portion thereof for the account of the Lender. The Lender shall not be obligated to make any disposition of the whole or any part of the Collateral if it shall determine not to do so, regardless of the fact that notice of disposition of the Collateral may have been given. The Lender may by announcement at the time and place fixed for disposition, without prior notice or publication, adjourn any public or private disposition of the Collateral or cause the same to be adjourned from time to time, and such disposition may, without further notice, be made at the time and place to which the same was so adjourned. In case a disposition of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Lender until the sale price is paid by the purchaser or purchasers thereof, but the Lender shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so disposed of and, in case of any such failure, such Collateral may be sold again upon like notice.

(e)        Any Laboratory that has possession of any of the Collateral is hereby constituted and appointed by the Borrower as pledgeholder for the Lender. The Lender may authorize each such pledgeholder to sell all or any portion of the Collateral upon the order and direction of the Lender, and each Loan Party hereby waives all claims for damages, or otherwise, for any action taken by such pledgeholder.

(f)        The Lender shall be entitled to the appointment of a receiver to take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver. Each Loan Party, to the fullest extent permitted by law, hereby waives notice and the right to receive notice of any application by the Lender for such appointment; provided, however, that the Lender shall endeavor to send the Borrower a courtesy notice of such application, and provided further that, notwithstanding any such application or appointment, the Lender shall be entitled to apply, without notice to any Loan Party, any cash or cash items constituting Collateral in the possession of the Lender to payment of the Obligations under this Agreement, the Note and the other Loan Documents.

(g)        Upon any disposition of any item of Collateral by the Lender hereunder (whether by virtue of the power of attorney herein granted, pursuant to judicial process or otherwise), the receipt of the Lender or the officer making the disposition shall be a sufficient discharge to the purchaser or purchasers of such item or items of Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

(h)        The Lender is hereby authorized at any time and from time to time, with reasonable notice to the Borrower other than during the continuance of an Event of Default, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, any other account maintained by the Lender, any certificate of deposit, and any other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not the Lender shall have made any demand under this Agreement, the Note or any other Loan Document. The Lender agrees promptly to notify the Borrower after any such setoff and application. The rights of the Lender under this Section 11.2(h) are in addition to other rights and remedies (including, without limitation, other rights of setoff) that the Lender may have.

11.3        Cumulative Remedies; No Prior Recourse to Collateral. The enumeration herein of the Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that the Lender may have under the UCC or other applicable law. The Lender shall have the right, in its sole and absolute discretion to determine which rights and remedies are to be exercised and in which order. The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative. The Lender may, without limitation, proceed directly against the Loan Parties to collect the Obligations without any prior recourse to the Collateral.

11.4        Failure or Indulgence Not Waiver. No failure or delay on the part of the Lender any holder of the Note in the exercise of any power, right, remedy or privilege under this Agreement, the Note or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, remedy or privilege preclude any other or further exercise thereof or of any other right, power, remedy or privilege. All rights and remedies existing under this Agreement, the Note and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

11.5        Performance of Obligations by Lender. If any Loan Party shall fail to do any act or thing which it has covenanted to do hereunder, under any other Loan Document, or otherwise, or if any representation or warranty of any Loan Party under any such agreement shall be breached, the Lender may

29

(but shall not be obligated to) perform such act or thing on behalf of such Loan Party or cause it to be done or remedy any such breach, and there shall be added to the liabilities of the Loan Parties secured hereunder the cost or expense incurred by the Lender in so doing, and any and all amounts expended by the Lender in taking any such action shall be repayable to it upon demand being made to the Loan Parties therefor and shall bear interest at the rate of interest then applicable to the Loans made to the Borrower hereunder from and including the date advanced to the date of repayment.

## ARTICLE 12 - TERM AND TERMINATION

12.1    Termination.

(a)    The Lender may terminate this Agreement without notice upon the occurrence and during the continuance of a Default or Event of Default for longer than five (5) Business Days.

(b)    This Agreement shall also terminate when all Obligations have been fully and indefeasibly paid and performed.

(c)    Upon repayment of the principal of and interest on the Loan and all other Obligations then due and payable, the security interests granted by the Secured Loan Parties shall automatically be released and the provisions of Article 5, 7 (other than Sections 7.4 and 7.7(a) and (b)), 11 and 13, and Sections 10.4, 10.9, 10.11, 10.12, and 10.13, shall be terminated and the Security Agreement and the Guaranty shall terminate (subject to the provisions of Section 3 of the Guaranty). Upon the indefeasible payment in full of the principal of and interest on the Loan and all other Obligations then due and payable, the Lender shall, at the Borrower's request and sole expense, assign and deliver to the Borrower, and the Borrower shall provide a receipt for, all Collateral in which the Lender shall have any interest hereunder or which shall then be held by the Lender or in its possession and, if requested by the Borrower, the Lender shall execute and deliver to the Borrower at the Borrower's sole expense, for filing in each office in which any financing statement relative to the Collateral, or any part thereof, shall have been filed, termination statements under the UCC and a quitclaim and reconveyance of the Lender's rights under the Copyright Mortgage and Assignments releasing the Lender's Lien therein, and a termination of the Guaranty,, all without recourse upon or warranty by the Lender and at the sole cost and expense of the Borrower.   Additionally, as a condition to the termination of the Lender's Liens, the Borrower agrees to obtain an acknowledgement from any subsequent lender that any lien on the Borrower's rights under the Acquisition Agreement would be subject to the Lender's right to the Continuing Participation.

(d)    Upon the effective date of termination, all Obligations shall become immediately due and payable in full. Notwithstanding such termination, the Borrower shall remain bound by all of the terms and conditions of this Agreement until all Obligations have been paid in full in cash, and the Lender shall retain all rights and remedies hereunder. For the purposes hereof, the Obligations shall only be deemed paid in full when all components thereof have been indefeasibly paid in full.

## ARTICLE 13 - THE GUARANTEES

13.1    The Guarantees. Each Guarantor acknowledges and confirms its guaranty of the Obligations, and agrees that the "Guaranteed Obligations", as defined in the Guaranty shall include the Obligations, and further agrees that the Guaranty Agreement shall be amended to replace the definition of "Guaranteed Obligations" therein with the definition of Obligations in this Agreement.

## ARTICLE 14 - MISCELLANEOUS

14.1     Severability. In case any provision of this Agreement, the Note or of any other Loan Document shall be invalid, illegal or unenforceable in any jurisdiction then such provision shall to the extent of such prohibition or unenforceability be deemed severed from the remainder of such agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

14.2     Governing Law. This Agreement and the other Loan Documents and all other documents provided for therein and the rights and obligations of the parties thereto shall be governed by and construed and enforced in accordance with, the laws of the State of New York without reference to its conflict or choice of law principles.

14.3     Jurisdiction. Any legal action or proceeding with respect to this Agreement, the other Loan Documents or any other agreement, document or other instrument executed in connection herewith or therewith, or any action or proceeding to execute or otherwise enforce any judgment obtained against the Borrower or any of its properties, may be brought in the state or federal courts of the State of New York, as the Lender may elect, provided always that suit also may be brought in the courts of any country or place where the Borrower or any of its assets may be found, and, by execution and delivery of this Agreement, the Borrower irrevocably submits to each such jurisdiction. The Borrower irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding, arising out of or relating to this Agreement, the other Loan Documents or any other agreement, document or other instrument executed in connection herewith brought in the state or federal courts of the State of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, New York shall be the sole venue for any dispute the Borrower initiates against the Lender.

14.4     Waiver of Jury Trial. Etc. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER AND THE LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY. THE BORROWER FURTHER WAIVES ANY RIGHTS OF SETOFF, AND THE RIGHT TO IMPOSE COUNTERCLAIMS (OTHER THAN THOSE RIGHTS OF SETOFF AND COUNTERCLAIMS ARISING SOLELY AND DIRECTLY FROM THE PICTURE OR THIS AGREEMENT) IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN THE BORROWER, ON THE ONE HAND, AND THE LENDER ON THE OTHER HAND. Each of the parties expressly agrees that service of process in any judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in accordance with the provisions of Section 14.4 and shall be deemed effective as provided therein.

14.5     Expenses and Fees.  Each party shall bear its own legal fees through the Effective Date. Other than legal fees, the Borrower shall on demand directly pay or reimburse the Lender for its reasonable actual out-of-pocket search and filing costs and expenses incurred in connection with the closing of the Loan.   The Borrower shall pay on demand all of the Lender's reasonable actual out-of-pocket costs and expenses incurred after the Effective Date, including (a) those related to necessary amendments to the Loan Documents, (b) costs and expenses of preserving and protecting the Collateral in the event of the Borrower's default hereunder, and (c) reasonably necessary costs and expenses (including reasonable outside attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the Lender's Liens, sell or otherwise realize upon the Collateral and otherwise enforce the provisions of the Loan Documents or to defend any claims made or threatened against the Lender arising out of the

transactions contemplated hereby, and in connection with the enforcement of the rights of the Lender thereunder or in connection with the realization upon any Collateral (including the costs of any "workout" of the Borrower's obligations and Lender's enforcement of its rights in any bankruptcy proceeding).

14.6    Taxes. Subject to the last sentence of the definition of Picture Collateral Proceeds:

(a)    All payments (including payments of principal, interest and all fees and other Obligations) by the Borrower hereunder the other Loan Documents shall be made free and clear of and without deduction for any and all present or future non-US taxes and other taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, taxes imposed on the Lender's income or measured by the overall net income or gross receipts of the Lender, and franchise taxes imposed on it, by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes"). If the Borrower or any of its Affiliates shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 14.6) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay all present and future stamp and documentary taxes and all other excise or property taxes, charges and similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement and the other Loan Documents (hereinafter referred to as "Other Taxes").

(c)    The Borrower will indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 14.6) paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days from the date the Lender makes written demand therefor. The affected Lender shall, at the time of any written demand for indemnification under this subsection (c), provide to the Borrower a receipt for, or other evidence of the payment of, the Taxes or Other Taxes for which indemnification is sought.

(d)    Within thirty (30) days after the date of any payment of Taxes, the Borrower will furnish to the Lender, at its address referred to in Section 14.7, the original or a certified copy of a receipt evidencing payment thereof. If no Taxes are payable in respect of any payment hereunder with respect to which a claim for indemnity has been made hereunder, the Borrower will furnish to the Lender, at such address, a certificate from each appropriate taxing authority, or an opinion of counsel acceptable to the Lender, in either case stating that such payment is exempt from or not subject to Taxes.

(e)    Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 14.6 shall survive the payment in full of the Obligations and termination of his Agreement.

14.7    Notices. In order to be effective under the terms hereof, except as otherwise expressly provided herein, any notice, approval, authorization, consent, request, demand or other communication provided for hereunder or under any of the other Loan Documents to be given shall be in writing and shall be delivered personally, by certified mail, return receipt requested, postage prepaid, or by transmission by an Electronic System, and shall be effective (a) on the day when personally served, including delivery by

32

overnight mail and courier service, (b) on the third day after its deposit in the United States mail, postage paid, and (c) on the Business Day of confirmed transmission by an Electronic System. The addresses of the parties hereto (until notice of a change thereof is served as provided in this Section 14.7) shall be as follows:

| To the Loan Parties: | To the Lender: |
|---|---|
| Clear Distribution, LLC<br>827 N Hollywood Way, #512<br>Burbank, CA 91505<br>Attention: David Brown<br>Email: david@clearhorizonent.com | 8TH Wonder Pictures, LLC<br> 1805 West Avenue<br>Austin, TX 78701<br>Attention: Andrew Townsend<br>Email: andrew@ocelotcapital.com |
| With a courtesy copy to: | With a courtesy copy to: |
| Creativ Law Professional Corp.<br>Attention: Harry Finkel, Esq.<br>88730 Wilshire Blvd, Suite 350<br>Beverly Hills, CA 90211<br>Email:  harry@creativlaw.com | Winston & Strawn LLP.<br>Attention: Warren Loui, Esq.<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>Email:  warren.loui@winston.com |

14.8    Assignments: Participations.

(a)    The Lender may, at any time and from time to time, without notice to Borrower, sell, transfer, assign or grant participations in any or all of its rights and obligations hereunder or under the Note without the consent of or notice to Borrower; provided that the provisions of Section 6.2 shall only be assignable to an affiliate of the Lender that is wholly or majority-owned by Ocelot Capital, LLC.  The Borrower authorizes Lender to forward to such assignee, transferee or assignee, transferee or participant or prospective participant all documents and information relating to Borrower or the Loan as Lender determines necessary or desirable. Borrower may not assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender and any purported assignment shall be void and of no force or effect. This Agreement shall be binding upon and inure to the benefit of Borrower and its permitted successors and assigns and Lender and its successors and assigns.

(b)    Notwithstanding any other provision in this Agreement, Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement and any Note held by the Lender, in favor of any Federal Reserve Lender, in accordance with Regulation A of the Federal Reserve Board or U.S. Treasury Regulation 31 CFR §203.14, and such Federal Reserve Lender may enforce such pledge or security interest in any manner permitted under applicable law.

14.9    Indemnification. The Borrower shall, at all times, defend and indemnify and hold the Lender (which for the purposes of this paragraph shall include the shareholders, partners, members, officers, directors, employees, representatives, attorneys and agents of Lender) harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, settlements, judgments or recoveries resulting from any alleged or actual breach of the warranties, agreements or covenants made by the Borrower herein, and from any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with the transactions contemplated by this Agreement, the other Loan Documents or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to Lender hereunder, or any rights otherwise granted to Lender, including reasonable outside attorneys' fees and costs and expenses incurred by Lender, all of which shall be charged to and paid by the Borrower and shall be secured by the Collateral hereunder; provided, however, the Borrower shall have no obligation under this Section with respect to any such event resulting from Lender's and/or such

33

Lender's gross negligence or willful misconduct (as determined by the final, non-appealable order of a court of competent jurisdiction).

14.10    USA Patriot Act et al. Lender notify the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Patriot Act"), the Lender are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow Lender to identify the Borrower in accordance with the Patriot Act. To the extent applicable, Borrower confirms that it is in compliance with the Patriot Act. No part of the proceeds of the Loans have been or will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

14.11    Final Agreement. This Agreement and the other Loan Documents are intended by the Borrower, the Lender to be the final, complete, and exclusive expression of the agreement between them. In the event of any conflict between the terms of the Term Sheet and any Loan Document, the terms of the related Loan Document shall control.  This Agreement and the other Loan Documents supersede any and all prior oral or written agreements relating to the subject matter hereof, including any term sheets, deal memoranda, or other written document. No modification, rescission, waiver, release, or amendment of any provision of this Agreement or any other Loan Document shall be made, except by a written agreement signed by the Borrower and duly authorized officers of Lender.

14.12    Counterparts. This Agreement and the other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, respectively. Delivery of an executed counterpart of this Agreement by facsimile or transmitted electronically (i.e., in a Tagged Image Format File ("TIFF") or Portable Document Format ("PDF")) shall be equally effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart by facsimile or electronically (i.e., in a TIFF or PDF) shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not affect the validity, enforceability, or binding effect of this Agreement.

14.13    No Beneficiaries. The parties hereto do not intend by the inclusion of references to various third Person agreements to create any third Person beneficiary rights herein or under any of those agreements. Without limiting the generality of the foregoing, Lender does not intend by the inclusion of references to payments to various third Persons in the definition of Permitted Liens or otherwise to give rise to any rights as a third party beneficiary in such Persons herein or under any of the agreements referenced in the definition of Permitted Liens.

14.14    Amendments. Etc. Except as otherwise expressly provided herein, no modification, amendment or waiver of any provision of this Agreement, and no consent to any departure by Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and acknowledged and agreed to by Borrower and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

14.15    Relationship of Parties. The relationship of the Lender, on the one hand, and Borrower, on the other hand, is solely one of lender and borrower, and this Agreement does not constitute a partnership or joint venture between the Lender, on the one hand, and Borrower, on the other hand. Borrower is not the representative or agent of Lender, and the Lender is not a representative or agent of Borrower.

14.16   <u>WAIVER WITH RESPECT TO DAMAGES</u>. THE PARTIES SHALL NOT ASSERT, AND HEREBY WAIVE, ANY CLAIMS AGAINST THE OTHER ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

*[SIGNATURES ON NEXT PAGE]*

IN WITNESS WHEREOF, the parties hereto have each executed this Agreement as of the date first above written.

BORROWER:

CLEAR DISTRIBUTION LLC

By: _____
    Name: David Brown
    Title: Authorized Signer

GUARANTORS:

CLEAR ENTERTAINMENT, LLC

By: _____
    Name:  David Brown
    Title: Authorized Signer

SPECTER ENTERTAINMENT, LLC

By: _____
    Name:  David Brown
    Title: Authorized Signer

DAVID BROWN

By: _____
    Name: David Brown

LENDER:

8TH WONDER PICTURES, LLC

By: _Andrew Townsend_

    Name: Andrew Townsend
    Title: Managing Member

# EXHIBIT E

*Execution Version*

## GUARANTY

This **GUARANTY** (this "**Guaranty**") is entered into as of June 17, 2020 by the undersigned (each a "**Guarantor**", and together with any future Loan Parties executing this Guaranty, being collectively referred to herein as the "**Guarantors**") in favor of and for the benefit of **8ᵀᴴ WONDER PICTURES, LLC** (the "**Lender**").

## RECITALS

A.      Clear Distribution, LLC a California limited liability company (the "**Borrower**") and the other guarantors from time to time party thereto (collectively with Borrower, the "**Loan Parties**"), have entered into that certain Term Sheet, dated as of the date hereof with the Lender (as amended, restated, amended and restated, refinanced, replaced, extended, supplemented or otherwise modified from time to time, the "**Term Sheet**"), that certain Security Agreement, dated as of the date hereof with the Lender (the "**Security Agreement**"), and Borrower has entered into that certain Promissory Note, dated as of the date hereof (the "**Note**" and together with the Term Sheet and the Security Agreement, the "**Loan Documents**"). Capitalized terms used herein and defined in the Term Sheet and not otherwise defined herein shall have the meanings assigned to such terms in the Term Sheet.

B.      The Borrower and each other Loan Party are sometimes referred to herein as "**Guarantee Parties**" and each, a "**Guarantee Party**".

C.      The Guarantors are affiliates of the Borrower, will derive substantial benefits from the extension of credit to the Borrower pursuant to the Loan Documents and are willing to execute and deliver this Guaranty in order to induce the Lender to extend such credit.

D.      It is a condition precedent to the making of the Loan under the Term Sheet that obligations under the Term Sheet, the Security Agreement and the Note (the "**Obligations**") be guaranteed by the Guarantors.

E.      The Guarantors are willing, irrevocably and unconditionally, to guaranty such Obligations.

**NOW, THEREFORE,** based upon the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Lenders to enter into the Note and to make Loan, the Guarantors hereby agree as follows:

1.      **Guaranty**.

(a)      The Guarantors jointly and severally irrevocably and unconditionally guarantee, as primary obligors and not merely as sureties, the due and punctual payment in full of all Guaranteed Obligations (as hereinafter defined) when the same shall become due, whether at stated maturity, by acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code). The term "**Guaranteed Obligations**" is used herein in its most comprehensive sense and includes any and all obligations of any of the Loan Parties now or hereafter made, incurred or created, whether absolute or contingent, liquidated or unliquidated, whether due or not due, and however arising.

(b)      Each Guarantor acknowledges that it is an affiliate of the Borrower and will derive substantial benefits from the extension of credit to the Borrower pursuant to the Loan Documents.

1

(c)     Any interest on any portion of the Guaranteed Obligations that accrues after the commencement of any proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), liquidation, winding-up, examinership, suspension of payments, a moratorium of any indebtedness, dissolution, administration or arrangement of any Guarantee Party (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of said proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if said proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of each Guarantor and the Lender that the Guaranteed Obligations should be determined without regard to any rule of law or order that may relieve any Guarantee Party of any portion of such Guaranteed Obligations.

(d)     In the event that all or any portion of the Guaranteed Obligations is paid by the Guarantee Parties, the obligations of each Guarantor hereunder that is a Guarantee Party immediately prior to any such payment shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) is rescinded or recovered directly or indirectly from the Lender as a preference, fraudulent transfer or otherwise, and any such payments that are so rescinded or recovered shall constitute Guaranteed Obligations.

(e)     Subject to the other provisions of this <u>Section 1</u>, upon the failure of any Guarantee Party to pay any of the Guaranteed Obligations when and as the same shall become due, each Guarantor will promptly pay, or cause to be paid, in cash, to the Lender, an aggregate amount equal to the aggregate of the unpaid Guaranteed Obligations.

(f)     Notwithstanding anything contained in this Guaranty to the contrary, the obligations of each Guarantor under this Guaranty and the other Loan Documents shall be limited to a maximum aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any applicable provisions of comparable state law (collectively, the **"Fraudulent Transfer Laws"**), in each case after giving effect to all other liabilities of such Guarantor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such Guarantor (x) in respect of intercompany indebtedness to the Borrower or other affiliates of the Borrower to the extent that such indebtedness would be discharged in an amount equal to the amount paid by such Guarantor hereunder and (y) under any guaranty of subordinated indebtedness which guaranty contains a limitation as to maximum amount similar to that set forth in this <u>Section 1(f)</u>, pursuant to which the liability of such Guarantor hereunder is included in the liabilities taken into account in determining such maximum amount) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, reimbursement, indemnification or contribution of such Guarantor pursuant to applicable law or pursuant to the terms of any agreement (including this Guaranty).

(g)     The Guarantors desire to allocate, as among themselves, in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty, each such Guarantor shall be entitled to a contribution from each of the other Guarantors in the maximum amount permitted by law so as to maximize the aggregate amount of the Guaranteed Obligations paid to Lender.

**2.     Guaranty Absolute; Continuing Guaranty.**  The Guaranteed Obligations shall remain in full force and effect until the Obligations payable by the Borrower and the Guarantors under this Guaranty and all other Loan Documents and, if then outstanding and unpaid and due, shall have been paid in full.  If at any time any payment of the Obligations payable by the Borrower or other obligor or any Guarantor

2

under the Loan Documents, each Guarantor's obligations under this Guaranty with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made.

**3.     Discharge only Upon Payment in Full; Reinstatement.**  The Guaranteed Obligations shall remain in full force and effect until the Obligations payable by the Borrower and the Guarantors under this Guaranty and all other Loan Documents and, if then outstanding and unpaid and due, shall have been paid in full.  If at any time any payment of the Obligations payable by the Borrower or other obligor or any Guarantor under the Loan Documents, the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made.

**4.     Subrogation.**  Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations, shall have been paid in full.  If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the payment in full of the Obligations payable by the Borrower hereunder and the other Loan Documents, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender or be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of this Guaranty.

**5.     Waivers.**  Each Guarantor waives presentment to, demand for payment from and protest to, as the case may be, any Loan Party or any other guarantor of any of the Obligations, and also waives notice of protest for nonpayment, notice of acceleration and notice of intent to accelerate.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of the Lender to assert any claim or demand or to enforce any right or remedy against the Borrower or any Guarantor or any other guarantor under the provisions of this Guaranty or any other agreement or otherwise, (ii) any extension or renewal of any provision hereof or thereof, (iii) the failure of the Lender, the to obtain the consent of the Guarantor with respect to any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of this Guaranty, the Notes or of any other agreement; (iv) the release, exchange, waiver or foreclosure of any security held by the Lender for the Obligations or any of them, or otherwise; (v) the failure of Lender to exercise any right or remedy against any other Guarantor or any other guarantor of the Obligations, (vi) any bankruptcy, reorganization, liquidation, dissolution or receivership proceeding or case by or against any Loan Party, or any change in the corporate existence, structure, ownership or control of any Loan Party (including any of the foregoing arising from any merger, consolidation, amalgamation, reorganization or similar transaction), or (vii) the release or substitution of any Guarantor or any other guarantor of the Obligations..  Without limiting the generality of the foregoing or any other provision hereof, to the extent permitted by applicable law, each Guarantor hereby expressly waives any and all benefits which might otherwise be available to it under California Civil Code Sections 2799, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2838, 2839, 2845, 2848, 2849, 2850, 2899 and 3433 or similar applicable law.

Each Guarantor further agrees that this Guaranty is a continuing guaranty, shall secure the Obligations and any ultimate balance thereof, notwithstanding that the Borrower or any other Persons may from time to time satisfy the Obligations in whole or in part and thereafter incur further Obligations, and that this Guaranty constitutes a guaranty of performance and of payment when due and not just of collection, and waives any right to require that any resort be had by the Lender to any security held for payment of the Obligations or to any balance of any deposit, account or credit on the books of the Lender in favor of the Borrower or any Guarantor, or to any other Person.

**6.     Stay of Acceleration.**  If acceleration of the time for payment of any Obligation payable by the Borrower or other obligor under this Guaranty or any other Loan Document, or under any agreement, is stayed upon the insolvency, bankruptcy or reorganization of the Borrower or such obligor, all such amounts otherwise subject to acceleration under the terms of this Guaranty or the other Loan Documents,

AmericasActive:14824700.3

or under any agreement, shall nonetheless be payable by the Guarantors hereunder forthwith on demand by Lender.

7.      **Benefit of Guarantors.**  The Guarantee Parties are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of each Borrower has a direct impact on the success of each Guarantor.  Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder.

8.      **Reinstatement of Obligations.**  Notwithstanding anything to the contrary contained herein, the Obligations shall be automatically reinstated if and to the extent that for any reason any payment of any of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify the Lender on demand for all reasonable costs and expenses incurred by the Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

9.      **Guarantor Waivers.**  Each Guarantor waives presentment to, demand for payment from and protest to, as the case may be, any Loan Party or any other guarantor of any of the Obligations, and also waives notice of protest for nonpayment, notice of acceleration and notice of intent to accelerate.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of the Lender to assert any claim or demand or to enforce any right or remedy against the Borrower or any Guarantor or any other guarantor under the provisions of this Guaranty or other agreement or otherwise, (ii) any extension or renewal of any provision hereof or thereof, (iii) the failure of the Lender, the to obtain the consent of the Guarantor with respect to any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of this Guaranty, the Note or of any other agreement; (iv) the release, exchange, waiver or foreclosure of any security held by the Lender for the Obligations or any of them, or otherwise; (v) the failure of Lender to exercise any right or remedy against any other Guarantor or any other guarantor of the Obligations, (vi) any bankruptcy, reorganization, liquidation, dissolution or receivership proceeding or case by or against any Loan Party, or any change in the corporate existence, structure, ownership or control of any Loan Party (including any of the foregoing arising from any merger, consolidation, amalgamation, reorganization or similar transaction), or (vii) the release or substitution of any Guarantor or any other guarantor of the Obligations..  Without limiting the generality of the foregoing or any other provision hereof, to the extent permitted by applicable law, each Guarantor hereby expressly waives any and all benefits which might otherwise be available to it under California Civil Code Sections 2799, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2838, 2839, 2845, 2848, 2849, 2850, 2899 and 3433 or similar applicable law.

Each Guarantor further agrees that this Guaranty is a continuing guaranty, shall secure the Obligations and any ultimate balance thereof, notwithstanding that the Borrower or any other Persons may from time to time satisfy the Obligations in whole or in part and thereafter incur further Obligations, and that this Guaranty constitutes a guaranty of performance and of payment when due and not just of collection, and waives any right to require that any resort be had by the Lender to any security held for payment of the Obligations or to any balance of any deposit, account or credit on the books of the Lender in favor of the Borrower or any Guarantor, or to any other Person.

10.     **Amendments.**  No amendment, modification, termination or waiver of any provision of this Guaranty (which in any event shall not include execution of counterparts to this Guaranty), and no consent to any departure by any Guarantor therefrom, shall in any event be effective without the written concurrence of the Lender and, in the case of any such amendment or modification, the Guarantors.  Any

AmericasActive:14824700.3

such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

**11.     Miscellaneous.**  It is not necessary for the Lender to inquire into the capacity or powers of any Guarantor or any Guarantee Party or the officers, directors or any agents acting or purporting to act on behalf of any of them.

(a)     The rights, powers and remedies given to the Lender by this Guaranty are cumulative and shall be in addition to all rights, powers and remedies given to the Lender by virtue of any statute or rule of law or in any of the other Loan Documents.  Any forbearance or failure to exercise, and any delay by the Lender in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

(b)     Any provision of this Guaranty held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

(c)     The provisions of Sections 13, 15 and 16 of the Security Agreement are hereby incorporated by reference *mutatis mutandis*.

**12.     Counterparts.**  This Guaranty may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original for all purposes; but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page of this Guaranty by telecopy or electronic transmission (including Adobe pdf file) shall be effective as delivery of a manually executed counterpart of this Guaranty.

**13.     Interpretive Provisions.**  Section 17.2 of the Security Agreement is incorporated herein by reference *mutatis mutandis*.

**14.     Termination.**  Subject to Section 1(d), upon the occurrence of any transaction permitted by the Loan Documents which would require termination of this Guaranty, this Guaranty and the guarantees made herein shall automatically terminate with respect to all Guaranteed Obligations and each Guarantor shall be automatically released from its Guaranteed Obligations hereunder upon such termination, all without delivery of any instrument or performance of any act by any Person.  In connection with any termination or release pursuant to this Section 14, the Lender shall execute and deliver such documentation and releases at the expense of the Guarantors as may be reasonably requested by any Guarantor to effectuate or evidence such termination or release.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF,** each Guarantor and the Lender have caused this Guaranty to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

GUARANTORS:

**CLEAR DISTRIBUTION LLC**

By: _____
Name:  David Brown
Title: Authorized Signer/Owner

**CLEAR ENTERTAINMENT, LLC**

By: _____
Name:  David Brown
Title:  Authorized Signer/Owner

**SPECTER ENTERTAINMENT, LLC**

By: _____
Name:  David Brown
Title:  Authorized Signer/Owner

By: _____
Name: David Brown

*Signature Page to Guaranty*

LENDER:

**8TH WONDER PICTURES, LLC**

By: _____
    Name: Andrew Townsend
    Title: Managing Member

*Signature Page to Guaranty*

**IN WITNESS WHEREOF,** each Guarantor and the Lender have caused this Guaranty to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

GUARANTORS:

**CLEAR DISTRIBUTION LLC**

By: _____
    Name:
    Title:

**CLEAR ENTERTAINMENT, LLC**

By: _____
    Name:
    Title:

**SPECTER ENTERTAINMENT, LLC**

By: _____
    Name:
    Title:

By: _____
    Name: David Brown

LENDER:

**8ᵀᴴ WONDER PICTURES, LLC**

By: _____
    Name:
    Title:

*[Signature Page to Guaranty Agreement]*

# EXHIBIT F

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Karissa Lowry
916-641-5100

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
CSC
2710 GATEWAY OAKS DRIVE, SUITE 150N
SACRAMENTO, CA 95833
USA

DOCUMENT NUMBER: 90558740002
FILING NUMBER: 20-7791884884
FILING DATE: 06/17/2020 06:41

IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| Clear Distribution LLC | | | | |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9350 Wilshire, Suite 203 | Beverly Hills | CA | 90212 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| 8th Wonder Pictures, LLC | | | | |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1805 West Avenue | Austin | TX | 78701 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor whether now existing or hereafter arising or acquired, including all proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Clear/Specter

FILING OFFICE COPY

# FINANCING STATEMENT

This document is a representation of a filing made electronically through the Wyoming Secretary of State's web site.

EDWARD A. BUCHANAN, WY SECRETARY OF STATE
Filing Date: 6/17/2020 7:49 AM
Lapse Date: 6/17/2030 11:59 PM
Financing Statement Doc #: 2020-16638324

**A. NAME & PHONE OF CONTACT AT FILER (Optional)**
SHERIKA HILL 8002222122

**B. EMAIL OF CONTACT AT FILER (Optional)**
sherika.hill@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
2730 GATEWAY OAKS DRIVE
SUITE 100
SACRAMENTO, CA  95833

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

## DEBTORS

**1. DEBTOR'S NAME**

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | SPECTER ENTERTAINMENT LLC | | | |
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

**c. MAILING ADDRESS**
925B PEACHTREE ST. NE, UNIT 304

| CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|
| ATLANTA | GA | 30309 | USA |

## SECURED PARTIES

**1. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY)**

| | a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 8TH WONDER PICTURES, LLC | | | |
| | b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

**c. MAILING ADDRESS**
1805 WEST AVENUE

| CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|
| AUSTIN | TX | 78701 | USA |

**COLLATERAL:**  This financing statement covers the following collateral:

All assets of the Debtor whether now existing or hereafter arising or acquired, including all proceeds thereof.

Check only if applicable and check only one box:  Collateral is ☐ held in a Trust ☐ being administered by a Decedent's Personal Representative

Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

RECORD TYPE:   UCC

DESIGNATION:    Debtor / Secured Party

OPTIONAL FILER REFERENCE DATA:
Clear/Specter

NOTE: All information on this form is public record.

# FINANCING STATEMENT

This document is a representation of a filing made electronically through the Wyoming Secretary of State's web site.

EDWARD A. BUCHANAN, WY SECRETARY OF STATE
Filing Date: 6/17/2020 7:57 AM
Lapse Date: 6/17/2030 11:59 PM
Financing Statement Doc #: 2020-16638425

**A. NAME & PHONE OF CONTACT AT FILER (Optional)**
SHERIKA HILL 8002222122

**B. EMAIL OF CONTACT AT FILER (Optional)**
sherika.hill@cscglobal.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

CORPORATION SERVICE COMPANY
2730 GATEWAY OAKS DRIVE
SUITE 100
SACRAMENTO, CA  95833

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

DEBTORS

| 1. DEBTOR'S NAME | | | |
|---|---|---|---|
| a. ORGANIZATION'S NAME: CLEAR ENTERTAINMENT LLC | | | |
| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

c. MAILING ADDRESS
3940 LAUREL CANYON BLVD., #1413

| CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|
| STUDIO CITY | CA | 91604 | USA |

SECURED PARTIES

| 1. SECURED PARTY'S NAME (or Name of ASSIGNEE of ASSIGNOR SECURED PARTY) | | | |
|---|---|---|---|
| a. ORGANIZATION'S NAME: 8TH WONDER PICTURES, LLC | | | |
| b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S) INITIAL(S) | SUFFIX |

c. MAILING ADDRESS
1805 WEST AVENUE

| CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|
| AUSTIN | TX | 78701 | USA |

COLLATERAL:  This financing statement covers the following collateral:

All assets of the Debtor whether now existing or hereafter arising or acquired, including all proceeds thereof.

Check only if applicable and check only one box:  Collateral is ☐ held in a Trust
☐ being administered by a Decedent's Personal Representative

Check only if applicable and check only one box: ☐ Agricultural Lien  ☐ Non-UCC Filing

RECORD TYPE:   UCC

DESIGNATION:   Debtor / Secured Party

OPTIONAL FILER REFERENCE DATA:
Clear/Specter

NOTE: All information on this form is public record.

# EXHIBIT G

ACQUISITION AGREEMENT

This Acquisition Agreement (together with any and all schedules and exhibits attached hereto, the "**Agreement**") is entered into as of June 12, 2020 (the "**Effective Date**") by and between Clear Distribution LLC, a California limited liability company ("**Distributor**"), and Son of the South Owner LLC, a New York limited liability company ("**Grantor**"; each of Distributor and Grantor a "**Party**", and collectively, the "**Parties**") and sets forth the Parties' agreement regarding Distributor's acquisition of certain rights in and to the motion picture currently titled "**Son of the South**." In consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     **Conditions Precedent.**  All of Distributor's obligations under this Agreement are conditioned upon satisfaction of the following conditions precedent (collectively, the "**Conditions Precedent**"): (a) completion of the Picture and Distributor's receipt and approval of the chain-of-title documentation to support Grantor's rights to the Picture (as defined below), including without limitation, receipt by Distributor of all necessary releases, assignments, supporting agreements and documentation required by Distributor in its sole discretion in connection therewith; (b) Distributor's receipt and approval of the errors and omissions ("**E&O**") insurance documentation described and otherwise required by Section 26 below; (c) Distributor's receipt, in each case in a form satisfactory to Distributor, of a fully executed intercreditor agreement and/or non-disturbance agreement (at Distributor's option) from each third party claiming any lien, security interest, or other encumbrance affecting the Picture (defined below); (d) Distributor's receipt of a short form assignment in duplicate duly executed and notarized and bearing original Grantor signatures in the form attached as **Exhibit A** hereto; (e) Distributor's receipt of a copyright mortgage and security agreement in duplicate duly executed and notarized and bearing original Grantor signatures in the form attached as **Exhibit B** hereto; (f) Distributor's receipt of a completed Form W-9 or Form W-8BEN, as applicable, for Grantor; (g) the Parties' exchange of duly authorized signatures hereto and Distributor's receipt of a fully executed copy of this Agreement, including the signed acknowledgment of Grantor's agent, JABA Entertainment, Inc. ("**Agent**") in the form attached hereto; and (h) execution by Distributor, Grantor and Forcht Associates LLP of an escrow agreement which shall provide exact directions for usage of the Advance by Grantor and/or Forcht Associates LLP (as escrow holder), the form of which shall be mutually approved by the aforementioned parties thereunder ("Escrow Agreement").   If Distributor determines the Conditions Precedent are not met or cannot be met, Distributor shall have the right, but not the obligation, upon written notice to Grantor, to terminate this Agreement, in Distributor's sole discretion, and after such termination Distributor shall have no liability or obligation whatsoever to Grantor, and any Advance or portion thereof which is theretofore tendered to Grantor shall be immediately refunded to Distributor.

2.     **Picture.**  As used herein, the term "**Picture**" means that certain feature length motion picture currently titled "Son of the South" (under whatever title by which such motion picture is now or may hereafter become known), all versions and trailers thereof, all outtakes, "behind the scenes," "making of," "blooper" and other footage and works related thereto, all characters and literary, artistic and other material contained therein, and all scripts, screenplays and other material on which it may be based.  Grantor shall cause Delivery (as defined below) to occur on or before

Acquisition Agreement                                                                                      "Son of the South"

June 30, 2020 (the "**Outside Delivery Date**").  The Picture as delivered shall be of first-class technical quality, originally shot in the English language, originally shot in color, and the Picture's feature presentation shall conform to the following specifications ("**Picture Specifications**"):

**PICTURE SPECIFICATIONS**:

> **Writers:** Barry Alexander Brown,
> **Director:** Barry Alexander Brown
> **Running Time:** not less than eighty-six (86) minutes nor more than one hundred twenty (120) minutes, inclusive of main and end titles
> **Guilds:** the Picture is produced subject to the collective bargaining agreement(s) of the following union(s) and/or guild(s) only: SAG-AFTRA and IATSE
> **Rating:** capable of receiving MPAA rating no more restrictive than "R"
> **Cut:** The Picture shall be delivered the same as the cut of the Picture that Grantor provided to Distributor on May 15, 2020, with no substantial changes.
> **Representative:** Distributor shall have the right to appoint one or more duly authorized representatives (the "**Distributor Representatives**") who shall oversee Distributor's interests in the Picture.  Each such Distributor Representative shall be bound (and shall acknowledge the same in writing) by the terms of paragraph 23 herein.  Grantor shall promptly notify the Distributor Representatives of each cut of the Picture no later than when such are available to any of the producers, and shall upon request therefor provide to each Distributor Representative each cut that such Distributor Representative requests to see.  The Distributor Representatives shall be kept reasonably informed as to the production schedule and locations and receive call sheets and production reports as processed daily.  Distributor may replace any Distributor Representative at any time at its sole discretion, and in all events, Grantor agrees to cooperate with and not frustrate the Distributor Representatives' reasonable access to the production process so as to protect Distributor's interest herein.  In addition to providing the film dailies and each cut of the Picture to the Distributor Representatives, Grantor shall ensure that Distributor receives a copy of each cut of the Picture promptly upon its availability, and in any event no later than when such cuts are available to any of the producers.

**MILESTONE DATES:**

Grantor represents, warrants and covenants that production of the Picture shall adhere to the following milestone dates ("**Milestone Dates**"):

> **Production Start Date:** Grantor represents and warrants that production is complete and the Picture is ready to deliver.
> **Completion Date:**  As used herein, the term "**Completion Date**" shall mean (a) the date of completion of post-production of the Picture or (b) the first date any version of the Picture is screened at a festival or market, for the public or for a distributor, whichever is earliest.

Any changes to the Picture, the Picture Specifications (including the guilds to the collective bargaining agreements of which production of the Picture is subject, if any), the Milestone Dates and/or the Outside Delivery Date must be preapproved in writing by Distributor.  Distributor's

right to approve changes to any of the foregoing is a material condition to Distributor's obligations under this Agreement.

**3.**     **Rights.**   Grantor hereby irrevocably and exclusively licenses, grants, assigns and conveys solely to Distributor all rights, licenses and privileges (other than Reserved Rights, as defined below), in and to the Picture in all languages (subtitled, dubbed and otherwise) and in all media and manners, now known and hereafter devised, under copyright (including by way of present assignment of future rights under copyright) and otherwise (collectively, the "**Rights**"), for the Term (and after the Term, for sell-off and for the limited purpose of re-transmitting the Picture to end users who obtain during the Term rights to re-transmission of the Picture), and throughout the Territory (and outside the Territory, for the limited purpose of marketing, advertising, publicizing, promoting and technically supporting exploitation of the Picture in the Territory).

Other than Reserved Rights, the Rights include, without limitation, the exclusive right, license and privilege derived through copyright, including, without limitation, all extensions and renewals of copyright, whether directly or through sublicenses, to market, advertise, promote, publicize, replicate, exhibit, distribute, display, project, transmit, broadcast, perform and otherwise exploit the Picture, including, without limitation, all versions, portions, elements and trailers thereof and all literary, music and other material embodied therein, in all media, and all languages, by any and all means, methods, forms and processes and devices, now known or hereafter devised. The Rights also include, without limitation, the right to exploit clips from the Picture, cut and use trailers, engage in all customary promotional and marketing activities regarding the Picture, including, without limitation, the exclusive right to engage in advertising, promotion, "co-promotions," promotional merchandising and "commercial tie-ins," and the right to use, produce and exploit any and all available trailers, special feature, "blooper," out-take, making-of and bonus material, if any, in connection with release of the Picture.  The Rights include, without limitation, music publishing rights, soundtrack rights, and the right to use, perform and exploit any and all music, lyrics and musical performances created for the Picture, any and all pre-existing music licensed for use in the Picture, and the master recordings thereof, in any and all media now known or hereafter devised, in synchronization (in timed relation) with the Picture, in connection with exploitation of the Picture and in all forms of in-context and out-of-context advertising. The Rights also include, without limitation, the right to use the approved names, voices and likenesses of all persons who appear in, and above-the-line persons who rendered services in connection with the production of, the Picture to advertise the Picture, subject to contractual limitations for such agreements.  The Rights also include the right to broadcast, transmit, make, publish or reproduce, separately from other portions of the Picture, the visual portion, sound or music contained in the Picture, or trailers, excerpts, clips, dramatizations or summaries of such visual portion, sound or music, or any part or combination of all or any part of the foregoing,  subject to contractual limitations of the agreements for the score and other musical selections integrated into the Picture, in any and all languages and versions, on any and all sizes, gauges, widths of film or tape or other materials, for any and all uses and purposes (including without limitation, in connection with the advertising and publicity of the Picture or exploiting the foregoing rights in and to the Picture), and the right to exercise all benefits, privileges, causes of action and remedies relating to any of the foregoing, whether before or hereafter accrued, including, without limitation, the exclusive right to sue for all past, present or future infringements or other violations of any of Distributor's

rights in the Picture and/or under this Agreement and to settle and retain proceeds from any such actions. For the avoidance of doubt, the Rights include, without limitation, the following:

**"Theatrical Rights"**, meaning exclusive rights to exploit the Picture for viewing by the public in theaters, without regard as to how the Picture is distributed to theaters;

**"Non-Theatrical Rights"**, meaning exclusive rights to exploit the Picture in aircraft, ships, trains, buses, military installations, oil rigs, educational institutions, libraries, hotels, motels, prisons, museums, churches, hospitals and other institutions that license recorded entertainment rights;

**"Television Rights"**, meaning exclusive rights to exploit the Picture by means of television signal, without regard as to how such signal is transmitted (e.g., broadcast over the air or via satellite or cable), including free television, basic cable, and pay television, but excluding all forms of electronic sell-through, download to own, pay-per-view and video-on-demand;

**"Video Rights"**, meaning exclusive rights to exploit the Picture in tangible home entertainment formats, now known and hereafter devised, including any and all forms of videocassette, cartridge, phonogram, tape, video disc, laser disc, 8mm recording, DVD, DVD-ROM, Blu-ray, HD-DVD, Internet access-ready DVD, CD-I, CD-ROM, Video Compact Disc, discs for PSP (Play Station Portable) and other players, UMDs (universal media discs), memory sticks and other tangible media storage and recording formats; and

**"Electronic Rights"**, meaning exclusive rights to exploit the Picture by any and all forms of electronic sell-through ("EST"), download to own, pay-per-view ("PPV") and video-on-demand (transactional ("VOD"), subscription ("SVOD"), advertising supported ("AVOD"), and otherwise), regardless of how transmitted; and to otherwise exploit the Picture by exhibition, broadcast or transmission (wired, wireless, mobile or otherwise) over Internet, intranet, and multi-node computer networks by any and all means, now known or hereafter devised.

The Rights further include the right to cut, edit, add to, delete from, arrange, rearrange, and revise the Picture as Distributor may determine (a) to meet any applicable broadcast and/or viewing standards and practices; (b) with respect to timing requirements, rating, censorship, and/or creating commercial breaks; (c) for closed captioning, subtitling and dubbing, for panning or scanning, to create files for Electronic Rights distribution; (d) as required by law or court order, in connection with the settlement of a dispute, and/or to avoid legal liability; and (e) any other customary editing necessary in Distributor's good faith determination to exhibit the Picture in various media, as well as the right to make changes to the title of the Picture in Distributor's sole discretion. If Distributor elects to change the title as permitted hereunder, Grantor shall use best efforts to assist Distributor in obtaining an E&O insurance certificate that covers the Picture as newly titled.

Grantor hereby waives the benefits of any provision of law known as "droit moral" or any similar law which Grantor may have in any country of the Territory with respect to the Picture, and Grantor shall not institute, support, maintain, authorize or consent to any action or lawsuit on grounds that the Picture or any version of the Picture or any exploitation or use thereof or of the Rights in any way constitutes an infringement of droit moral or any similar law.

As used herein, the term "**Reserved Rights**" means radio dramatization, stage play, theme park and derivative production (remake, sequel, prequel and television "spin-off") rights; provided, however, that to the extent that Grantor has or acquires rights in any derivative productions, Distributor shall have a right of first negotiation, which shall in good faith be accepted or rejected within 90 days following the notice of rights acquisition,  to acquire the same rights in the Territory with respect to each such work that Distributor is acquiring with respect to the Picture under this Agreement, provided that if Distributor rejects any such right in connection with any derivative productions, then Distributor's continued rights hereunder shall thereupon lapse.

4.      **Term; Right of First Negotiation/Last Refusal.**

       (a)      "**Term**", as used herein, shall mean the period commencing upon the Effective Date and expiring twenty-five (25) years after the earlier of (i) Distributor's first release of the Picture in the Territory (as defined below), or (ii) six (6) months after Delivery (as defined below). Distributor shall have the right to a standard six (6) month non-exclusive sell-off period for DVDs, Blu-ray discs and/or other similar physical embodiments of the Picture commencing upon the end of the Term, and if Distributor has not recouped the Advance (as defined below) at the end of the Term, such Term shall be automatically extended for a period of five (5) years (with no extended sell-off period thereafter).

       (b)      Distributor shall have the right of first negotiation and last refusal (i.e., matching) to acquire any rights owned or controlled by Grantor, its equity owners, subsidiaries or affiliates of any of the foregoing with respect to any of the Rights for the period following expiration of the Term as follows: After the expiration or earlier termination of this Agreement, Grantor may not itself exploit any of the Rights in the Territory without first attempting in good faith to negotiate with Distributor terms for Distributor's renewed exploitation thereof, and may not permit any third party to exploit any of the Rights in the Territory without first delivering seven (7) days' prior written notice of the proposed exploitation and terms thereof to Distributor.  If, prior to the expiration of such seven (7) day period, Distributor notifies Grantor in writing that Distributor will match such terms (other than any terms and conditions that are not relevant to Distributor and/or that Distributor is not reasonably capable of complying with, taking into consideration Distributor's business), Distributor shall be entitled to exploit such Rights on such terms in lieu of such third party; otherwise, Grantor may permit such third party to exploit such Rights on the terms so proposed.

5.      **Territory.**  As used herein, the term "**Territory**" shall mean and include the universe, without limitation.

6.      **Intentionally Omitted.**

7.      **Delivery.**  As used in this Agreement, the term "**Delivery**" means Distributor's receipt and approval of all Delivery Elements, the term "**Bonded Delivery**" shall mean Distributor's acceptance of those Delivery Elements marked with an asterisk (*) on **Exhibit C** hereto, and the term "**Delivery Elements**" means all those items set forth on **Exhibit C** attached hereto together

with any additional delivery elements consistent with industry standards for this kind of exploitation. As used in this Agreement, the term "**Licensees**" of a party shall mean such party's licensees, sublicensees, subdistributors, successors and assigns, each individually a "**Licensee**".

Distributor reserves the right to require additional deliverables to conform with changing technology and to fulfill its obligations to its Licensees, and Grantor agrees to comply with such requirements provided Grantor's inability to so comply shall not be deemed a violation or default under this Agreement. In the event that Grantor is unable to comply with the immediately preceding sentence, Distributor shall have the right to create such additional deliverables and/or take all reasonable actions as necessary to complete Delivery and deduct the actual, arms-length, out-of-pocket expense of such additional deliverables from any portion of the Advance as-of-yet unpaid to Grantor. Grantor shall provide Distributor no later than 15 days from execution of this Agreement with (i) a written statement of all credit and related restrictions and obligations for the Picture, including with respect to paid advertising, screen credit obligations, and name and likeness restrictions, dubbing and subtitling restrictions, and required approvals (the "**Credit Statement**") in the form attached as Attachment F to **Exhibit C**, along with an approved billing block and copyright line for the Picture; (ii) the documentation regarding Residuals (defined below) referenced in Attachment E to **Exhibit C**; (iii) all material agreements regarding Principal Talent; and (iv) a completed fact sheet for the Picture in substantially the form attached as Attachment H to **Exhibit C**. The Parties acknowledge that Grantor's timely delivery of the Delivery Elements to Distributor is of the essence of this Agreement, and all costs of Delivery will be borne by Grantor. Grantor guarantees that the quality of the Delivery Elements shall be such that each can be utilized for the scope of exploitation of the Rights contemplated by this Agreement and is suitable for exploitation in compliance with the technical standards in the Territory. For the avoidance of doubt, the Delivery Elements shall include, without limitation, any and all clearances and consents necessary to permit Distributor to exploit the Rights in the Territory during the Term (and thereafter, to the extent herein provided).

If Grantor fails to effect Delivery by the Outside Delivery Date, Distributor may, in its sole discretion (a) secure acceptable replacements for each undelivered or defective Delivery Element and withhold from any amounts otherwise payable to Grantor or its designee Distributor's reasonable estimate of the cost thereof (provided that if the actual cost of such replacement(s) exceeds the amount withheld by Distributor therefor, then the difference between the amount withheld and the actual cost shall be payable by Grantor to Distributor upon demand), (b) withhold from amounts otherwise payable to Grantor or its designee any amount Distributor reasonably deems appropriate in its sole discretion until Delivery is complete, and/or (c) terminate this Agreement by written notice to Grantor. Upon any such termination, or upon termination in accordance with Section 14 below, Distributor shall be relieved of its obligations under this Agreement, if any, and Grantor shall, within fifteen (15) days of receipt of Distributor's notice of termination, refund to Distributor any monies paid by Distributor, including (x) any portion of the Advance paid hereunder, (y) any Deductible Costs incurred prior to termination, and (z) interest thereon at a rate of prime + 3%. Distributor may deduct and retain from payments otherwise due to Grantor under this Agreement any and all amounts due and unpaid to Distributor from Grantor hereunder. The foregoing shall not limit in any way Distributor's rights to assert any claims or remedies against Grantor and to seek any other damages to which Distributor may be entitled as a result of any Delivery failure. Nothing contained herein obligates Distributor to create any

Delivery Elements. Distributor's exploitation of the Picture shall not relieve Grantor of its obligation to effect complete Delivery. Distributor's acceptance of delivery of less than all Delivery Elements under a notice of assignment, if any, shall not relieve Grantor of the obligation to effect full Delivery as set forth herein.

**8.** **Advance**. Distributor shall pay to Grantor or Grantor's designee a fully recoupable advance equal to US$1,800,000 (the "**Advance**") payable as follows, time being of the essence as to each installment:

(a) US$1,500,000 not more than two (2) business days after satisfaction of the Conditions Precedent;

(b) US$300,000 no later than ten (10) business days after initial US release.

For the avoidance of doubt, payments made by Distributor to or for the benefit of Grantor under this Agreement shall be credited against Advance payment obligations.

**9.** **Allocation of Proceeds**. Any and all monies derived from exploitation of the Rights in the Territory during the Term and sell-off period ("**Gross Revenue**") shall be allocated, on a fully cross-collateralized, continuing basis, as follows:

(a) First, Distributor shall deduct and retain a distribution fee in the amount equal to 30.0% of 100% of Gross Revenue (the "**Distribution Fee**");

(b) Thereafter Distributor shall recoup the total of all costs set forth below ("**Deductible Costs**"),[1] whether incurred directly by Distributor or by its affiliates or any of the foregoing's Licensees or reimbursed to other parties;

(i) Interest on the Advance in an amount equal to the lesser of prime (as published by the Wall Street Journal) plus 2% or the highest rate permitted by law;

(ii) Credits, discounts, rebates, incentives, co-op, settlements, allowances, discounts, placement fees, market development funds and similar, and costs incurred in connection with marketing, selling and distributing the Picture with settlements, allowances, discounts capped at 10%;

(iii) All costs and fees for authoring, mastering, artwork design, and creation of so called bonus or added material, and similar charges;

(iv) All costs and fees in connection with manufacturing and producing material for the Picture, including without limit, all costs of preparing, delivering and/or preserving the Picture for distribution and exploitation, and (if applicable) costs incurred in connection with the production of foreign language versions of the Picture;

---

[1] For purposes of clarity, any reference to Deductible Costs herein shall refer only to actual, out-of-pocket arms-length usual and customary third party costs.

(v)      All payments, costs and fees incurred with respect to distribution, fulfillment, freight, returns processing or similar for the Picture;

(vi)      All costs and expenses incurred in connection with the advertising, exploiting, publicizing and marketing of the Picture, which shall be limited to $250,000.

(vii)      All costs and expenses incurred in connection with collection of any Gross Revenue, the institution and/or maintenance or defense of any claim naming Distributor and/or any of its Licensees, or otherwise affecting or impairing the rights granted by Grantor hereunder, unless such costs and expenses are caused by the acts or omissions of Distributor, its assignees, representatives and/or licensees;

(viii)      In the case of non-traditional channels (non-traditional channels include, but are not limited to, scan based trading, CBA markets, and third party out of pocket marketing and/or sales services for one time and/or limited time promotions and programs), all costs of such sales including but not limited to costs of goods, co-op, discounts, placement fees, (discounts and placement fees capped at 5%), and of marketing, selling and distributing the same;

(ix)      Any other costs, charges and expenses reasonably and customarily paid or incurred to third parties, including incentive revenue share payments, in connection with distribution, advertising, marketing and/or exploitation of the Picture and the Rights hereunder, to the extent not otherwise recouped under this Agreement;

(x)      All copyright, patent and trademark expenses and all royalties and other sums payable to owners or licensors of music and other copyrighted material included in the Picture or to other third parties with respect to sound and/or visual recording and/or reproducing equipment, including without limitation special assessments and/or anti-piracy dues and assessments, and reasonable legal fees, to the extent not otherwise recouped under this Agreement;

(xi)      All premiums and other costs of insurance, including, but not limited to, E&O insurance and insurance against loss with respect to physical materials, it being understood that Distributor shall have the right to allocate to the Picture a share determined in Distributor's reasonable judgment of all costs of Distributor's insurance programs which relate in any way to the distribution or exploitation of the Picture;

(xii)      All actual third-party expenses of transmitting to the U.S. funds from any other country, or discounts taken to convert funds into U.S. dollars;

(xiii)      The amounts of all Taxes (defined below) paid and not otherwise recouped under this Agreement; and

(xiv)      A reserve for returns and bad debt (the "**Return Reserve**"), not to exceed 20% of Gross Revenue derived from exploitation of the Video Rights except as provided below. The Return Reserve will be held and accrued on a rolling 12-month basis; after a particular reserve amount has been accrued and held for the 12-month period, such amount will be liquidated ("flushed") in the next subsequent accounting period. If actual returns exceed the Return Reserve

balance, Distributor may withhold the balance of the Return Reserve until actual returns are lower than the Return Reserve balance.

(c)     As used herein, the term "**Adjusted Gross Receipts**" means Gross Revenue actually received by Distributor after deduction of the Distribution Fee and those Deductible Costs identified above.  Adjusted Gross Receipts shall be allocated as follows:

(i)     Grantor shall be entitled to an amount equal to 75% of Adjusted Gross Receipts ("**Grantor's Share**"); provided that first, from Grantor's Share, Distributor shall retain an amount equal to the sum of (W) Taxes (other than such Taxes, if any, as Distributor elects to recoup as Deductible Costs), plus (X) Third Party Payments paid or to be paid by Distributor (inclusive of all Residuals), plus (Y) the Advance, plus (Z) any other amounts to be withheld from amounts payable to Grantor under this Agreement (W, X, Y, and Z collectively the "**Grantor's Share Deductions**");

(ii)     All other proceeds (i.e., Adjusted Gross Receipts exclusive of Grantor's Share Deductions and the balance of Grantor's Share) shall be retained by Distributor as Distributor's share.

Grantor's Share (less Grantor's Share Deductions) shall be payable to Grantor pursuant to the reporting terms outlined in Section 11 below.

**10.     Intentionally Omitted.**

**11.     Reporting.**  Distributor shall render to Grantor, no later than sixty (60) days after (a) the end of the calendar quarter in which Distributor first releases the Picture in the Territory, (b) the end of each calendar quarter thereafter for the first two (2) years, (c) the end of each semi-annual period ending June 30 or December 31 for the next two (2) years, and (d) the end of each calendar year for the remainder of the Term and sell-off period thereafter, a written accounting statement (each, an "**Accounting Statement**") setting forth Grantor's Share, if any; provided, however, that no Accounting Statement shall be required for any period in which there is no reportable Grantor's Share, and further provided that if Distributor receives more than US$25,000 for any quarter or semi-annual period, as the case may be, Distributor shall provide Grantor with an Accounting Statement and remittance with respect to such reporting period. Each Accounting Statement shall be accompanied by remittance of the amount (if any) of Grantor's Share shown to be due thereon, less the amount (if any) of Taxes and Third Party Payments paid or to be paid by Distributor withheld therefrom. Each Accounting Statement shall be deemed incontestable within twelve (12) months from the date it is issued by Distributor. Accounting Statements shall be delivered by first class mail or e-mail or by any other method of delivery herein approved for communications between or otherwise agreed by the Parties.

**12.     Taxes.**  Distributor may withhold from payments to be made by Distributor under this Agreement any Taxes required by law and may remit any such withheld Taxes to the appropriate authority.  As used herein, the term "**Taxes**" means sales, use, receipts, excise, remittance, withholding, value added and other taxes or fees of any nature imposed by or payable to any governmental or taxing authority assessed directly or indirectly, with respect to the Picture or the

exploitation and/or distribution thereof, or any part of the revenues derived from the Picture. If Grantor claims an exemption to any Taxes, Grantor shall provide Distributor with documentation sufficient and acceptable to Distributor to verify that withholding is not required. Grantor shall hold the Indemnified Distributor Parties (defined below) harmless from and against any and all assessments, if any, for Taxes not collected by Distributor, including all interest, penalties and late charges thereon, and shall indemnify the Indemnified Distributor Parties (defined below) for any failure of Grantor to pay applicable Taxes.

**13.**    **Audit.**    Grantor shall have customary motion picture industry audit rights, not to be exercised more than once in any 12-month period. Any audit may only be performed by an independent certified public accountant not retained on a contingency basis, and only on the condition that Grantor provide to Distributor promptly, and in any event no later than five (5) business days following Grantor's receipt of the same, copies of any and all corresponding audit reports. Such examination shall be limited to the books and records of Distributor relating directly to the Picture, and any books and records that relate to allocated costs imposed by Distributor against the Picture, for the most recent accounting period covered by an Accounting Statement received within twelve (12) months prior to the date of such examination, must be reasonable in scope and duration, and shall be subject to Grantor and its representatives executing confidentiality undertakings. Any objections of Grantor to any information in any Accounting Statement shall be deemed to have been waived unless Grantor institutes an arbitration proceeding with respect thereto within twelve (12) months after such Accounting Statement is issued. For the avoidance of doubt, the inclusion in any Accounting Statement of information that appeared in a previous Accounting Statement shall not make any such information subject to objection again and does not recommence the running of the twelve (12) month objection period therefor. Any audit that reveals an underpayment by Distributor to Grantor of greater than $40,000 or 7.5% or more, then Distributor shall reimburse Grantor for the reasonable third-party out of pocket costs of such audit.

**14.**    **Publicity.**    Grantor represents, warrants and covenants that each of Lucy Hale, Lukas Till, Lex Scott Davis and Cedric the Entertainer (each, a **"Principal Talent"**) is or by the Outside Delivery Date shall be contractually obligated to provide a reasonable amount of publicity and promotional services with respect to the Picture, including, without limitation, not less than two (2) full days (not including travel time) of "in person" press and publicity for the Picture, subject to to the Talent Agreements. Grantor further represents, warrants and covenants that there are no agreements relating to Principal Talent for the Picture other than the agreements relating to Principal Talent copies of which Grantor delivered to Distributor prior to Grantor's execution of this Agreement (the **"Talent Agreements"**), and that, subject to the express terms of each such Talent Agreement: (i) that there are no requirements or restrictions on the use of the names, voices and likenesses of any of the Picture's cast or crew in connection with the advertising, marketing, promotion or publicity for the Picture, (ii) that Distributor may (but shall not be required to) use the name of each Principal Talent, alone or with such other names as Distributor may determine in Distributor's sole discretion, above or before title, and (iii) that Distributor may (but shall not be required to) use each Principal Talent's image and may (but shall not be required to) use each Principal Talent's likeness, in each case, alone or with such other images and/or likenesses as Distributor may determine in Distributor's sole discretion, in the key art, trailers and other marketing materials for the Picture and in connection with the advertising, marketing, promotion and publicity of the Picture. Distributor may remove from the Picture, and from advertising,

publicity, and credits therefor, any person or entity whom Distributor discovers has committed or been accused of a felony or a crime of moral turpitude or an act tending to shock, insult or offend the community or violate public morals or standards of decency or who has become the subject of public hatred, contempt, scorn or ridicule. In the event two or more customers reject the Picture on grounds that any person or entity has committed or been accused of a felony or a crime of moral turpitude or an act tending to shock, insult or offend the community or violate public morals or standards of decency or who has become the subject of public hatred, contempt, scorn or ridicule, Distributor shall be entitled to terminate this Agreement. In the event of any conflict between this Section 14, and the contents of the Credit Statement, the Credit Statement shall be deemed amended to conform to this Section 14. Any agreements for the Picture relating to any Principal Talent other than the Talent Agreements shall be subject to Distributor's prior written approval, and Grantor may not, without Distributor's express prior written approval, amend, restate, supplement or otherwise modify the Talent Agreements or any other contract an executed copy of which Grantor provides to Distributor under this Agreement, whether for Principal Talent or otherwise.

**15.    Marketing Materials.**  Distributor and its agents and Licensees shall have free access to and use of all foreign language tracks (regardless of format), all dubbed versions/tracks (whether on film, videotape or otherwise), all subtitled versions/tracks (whether on film, videotape or otherwise), all artwork, marketing/publicity, so-called "bonus material" and similar advertising/publicity materials in all formats (including print ads, trailers, and television and radio spots) and electronic press kits, which are created or used by Grantor or by any of Grantor's agents or Grantor's Licensees in connection with the exploitation of rights retained with respect to the Picture, all at no cost to Distributor or Distributor's agents or Distributor's Licensees (other than any applicable duplication and shipping costs, if any, for items that are not Delivery Elements). Grantor shall provide Distributor with such laboratory access letters as Distributor may reasonably request or require with respect to the same.

**16.    Credit.**  Distributor shall receive, in perpetuity and throughout the Universe, (a) two (2) presentation credits (in first and second positions, which, unless otherwise directed by Distributor in writing, shall read "Clear Horizon Presents" and/or as otherwise designated) on a separate cards in the main titles and in all paid ads and the billing block of the Picture and (b) two (2) static distributor logo as the last card in the Picture's end credit roll and (c) four (4) executive producer credits for designees designated by Distributor in its sole discretion in the main titles (on a card shared by Distributor's designees only) and in paid ads and billing block tied in all aspects on a most favored nations basis to each other individual receiving a producer type credit on the Picture. Distributor shall have the right, in its discretion, to accord similar credits to its Licensees. Each of Distributor and Distributor's Licensees shall also be entitled, in perpetuity and throughout the Universe, to inclusion of its animated and/or static logo at the beginning of the Picture (and any trailers) and to inclusion of its logos on all artwork, paid advertising and promotional materials for the Picture, including DVD/videogram packaging, the size, placement and prominence of which, Distributor may determine (but in the case of Distributor's Licensees, only within such licensee's Territory). No casual or inadvertent failure by Distributor or Distributor's Licensees to observe the requirements and restrictions specified in the Credit Statement shall constitute a breach of this Agreement, and Distributor shall not be liable for the failure of any of Distributor's Licensees to comply with therewith. Promptly following Distributor's receipt of written notice detailing, with

reasonable specificity, a failure by Distributor to comply with the Credit Statement, Distributor shall use commercially reasonable efforts to prospectively cure such failure on materials created after the date of such notice, provided that in no event shall Distributor be obligated to recall any materials. The Picture as delivered to Distributor shall contain all required screen credits, and, provided that Distributor does not alter such screen credits without Grantor's consent or as otherwise required to conform credits to guild and other legal requirements, Grantor shall indemnify and hold the Indemnified Distributor Parties (defined below) harmless with respect to any claims regarding such screen credits. Grantor shall forever indemnify, defend and hold harmless the Indemnified Distributor Parties (defined below) from and against any and all claims arising from or related to Grantor's failure to deliver proper or sufficient Credit Statement information. In the event that Grantor fails to timely deliver a Credit Statement, any and all references in this Agreement to obligations of Distributor or Distributor's Licensees to comply with the Credit Statement or rights being subject thereto shall be deemed stricken.

17.    **Release Obligation.** Distributor shall have complete, exclusive and unqualified discretion and control as to the time, manner and terms of distribution, exhibition and exploitation of the Picture in any and all media for which Distributor has been granted rights throughout the Territory, separately or in connection with other pictures, in accordance with such policies, terms and conditions and through such parties as Distributor in its sole business judgment may determine proper or expedient and the decision Distributor in all such matters shall be binding and conclusive upon Grantor. Grantor shall have meaningful consultation with respect to Distributor's marketing campaign, initial release plan, and on the initial press release regarding Distributor's acquisition of rights in the Picture. Notwithstanding the foregoing, provided Delivery is timely completed, Distributor agrees to release or cause the Picture to be released in at least one (1) theater in each of ten (10) of the top fifty (50) U.S. markets ("**Theatrical Release**"), including in Los Angeles and New York, with other markets to be determined in Distributor's sole discretion. In the event that the Picture is initially released exclusively via a premium streaming platform (e.g. Netflix, Prime Video, Hulu, Apple TV, etc.), then Distributor shall not be obligated to the Theatrical Release. In the event of any existing national or regional commercial restrictions related to pandemic or any other so-called "force majeure" event at any time within 3 months of Distributor's designated theatrical release date, Distributor will have sole discretion to cancel planned theatrical distribution and to change any or all marketing and exploitation plans relating to the Picture. Except as specifically noted herein in this Section 17, Distributor shall have no release obligations related to any media or otherwise.

18.    **Assignment.** Notwithstanding anything else contained in this Agreement, Distributor may freely assign this Agreement and license, sublicense, grant and/or otherwise delegate any or all of its rights and obligations hereunder at any time. For the avoidance of doubt, with respect to any rights granted to Distributor under this Agreement, Distributor may grant such rights to a third party, including, without limitation, a licensee, sublicensee and/or subdistributor, and such rights may be exercised hereunder by such third parties. The foregoing is intended by the parties to be a specific consent to such licensing and sub-licensing and to overcome any restrictions on licensing and sub-licensing of any or all of their respective rights. Grantor shall not assign this Agreement or any of its rights or obligations hereunder without Distributor's prior written consent.

19.   **Residuals; Third Party Payments**.  As used in this Agreement, the term "**Residuals**" means compensation payments and pension and health contributions, if any, required with respect to exploitation of the Rights in the Territory during the Term by collective bargaining agreements negotiated under the laws of the United States and subject to which the Picture is or was produced, together with any and all Social Security, withholding, unemployment insurance, disability insurance and other payments required by law with respect thereto.  Provided Grantor timely delivers all information and documents specified in the **Exhibit C** to this Agreement for each of SAG-AFRA and IATSE (collectively, the "**Guilds**"), and such additional information and documents as Distributor may reasonably request with respect thereto, Distributor shall satisfy the Residuals payment obligations arising from its exploitation of the Rights in the United States, Canada and their respective territories ("Domestic Territory") during the Term with respect to each of the Guilds.  Additionally, Distributor shall undertake to make Residuals payments on behalf of Grantor for all territories other than the Domestic Territory ("ROW Residuals"), provided that (i) the Guilds shall not be third-party beneficiaries to this Agreement, and (ii) that ROW Residuals shall be deducted as part of Grantor's Share Deductions; and (iii) Distributor assumes no liability for ROW  Residuals in the event that Grantor's share is insufficient to pay ROW Residuals, and (iv) Grantor shall indemnify the Indemnified Distributor Parties (defined below) from any and all claims related to ROW Residuals, any payments made by Distributor related thereto, and/or Distributor's assumption thereof. For clarity, any costs and expenses of administration (e.g. payroll house, accounting, etc.) shall be included as part of the Grantor's Share Deductions related to Residuals. Distributor shall have sole discretion whether to advance any amounts payable for ROW Residuals to the extent that Grantor's share is insufficient to pay such Row Residuals. In such event, Distributor would be entitled to deduct any such amounts advanced by Distributor from Grantor's Share in repayment of such advances. Distributor shall provide statements of all Residuals paid to Guilds in relation to the Picture every quarter for as long Residuals are due to the Guilds. If for any reason Distributor's rights to the Picture cease or are terminated, Grantor shall immediately assume all obligations under any and all agreements with the Guilds in connection with the Picture, if any, and shall indemnify the Indemnified Distributor Parties (defined below) from any and all claims related to Residuals, any payments made by Distributor related thereto, and/or Distributor's assumption thereof.

As used in this Agreement, the term "**Third Party Payments**" means any and all Residuals, compensation/participations/bonuses and other additional or supplemental payments to any talent or crew or third party who worked on or contributed to the Picture in any way and all profit participations, music synchronization, performance and other mechanical fees, and any other license fees (including, without limitation, all literary, artistic, musical, technological and/or intellectual property rights fees, payments and/or royalties) arising from exploitation of the Rights hereunder or otherwise applicable to the Picture and/or any fees paid to a third party to track and/or pay the foregoing.  Grantor is solely responsible for and shall timely satisfy any and all Third Party Payments, other than Assumed Obligations.  As used in this Agreement, the term "**Assumed Obligations**" means any and all Third Party Payments, if any, the responsibility for the satisfaction of which Distributor, at its option, may expressly agree in writing to assume.  Notwithstanding the foregoing, Distributor shall have the right, but not the obligation (except in the case of Assumed Obligations), to make any such Third Party Payments (Assumed Obligations or otherwise) on behalf of Grantor and may at Distributor's election withhold from amounts otherwise due to Grantor a reasonable reserve for such purpose.  Grantor agrees that from such reserves and from

amounts otherwise payable to Grantor hereunder Distributor may make Third Party Payments, and Grantor otherwise agrees to reimburse Distributor promptly upon request for any Third Party Payments made by Distributor. Without limiting Grantor's indemnification obligations otherwise in this Agreement, Grantor shall indemnify and hold harmless the Indemnified Distributor Parties (defined below) from any and all claims, liabilities and damages in connection with any Third Party Payments, unless resulting from Distributor's knowing or reckless negligent acts or omissions.

20.     **Liens and Encumbrances.**  Grantor shall deliver the Picture free and clear of any liens or encumbrances that could interfere in any way with Distributor's exploitation of the Picture and/or Distributor's quiet enjoyment of the Rights in the Territory during the Term (and thereafter, to the extent provided in this Agreement). As shall be provided in the contemplated Escrow Agreement, Grantor may utilize all or any part of the Advance to satisfy and release such liens. Grantor will promptly alert Distributor in writing with respect to any dispute or issue that becomes known to Grantor or its affiliates that could interfere with Distributor's exploitation of the Picture and/or Distributor's quiet enjoyment of the Rights in the Territory during the Term (and thereafter, to the extent herein provided) and defend, hold harmless and indemnify the Indemnified Distributor Parties (defined below) against the same.

21.     **Security Interest.**  As an inducement to Distributor to enter into this Agreement, and to secure Grantor's obligations hereunder, Grantor hereby grants to Distributor a first-priority continuing lien and security interest (the "**Security Interest**") in and to all Delivery Elements, the Rights in the Territory during the Term (and after the Term, for sell-off and for the limited purpose of re-transmitting the Picture to end users who obtain during the Term rights to re-transmission of the Picture), and all their proceeds including without limitation Gross Revenue, all receivables, and Grantor's Share, and any and all security interests of Grantor in any of the foregoing (all of the foregoing, collectively, the "**Collateral**") to secure (a) Distributor's interest in the Rights and the other rights and benefits hereunder, (b) Distributor's right to retain and recoup all payments and amounts Distributor is entitled to hereunder and (c) the prompt performance of Grantor's obligations, agreements, representations, warranties and covenants under this Agreement. The Security Interest shall continue until expiration of the Term, as the Term may be extended as set forth in this Agreement. Grantor agrees that Distributor may file such notices as may be necessary or desirable to perfect, evidence, renew and/or continue the Security Interest and to otherwise make Distributor's security right effective against third parties or to give it priority over competing claimants. If Grantor fails to execute and deliver any such document promptly upon request, Grantor hereby appoints Distributor as its irrevocable attorney-in-fact to execute and deliver any such document for and on behalf of Distributor, and Grantor agrees that such appointment constitutes a power coupled with an interest and is irrevocable. To enforce its rights hereunder, Distributor shall have all rights and remedies as a secured creditor available to it at law or in equity.

22.     **Indemnification.**  Grantor shall indemnify, hold harmless and (if Distributor requests) defend, Distributor, its direct and indirect equity holders, each of the foregoing's affiliates and each of the foregoing's managers, members, officers, directors, employees, agents, licensees, sublicensees, subdistributors, assignees and successors (each an "**Indemnified Distributor Party**", and collectively, the "**Indemnified Distributor Parties**"), from any and all Claims. As used in this Agreement, the term "**Claims**" means claims, costs, losses, liabilities, obligations,

judgments and/or damages (including reasonable outside attorneys' fees and expenses) arising out of or incurred for the purposes of avoiding or settling any suit, claim, proceeding or demand in connection with (a) Grantor's breach or alleged breach of this Agreement, including Grantor's representations, warranties and covenants herein; (b) the failure of Distributor to acquire any rights granted to Distributor in this Agreement or otherwise any limitations contrary to any grant of rights herein; (c) failure by Grantor to make any third party participations, music publishing fees, deferments, royalties or other Third Party Payments or other payments in connection with the Picture; or (d) infringement of any rights of a third party including without limitation, the intellectual property of a third party.  Distributor may elect, in its sole discretion, to control the applicable action or proceeding, including without limitation to assume the defense.  No settlement agreement may be entered into without Distributor's written approval that (x) negatively impacts Distributor and/or any other Indemnified Distributor Party in any way or the Rights in the Territory and/or Distributor's exploitation thereof, (y) fails to fully and unconditionally release Distributor and the Indemnified Distributor Parties, or (z) assigns any fault or culpability to Distributor or any Indemnified Distributor Party.  Distributor shall have the right to withhold any payments hereunder to offset any Claim.

**23.**     **Confidentiality.**  The terms and existence of this acquisition shall be kept confidential by Grantor and Grantor shall not make or issue any press releases, public announcements, or otherwise allow publicity relating in any way to this Agreement without Distributor's prior written approval.  Distributor shall control all publicity related to this acquisition and the exploitation of the Picture in the Territory during the Term.

**24.**     **Governing Law; Dispute Resolution.**  This Agreement is binding upon the parties hereto upon execution by both Grantor and Distributor.  This Agreement will be construed and interpreted in accordance with the substantive laws of California applicable to contracts made and fully performed in California.  Any disputes, controversies or claims arising out of or relating to this Agreement, including without limitation, the issue of arbitrability of any such disputes and requests for declaratory judgments (each, a "**Dispute**"), shall be resolved according to the procedures set forth in this section, which shall constitute the sole dispute resolution mechanism hereunder.  Either party may initiate binding arbitration of any Dispute before a retired judge or attorney with at least ten (10) years of experience in entertainment law type disputes on the JAMS panel.  The arbitration shall be held in Century City (Los Angeles), California.  The arbitration shall be conducted pursuant to JAMS arbitration rules and the arbitrator shall apply California substantive law to the proceedings except to the extent federal substantive law would apply.  Either party may record the arbitration through stenography or other legally acceptable methods.  The arbitrator shall permit limited discovery and shall use reasonable efforts to resolve the matter within forty-five (45) days and shall provide a written judgment setting forth his/her reasoning.  The arbitrator shall follow legal precedent in California and federal law and shall not have the power to commit errors of law or legal reasoning.  At Distributor's request, the arbitrator shall have the power to enjoin any activity by Grantor that interferes or is inconsistent with Distributor's exploitation of the Picture and quiet enjoyment of the Rights in the Territory during the Term (and thereafter, to the extent of Distributor's rights after the Term) and/or this Agreement.  Any resolution of the arbitrator shall be final and binding on the parties provided the arbitrator's award may be vacated or corrected on appeal to any federal or state court located in Los Angeles County for any such error(s) of law or legal reasoning, any objection to the jurisdiction and venue of which for such

proceeding each Party hereby waives. Any party may enforce the arbitration award in any court or similar tribunal in the world. Each party to any arbitration shall bear any fees, costs and expenses incurred by it or on its behalf in connection with any such arbitration (including any investigation and preparation costs and expenses, and legal costs and expenses) but the parties to the arbitration shall share equally in the fees and costs of the arbitration. The parties shall maintain strict confidentiality with respect to all aspects of any and all arbitration of Disputes pursuant to this Agreement and shall not, without the prior written consent of all parties to such arbitration, disclose the existence, conduct or outcome thereof to any non-parties or non-participants except to the extent required by applicable law or to the extent necessary to recognize, confirm or enforce the resulting final award or decision and otherwise to those representatives, distributors or subdistributors who need to know or in financial statements as required by auditors. Nothing to the contrary herein withstanding, Distributor may seek injunctive or other provisional relief in any court of competent jurisdiction. Each of the parties hereto irrevocably consents to the service of process for arbitration or other legal proceeding by the mailing of copies thereof by registered mail, postage prepaid, to such party at its notice address set forth in this Agreement, such service of process to be effective three (3) business days after such mailing; nothing in this sentence shall limit the right of any party hereto to serve legal process in any other manner permitted by law.

25. **Bankruptcy.** In the event of Grantor's bankruptcy, the Parties acknowledge and agree that the licensed rights hereunder are fundamentally in the nature of "intellectual property" as defined in the Bankruptcy Code; that Distributor's continued enjoyment of all licensed rights is fundamental to the basic license hereunder, and therefore all licensed rights should be deemed intellectual property subject to Distributor's election under Section 365(n)(1)(B) of the Bankruptcy Code. The Parties hereby acknowledge that for all purposes, including but not limited to, any interpretation related to bankruptcy law (inclusive of issues related to Bankruptcy Code Section 365(n)), Distributor's right to recoup the Advance, Deductible Costs and other amounts allowed under this Agreement refers to the equitable doctrine of recoupment and does not constitute a legal or equitable "right of setoff" under any applicable state or federal law.

26. **Insurance.** Grantor shall procure and maintain in full force and effect and not permit to lapse an occurrence based producer's errors and omissions liability insurance policy, with an insurance carrier approved by Distributor, that does not exclude title, music, advertising or promotional materials or contain any other non-standard exclusions, with liability limits of not less than $3,000,000 for each occurrence and $5,000,000 in the aggregate, with a deductible not to exceed $25,000 per occurrence, and which provides that such policy shall be primary and not contributing to or in excess of any such insurance maintained by Distributor, shall remain in full force and effect until three (3) years from completion of Delivery, and shall require 30 days prior written notice to Distributor (11846 Ventura Blvd. Suite 130. Studio City, CA 91604), or such other recipient(s) as Distributor may notify Grantor in writing, of any cancellation, non-renewal or change in coverage. Grantor shall provide Distributor with a full copy of such policy and the application therefor, as well as certificates of such insurance and endorsement, in a form acceptable to Distributor, naming Clear Distribution LLC and their affiliates, subsidiaries, franchisees, sub-distributors, licensees, and sublicensees, and each of the foregoing's members, managers, officers, directors, employees, agents, successors, assigns and any other Distributor-designated entities or persons as additional insureds thereunder. Upon request by Distributor, Grantor will promptly add

by name such of Distributor's Licensees as Distributor may request as additional insureds on the aforementioned policy and timely provide certificates evidencing such addition.

**27.** **Physical Security Procedures; Notice of Security Breach, Anti-Piracy Measures Outside the Territory.**  The provisions on the attached **Exhibit D** related to physical security procedures, notice of security breach, and anti-piracy measures are hereby incorporated by reference.

**28.** **Representations and Warranties.**

 (a) Distributor represents and warrants to Grantor as follows:

  (i) Distributor is a limited liability company duly formed and validly existing in good standing under the laws of the State of California and has full right, power, legal capacity and authority to enter into and carry out the terms of this Agreement.

  (ii) Distributor has no agreement with or obligations to any third party that might conflict or interfere with this Agreement in a way that has a material adverse effect on this Agreement; Distributor's execution and performance of this Agreement does not violate Distributor's governing documents or any applicable law, statute, rule or regulation in a way that has a material adverse effect on this Agreement; Distributor has taken all action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other proceedings, consents or approvals are necessary to authorize Distributor's execution or performance of this Agreement or Distributor's consummation of the transactions contemplated hereby.

  (iii) This Agreement is a legal, valid and binding obligation of Distributor enforceable against Distributor in accordance with its terms.

 (b) Grantor represents, warrants and covenants to Distributor as follows:

  (i) Grantor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York, and has full power and authority to carry on its business as it is now being conducted and is duly qualified or licensed as a foreign entity to do business, and is in good standing, in each jurisdiction where the character of its business requires such qualification or licensing.

  (ii) Grantor has the sole and exclusive right to enter into and perform its obligations under this Agreement and has full legal and financial ability to perform its obligations under this Agreement and has all necessary right, power, legal capacity and authority and has taken all action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other proceedings, consents or approvals are necessary to authorize Grantor's execution or performance of this Agreement or Grantor's consummation of the transactions contemplated hereby.  Grantor has no agreement with or obligations to any third party that might conflict or interfere with this Agreement or Distributor's use or quiet enjoyment of any of the rights granted to Distributor under this Agreement, and

Grantor's execution and performance of this Agreement shall not conflict with or result in Grantor being in violation of its organizational documents, applicable law, statute, rule or regulation, or contract or agreement.

(iii) This Agreement is a legal, valid and binding obligation of Grantor enforceable against Grantor in accordance with its terms. Grantor is in compliance with all applicable laws, statutes, ordinances, rules and regulations promulgated, or judgments, decisions or orders entered, by any local or foreign court or governmental agency, department, authority or instrumentality.

(iv) There are no existing or, to Grantor's knowledge, threatened claims, arbitration or litigation that would adversely affect or impair Grantor's ability to perform under this Agreement.

(v) Grantor has and shall, during the Term, continue to have title to the Picture. Grantor has secured and will maintain throughout the Term all rights necessary for Distributor to use and enjoy all rights granted to Distributor in this Agreement. All rights, services, performances, materials, equipment, sound, music, locations, names, products and logos used in the Picture have been paid for in full and shall be owned by or licensed to Grantor throughout the Universe in all media and by all means now known or hereafter devised.

(vi) Grantor has and will continue to have during the Term sole and unencumbered title to, and the exclusive and complete right and authority to grant, the Rights and the other rights and benefits granted to Distributor under this Agreement, and such rights are free and clear of any liens, encumbrances and/or security interests. There are no defects in the chain-of-title for the Picture that could adversely affect any of Distributor's rights under this Agreement.

(vii) If this Agreement is executed by exercise of a power of attorney or similar, such execution represents a legal, valid and binding obligation of Grantor.

(viii) Grantor shall deliver the Picture fully cleared, all Third Party Payments (except Assumed Obligations, if any) shall be borne solely by Grantor, and the performing rights to all musical compositions contained in the Picture are, or will be by the Outside Delivery Date, (A) controlled by the American Society of Composers, Authors and Publishers ("ASCAP"), Broadcast Music, Inc. ("BMI") or similar performing rights organizations in foreign countries or their affiliates, (B) in the public domain in the Territory, or (C) controlled by Grantor to the extent required for the purpose of this Agreement. Distributor shall have quiet enjoyment and possession of the Rights in the Territory during the Term (and thereafter, to the extent provided in this Agreement). Grantor shall deliver a music cue sheet for the Picture on or before the Outside Delivery Date in the format specified in the delivery schedule attached hereto, and the information contained in such cue sheet shall be complete and accurate. The Picture has not heretofore been exploited anywhere in the Universe in any medium, the rights granted to Distributor pursuant to this Agreement have not been previously granted, licensed, sold, assigned, transferred, conveyed or exploited by any person or entity, and Grantor shall not, or authorize another to, sell, assign, transfer, or convey to any person or entity any right, title or interest in and/or to the Picture or any part thereof or in and/or to the dramatic or literary material upon which the Picture is based which

is adverse to, or otherwise in derogation of, the rights granted to Distributor, except with respect to a certain Sales Representation Agreement between Grantor and Film Sales Company, dated as of November 22, 2019, which has been terminated prior to the date of execution hereof, nor has Grantor or any other person or entity previously assigned, granted or transferred any interest in or lien on, nor shall Grantor, and Grantor shall not, and shall not authorize another to, assign, grant or transfer any interest in or lien on, the Collateral to any party that would conflict, interfere or be inconsistent with the Security Interest. No person or entity has any right of first negotiation, first or last refusal, option right, matching right, preemptive or contingent right with respect to any of the Rights in the Territory during the Term.

(ix)     The Picture is wholly original and is not in the public domain. None of the Picture, the elements contained therein (including, without limitation, the music, the title, any literary materials contained in the Picture or on which it is based, and advertising and publicity materials supplied by Grantor hereunder), nor the exercise of any rights granted to Distributor under this Agreement, (A) are or will during the Term be subject to any dispute as to ownership or exploitation, (B) violates, infringes or misappropriates, or will during the Term violate, infringe or misappropriate, any trademark, trade name, agreement, copyright, patent, literary or other property right, right of privacy, right of publicity or "moral rights of authors" or any other rights whatsoever of any third party, (C) contains or during the Term will contain any element or other intellectual property that infringes on the rights of another person, or (D) now does, or at any time during the Term will, unfairly compete with, or slander or libel (or constitute a trade disparagement of) any person or entity whatsoever. Grantor has obtained from all applicable artists, producers, record companies, songwriters, composers, and publishers all of the rights, permissions, licenses and/or waivers required to enable Distributor to fully exploit the Rights hereunder in the Territory during the Term (and after the Term, for sell-off and for the limited purpose of re-transmitting the Picture to end uses who obtain during the Term rights to re-transmission of the Picture), including for use of likenesses in connection with advertising, and all synchronization, master use, recording and performance rights, licenses and/or waivers necessary for the use of all music contained in the Picture, including master recordings newly recorded for or first exploited in connection with the Picture. Every musical composition contained in the Picture and every performance of a musical composition contained in the Picture has been licensed for use in and in connection with the Picture for the entire Term on a "flat buy-out basis" for the Territory, one-time fixed fees only are provided in the applicable licenses, all such fees have been fully paid, and no future payment of any kind shall be required with respect thereto. To the extent the Picture or the underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, Grantor has obtained all necessary personal releases and other rights necessary to permit Distributor to exploit the Picture in the manner provided herein without violating any third party rights or incurring any obligation to any third party, and Grantor shall provide true and correct copies of such personal releases to Distributor as part of the chain of title documents to be delivered hereunder.

(x)     All persons appearing in, connected with the production of or furnishing services in connection with the Picture have or shall have by the Completion Date authorized the use of their names, photographs, likenesses, acts, poses, sound effects, voices and biographical information (collectively, the "**Attributes**") in connection with Distributor's exploitation of all Rights granted hereunder in the Territory during the Term (and thereafter, to the extent provided

in this Agreement) and the advertising and promotion thereof and, subject to the express terms of the Talent Agreements, Distributor may use the Attributes in any and all advertising and publicity materials in such manner as Distributor shall determine and Distributor is not restricted and shall not be restricted in any way from using any of the Attributes in connection with advertising or promotional materials.

(xi)     The Picture, all parts thereof, and its production has been, is and will be, at all times and in all respects, in compliance with the requirements of all applicable laws, statutes, ordinances, rules, regulations, guidelines, judgments, decisions, and orders entered, whether state, federal, international or local (i.e., those imposed by any union, guild or labor organization), including without limitation the Child Protection and Obscenity Enforcement Act of 1988, as amended, and all rules and regulations promulgated thereunder (collectively, "**CPOEA**") and the Picture does not contain any material that would require Grantor to comply with the recordkeeping requirements of the CPOEA. The Picture does not contain any depiction of "actual" (i.e., the performer was actually engaged in the applicable act while being filmed) or simulated human sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal, whether between those of same or opposite sex), bestiality, masturbation, or sadistic or masochistic abuse. The performers in any depictions that may potentially constitute simulated sexually explicit conduct or lascivious exhibition of the genitals or pubic area of any person were not minors at the time the depictions were originally produced.

(xii)     Grantor shall (A) satisfy the safe harbor certification requirements promulgated by 18 U.S.C. § 2257 and 2257A (as the same may be amended) (the "**Act**") and provide Distributor with a copy of the certification timely filed with the Attorney General of the United States evidencing that Grantor is permitted to avail itself of the exemption set forth at 28 C.F.R. § 75.9 of the Act, or (B) abide by the record-keeping and other reporting and labeling obligations set forth in the Act and provide Distributor with copies of any and all records required to be kept thereunder, including the following information for each person who appears in the Picture: (1) all names ever used by each performer (including, but not limited to, maiden name, alias, nickname, stage name or professional name) and each performer's address and (2) a legible copy of each performer's government-issued identification card, such as a driver's license or passport, which contains a date of birth and a recent and recognizable photograph of the performer.

(xiii)     Grantor will comply with all applicable laws, and will comply with the anti-bribery provisions of the U.S. Foreign Corrupt Practices Act ("**FCPA**"), irrespective of whether the FCPA applies. Further, notwithstanding any other provision herein: (A) Grantor shall cooperate with Distributor's reasonable efforts to ensure Grantor's compliance with the FCPA; (B) Distributor shall have the right to immediately terminate this Agreement if Distributor has reason to believe that Grantor has violated the FCPA; and (C) Distributor is not obligated to pay any amounts under this Agreement if Distributor has reason to believe that conduct on behalf of Grantor violates the FCPA.

(xiv)     The Picture and its underlying literary, dramatic and musical materials are protected by all applicable copyright and other intellectual property laws throughout the Territory and have been duly and properly registered (and renewed if applicable) with the United States Copyright Office, and all applicable rights and registrations are and shall remain valid throughout

the Territory during the Term, and no part thereof is or will during the Term be in the public domain.

(xv)     All Delivery Elements, including all cast lists, credits, the Credit Statement, and copies of documents, are complete and accurate and Distributor will incur no liability to any third party from its reliance thereon and/or use thereof. The Picture has not been and shall not be produced subject to any collective bargaining agreement of any union or guild not expressly identified in Section 2 above, no guild or union was or shall be involved in the production of the Picture or has or shall have any interest therein except such guild(s) and/or union(s) as are expressly identified in Section 2 (if any), and all guild and/or union agreements pursuant to which the Picture was produced (if any) are theatrical motion picture agreements. All IATSE obligations (if any) other than residuals have been prepaid, and there will be no contributions, use fees or other payments due to or for the benefit of IATSE or IATSE members as a result of the exploitation of the Rights contemplated by this Agreement or in respect of payments made or received by Distributor in connection with the Picture.

(xvi)    Grantor is not the recipient of any equity or funding from the Canada Media Fund in respect of the Picture.

**29.     Breach.** Distributor shall not be deemed to be in default or breach of this Agreement unless and until (a) Distributor fails to cure any material default or breach of this Agreement within forty-five (45) calendar days after receipt of written notice from Grantor specifying the exact nature of the claimed default or breach and (b) after such cure period, Distributor is adjudicated to be in default. No waiver of any default or breach of this Agreement by either Party shall be deemed a continuing waiver or a waiver of any other breach or default, no matter how similar.

**30.     Remedies.** Grantor's rights and remedies in the event of a breach of any terms and conditions of this Agreement shall be limited to sole and exclusive right, if any, to recover damages in an action at law, and in no event shall Grantor, its affiliates, successors or assigns be entitled to terminate and/or rescind this Agreement, to seek specific performance, equitable relief or injunctive relief, or to enjoin or restrain or otherwise interfere with the production, distribution or exhibition of the Picture or the use, publication or dissemination of any advertising in connection therewith. Neither Party shall be liable to the other Party for any special, punitive or exemplary damages, except for and to the extent arising from third party claims made against the other Party for which the first Party has an indemnification obligation under this Agreement to such other Party.

**31.     Notice.** Except as otherwise expressly provided herein, any notice or communications provided for hereunder must be in writing and delivered by hand delivery, receipt confirmed e-mail (with "Notice" in the subject line) or receipt confirmed facsimile transmission, or postage prepaid delivery service with delivery confirmation (e.g., certified mail, registered mail, FedEx, etc.) to the following addresses for the receiving Party (or to such other address as such Party may hereafter specify by like notice) and shall be conclusively deemed to have been received by such Party and to be effective on the earliest of the day on which it is hand delivered to such address, or if sent by receipt confirmed facsimile or e-mail transmission, on the day on which it is transmitted, or if sent by registered or certified U.S. mail, on the fifth business day after the date

on which it is mailed, postage prepaid, addressed to such Party at such address, or if sent by overnight courier, on the first business day after the date on which it is mailed to such address, or regardless of how delivered, on the day actually received by such Party:

for Grantor:                           for Distributor:

Son of the South Owner LLC              Clear Horizon
                                        Attn: Legal Affairs
_____                 11846 Ventura Blvd. Suite 130
_____                 Studio City, CA 91604
_____                 Tel: 818-308-7822
Tel:                                    Email: notice@clearhorizonent.com
Fax:
Email:

With a courtesy copy to:
Foreht Associates, LLP
Attn: Stephen R. Foreht, Esq.
228 East 45th Street, 17th floor
New York, NY 10017
Tel: 646-230-8501
e-mail: sforeht@law-org.com

                                        With a courtesy copy to:
                                        Creativ Law P.C.
                                        Attn: Harry Finkel, Esq.
                                        8730 Wilshire Blvd suite 350
                                        Beverly Hills, CA 90211
                                        Tel: 323-892-0550
                                        Email: harry@creativlaw.com

                                        An additional courtesy copy to:
                                        Winston & Strawn LLP.
                                        Attention: Warren Loui, Esq.
                                        333 South Grand Avenue
                                        Los Angeles, CA 90071
                                        Email:  warren.loui@winston.com

**32.**   **Relationship of the Parties.**   Nothing contained herein shall be deemed to create a relationship of partnership, joint venture, agency, fiduciary or employment between the Parties. This Agreement is not for the benefit of any third party and will not be deemed to give any right or remedy to any such party, whether referred to herein or not.

**33.**   **Survival.**   The provisions of Sections 12, 13, 18, 19, 21 through 26,  29.30, 32 and 33, all definitions, all provisions which by their terms expressly contemplate survival after the Term, and all representations, warranties and indemnities made or provided herein will, as to events occurring

prior to termination, survive any termination or expiration of this Agreement and remain in full force and effect thereafter.

**34.     Miscellaneous.** This Agreement and any amendment or addendum hereto may be signed in any number of counterparts and delivered with original signature, by email transmission/PDF and/or facsimile, each of which shall be deemed an original, but all of which taken together shall constitute one Agreement. This Agreement contains the full and complete understanding between the Parties with respect to the subject matter herein and supersedes all prior agreements and understandings, whether written or oral, pertaining thereto, and cannot be amended, modified or changed except by a written instrument duly executed by the parties hereto. Nothing in this Agreement shall restrict Distributor from exercising any right Distributor has pursuant to another applicable permission or would have at law in the absence of this Agreement.  This Agreement is not an offer by either Party and is not effective unless and until the Parties' exchange of signatures hereto, at which time this Agreement shall be deemed effective as of the Effective Date. If any term or provision of this Agreement is found to be void or contrary to law, such term or provision will, but only to the extent necessary to bring this Agreement within the requirements of law, be deemed to be severable from the other terms and provisions of this Agreement, and the remainder of this Agreement will be given effect as if the parties hereto had not included the severed term herein.  Without limiting any other remedies available to it under this Agreement or by law, upon identifying risk(s) and making a reasonable good faith assessment of Distributor's financial exposure, Distributor shall have the right to withhold and reserve from any monies whatsoever payable by Distributor hereunder, sums reasonably sufficient to secure Distributor from and against Grantor's liabilities or the breach of any of its obligations, representations, warranties or covenants under this Agreement.  Grantor's Share is referred to herein merely as a measure in determining the time and manner of payment to Grantor, and Distributor shall not be deemed a trustee, pledgeholder or fiduciary thereof.  Distributor makes no representation, warranty or guarantee as to any amounts of Gross Revenue or Adjusted Gross Receipts to be generated by the Picture.  Grantor shall execute, acknowledge and deliver any and all further documents that are necessary, expedient or proper to implement, administer and effectuate the purpose and intent of this Agreement.  If Grantor fails to deliver such additional documents within thirty (30) days after Distributor's request therefor, Grantor irrevocably appoints Distributor to execute such additional documents as Grantor's attorney-in-fact, coupled with an interest.  Time is of the essence of this Agreement and of the obligations set forth herein.

[signature page follows]

35. **Definitions and Construction**.  Capitalized terms used herein shall have the meanings ascribed to them in this Agreement.  Unless otherwise required by the context in which any term appears: (a) the singular shall include the plural and vice versa, (b) the word "including" shall mean "including, without limitation," (c) references to Distributor's exercise of discretion, including through the use of terms such as "approve," "consent," "determine," "acceptable to" and words of like effect, shall mean Distributor's exercise of such discretion in Distributor's sole discretion, (d) references to "Paragraphs", " Sections", "Schedules" and "Exhibits" shall be to paragraphs, sections, schedules and exhibits hereof, (e) the words "herein", "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection hereof, and (f) references to this Agreement shall include a reference to all schedules and exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time. Unless otherwise specifically stated, all amounts set forth in this Agreement are stated in United States Dollars.  Section headings are inserted herein for convenience only and do not constitute a part of this Agreement.  Except where otherwise indicated herein, if there are any conflicts or inconsistencies between this Agreement and any schedules or exhibits attached hereto, the provisions of this Agreement shall control.  Each Party has had the opportunity to review and negotiate this Agreement in consultation with counsel of its choosing, and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement or any subsequent amendment hereto.

IN WITNESS WHEREOF, the Parties hereto have executed this Acquisition Agreement as of the date first above written.

SON OF THE SOUTH OWNER LLC
By JABA ENTERTAINMENT INC., Managing Member

CLEAR DISTRIBUTION LLC

By: _____        By: _____
Name: Bill Black                      Name: David Brown
Title:  President                     Title: CEO

Acquisition Agreement            *Signature Page*            "Son of the South"

## ACKNOWLEDGMENT

As an inducement to Clear Distribution LLC ("Distributor") to enter into that certain Acquisition Agreement, dated as of June 12, 2020, between Distributor and Son of the South Owner LLC ("Grantor") for Distributor's acquisition of certain rights in the motion picture currently titled "Son of the South" (the "Agreement"), which Agreement will directly or indirectly benefit Jaba Entertainment, Inc. ("Agent"), Agent does hereby acknowledge and agree to the terms of the Agreement and represent, warrant, covenant and agree as follows:

(a)     Agent represents, warrants and covenants as follows:

(i)     Agent is a corporation duly formed and validly existing in good standing under the laws of New York and has full right, power, legal capacity and authority to execute this Acknowledgment and perform its obligations hereunder.

(ii)     Grantor possesses each of the rights conveyed by Grantor by the Agreement, and to the extent that Agent possesses any interest therein, Agent hereby conveys all such interest to Grantor concurrent with Grantor's grant thereof to Distributor.

(iii)     The Agreement is a legal, valid and binding obligation of Grantor enforceable against Grantor in accordance with its terms, and this Acknowledgment is a legal, valid and binding obligation of Agent enforceable against Agent in accordance with its terms.

(iv)     The representations and warranties of Agent herein made are true and correct, and Agent shall indemnify, hold harmless and defend the Indemnified Distributor Parties from and against any and all liability, loss, damage, cost and expense, including, without limitation, actual, reasonable outside attorneys' fees, arising out of any breach or alleged breach thereof or third party claim with respect thereto.

(b)     Agent agrees to be obligated and bound by the provisions of Sections 19 (Residuals; Third Party Payments), 22 (Indemnification), 24 (Governing Law; Dispute Resolution), 31 (Notice) and 34 (Miscellaneous) of the Agreement to the same extent that Grantor is obligated and bound thereby.  Agent's address for notices is as set forth below.  In no event shall Agent, its successors or assigns be entitled to seek to have the Agreement or this Acknowledgment terminated and/or rescinded, or to seek specific performance, equitable relief or injunctive relief, or to enjoin or restrain or otherwise interfere with the production, distribution or exhibition of the Picture or the use, publication or dissemination of any advertising in connection therewith. Capitalized terms used and not defined in this Acknowledgment shall have the meanings ascribed thereto in the Agreement.

Jaba Entertainment, Inc. ("Agent")       42B Corchaug Avenue
By: _Bill Black_                          Port Washington, NY, 11050
Name: Bill Black                          Tel: 646-508-5634
Title:  President                         Fax: _____
Date: 6/15/20                             Email: jabafilms@aol.com

Acquisition Agreement                                          "Son of the South"

**EXHIBIT A**

**Form of Short Form Assignment**

[see attached]

**EXHIBIT B**

<u>**Form of Copyright Mortgage and Security Agreement**</u>

[see attached]

**EXHIBIT C**

**<u>Delivery Elements</u>**

[see attached]

**EXHIBIT D**

<u>Physical Security Procedures; Notice of Security Breach;</u>
<u>Anti-Piracy Measures Outside the Territory</u>

1.      Grantor represents and warrants that Grantor and its subcontractors will establish and employ security systems and procedures that are sufficient to prevent any theft of, injury to (other than normal wear and tear), or unauthorized printing, copying, duplication, use, exhibition or destruction of the Picture or the elements thereof while such elements and materials are in Grantor's (or such subcontractor's) possession, custody or control.  Distributor shall have the right to approve all security procedures employed by Grantor and/or its subcontractors.  Grantor agrees to make facilities available, at any time with reasonable notice, for inspection by the film security office or similar division of the Motion Picture Association of America or the Motion Picture Export Association of America.

2.      Grantor shall notify Distributor in writing within two (2) days of any security breach occurring in connection with the Picture, including, without limitation any reports of stolen or misplaced physical copies of the Picture, any suspected or confirmed events of unauthorized access or duplication, and any other failure of the security precautions set out hereunder.  Grantor shall coordinate directly with Distributor to respond to any such security breach relating to the Picture.

3.      Distributor shall have the non-exclusive right, but not the obligation, to take anti-piracy measures outside of the Territory.  Such anti-piracy measures may include, without limitation, sending takedown notices, using takedown tools and creating reference files for copyright filters. The rights granted to Distributor pursuant to this Agreement shall include, without limitation, the right to take anti-piracy measures within and outside of the Territory in Distributor's name and/or in the name of Grantor and/or in the name of the copyright holder (if different from Grantor), as determined by Distributor in its sole discretion.  Without limiting the generality of the foregoing, Grantor shall execute and deliver to Distributor any and all additional documents Distributor considers reasonably necessary or desirable in furtherance of its anti-piracy efforts.  If Grantor shall fail to execute, acknowledge or deliver any such instrument within two (2) business days (unless a shorter period is reasonably required) after request by Distributor to do so, Distributor shall have, and is hereby granted, the right and power for and on behalf of Grantor, as Grantor's attorney-in-fact, to execute, acknowledge and deliver such instruments which power is coupled with an interest and is irrevocable.  Nothing in the security measures set forth herein shall limit or otherwise diminish Grantor's obligations to take any and all action to protect Distributor's exclusive quiet enjoyment of the Rights in the Territory during the Term (and after the Term, for sell-off and for the limited purpose of re-transmitting the Picture to end users who obtain during the Term rights to re-transmission of the Picture).  For the avoidance of doubt, Distributor may grant any of the foregoing rights to a third party, including without limitation, a licensee, sublicensee and/or subdistributor and/or assignee, and such rights may be exercised hereunder by such third parties.

# EXHIBIT H

**8TH WONDER PICTURES, LLC**
1805 West Avenue
Austin, TX 78701

November 16, 2020

**BY FEDERAL EXPRESS**

Clear Distribution, LLC
827 N Hollywood Way, #512
Burbank, CA 91505
Attention: David Brown
Email: david@clearhorizonent.com

cc:

Clear Entertainment, LLC and Specter Entertainment, LLC
c/o Clear Distribution, LLC
827 N Hollywood Way, #512
Burbank, CA 91505
Attention: David Brown
Email: david@clearhorizonent.com

Mr. David Brown
c/o Clear Distribution, LLC
827 N Hollywood Way, #512
Burbank, CA 91505
Attention: David Brown
Email: david@clearhorizonent.com

Creativ Law Professional Corp.
Attention: Harry Finkel, Esq.
88730 Wilshire Blvd, Suite 350
Beverly Hills, CA 90211
Email: harry@creativlaw.com

  Re: **NOTICE OF EVENT OF DEFAULT;**
     **DEMAND FOR IMMEDIATE PAYMENT**

Ladies and Gentlemen:

    Reference is hereby made to (i) that certain Loan, Guaranty and Security Agreement (the "Loan Agreement"; capitalized terms used herein without definition have the respective meanings assigned such terms in the Loan Agreement), dated as of June 29, 2020, by and among **8TH WONDER PICTURES, LLC**, as the Lender (the "Lender"), **CLEAR DISTRIBUTION LLC**, as the Borrower (the "Borrower"), (ii) the other Loan Documents.

This letter shall serve as notice that the following Event(s) of Default continue exist under the Loan Documents:

(i) Pursuant to Section 4.1 of the Loan Agreement, the Borrower is obligated to repay the outstanding principal balance of the Loans and all other Obligations in full, plus all accrued but unpaid interest thereon, on the Maturity Date (September 15, 2020). A breach of Section 4.1 of the Loan Agreement is an immediate Event of Default under the Loan Agreement pursuant to Section 11.1(a) of the Loan Agreement. The Borrower is hereby notified that the Lender declares that the breach is an immediate Event of Default under the Loan Documents in accordance with Article 11 of the Loan Agreement.

(ii) Pursuant to Section 8.2 of the Loan Agreement, the Borrower is obligated to provide to the Lender regular status reports and other information but has breached its obligation to do so despite numerous requests, including information (including executed copies) about a purported subdistribution agreement with Vertical Entertainment. A breach of Section 8.2 of the Loan Agreement is an immediate Event of Default under the Loan Agreement pursuant to Section 11.1(d) of the Loan Agreement. The Borrower is hereby notified that the Lender declares that the breach is an immediate Event of Default under the Loan Documents in accordance with Article 11 of the Loan Agreement.

In accordance with Section 3.1(a) of the Loan Agreement, interest at the Default Rate is accruing on all outstanding Obligations from the date such Events of Default first occurred, and the Obligations will continue to accrue on a daily basis at the Default Rate, which payment is due on demand.

In accordance with Section 14.5 of the Loan Agreement, the Borrower is also required to pay on demand all of the Lender's reasonable actual out-of-pocket costs and expenses incurred after the Effective Date, including (a) those related to necessary amendments to the Loan Documents, (b) costs and expenses of preserving and protecting the Collateral in the event of the Borrower's default hereunder, and (c) reasonably necessary costs and expenses (including reasonable outside attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the Lender's Liens, sell or otherwise realize upon the Collateral and otherwise enforce the provisions of the Loan Documents or to defend any claims made or threatened against the Lender arising out of the transactions contemplated hereby, and in connection with the enforcement of the rights of the Lender thereunder or in connection with the realization upon any Collateral (including the costs of any "workout" of the Borrower's obligations and Lender's enforcement of its rights in any bankruptcy proceeding).

**IN FURTHERANCE OF THE FOREGOING, THE BORROWER AND THE GUARANTORS ARE HEREBY NOTIFIED THAT IN ACCORDANCE WITH SECTION 2.2 OF THE LOAN AGREEMENT THE LENDER MAY MAKE LENDER ADVANCES FOR THE PURPOSES DESCRIBED IN SECTION 2.2 OF THE LOAN AGREEMENT.**

The fact that the Lender has not herein listed other Defaults or Events of Default under the Loan Documents as Defaults and/or Events of Default herein does not mean (and shall not be construed to mean) that the Lender does not consider them to be such or as a waiver of the Lender's rights to rely upon them, or to exercise any rights flowing therefrom.

You are also hereby informed that, pursuant to Section 11.2 of the Loan Agreement, if an unremedied Event of Default endures for five (5) Business Days or longer, the Lender may, in the Lender's sole and absolute discretion, take certain actions, including pursuing all of its rights and remedies under the Loan Documents and applicable law, which remedies may include foreclosing on the Collateral. You are also hereby informed that, pursuant to Section 7.8 of the Loan Agreement, the Lender may take actions as the attorney-in-fact of each Loan Party.

**THE LENDER HEREBY DEMANDS THAT THE BORROWER AND THE GUARANTORS MAKE PROMPT AND IMMEDIATE PAYMENT OF ALL OBLIGATIONS.**

Each Loan Party is hereby advised that the Lender's delay, if any, in giving any notice of Default or Event of Default or exercising any rights and/or remedies under the Loan Agreement, the Guaranties and/or any of the other Loan Documents in respect of any Event of Default, and/or taking any other action under the Loan Agreement, the Guaranties and/or any of the other Loan Documents or otherwise, including, without limitation, any prior delay in demanding or failure to demand payment of any Obligations pursuant to the Loan Agreement and/or the other Loan Documents, in each case, whether prior to, on or after the date hereof, shall not in any event or at any time constitute (i) a waiver or modification or other amendment of the terms of the Loan Documents or any Loan Party's payment, performance or any other obligations set forth therein, (ii) a cure or waiver of any existing Defaults or Events of Default under the Loan Documents or a forbearance from the Lender's exercise of any rights or remedies pursuant to the same (including, without limitation, the right to charge interest at the Default Rate from the date of the occurrence of any applicable Default or Event of Default notwithstanding the fact that the same has not been demanded or collected on any date subsequent to the occurrence of such Default or Event of Default), (iii) a waiver of any rights or remedies that the Lender may have under the Loan Documents, at law or in equity, (iv) a modification of the Loan Documents or any agreement by the Lender to make any modifications to the Loan Documents, (v) a course of conduct or course of dealing obligating the Lender to act in a similar fashion in the future or otherwise suggesting any future behavior by the Lender, (vi) a waiver of the Lender's right to obligate any Loan Party to comply with the Loan Documents expressly in accordance with the Loan Documents and/or to exercise any rights under the Loan Documents as a result of any Loan Party's failure to act as required by the Loan Agreement and/or the Guaranties, or (vii) a rescission or modification of any notices given to any Loan Party or any other obligor, and the Lender expressly reserves the right to pursue any and all such rights and remedies with respect to any existing Defaults or Events of Default under the Loan Documents and any other existing delinquencies, breaches, Defaults or Events of Default, and with respect to any future delinquencies, breaches, Default, or Events of Default, as provided in the Loan Documents and applicable law.

Nothing contained in this letter shall confer on Borrower or any Guarantor or any other party to any of the Loan Documents any right to notice or cure periods with respect to any Default or Event of Default or any action the Lender may take based upon any existing or future Defaults or Events of Default. Further, no commencement or continuation of discussions with you regarding the Obligations or any of the Loan Documents or any other obligation owed by you to the Lender, either directly or indirectly, shall constitute a waiver or limitation of the Lender's rights and remedies under the Loan Documents, at law or in equity.

This letter confirms that the Lender has not waived any Default, Event of Default or other breach under the Loan Documents and the Lender expressly reserves all of its rights, powers, privileges and remedies under the Loan Documents and/or applicable law, including, without limitation, its right at any time, as applicable, (i) to commence any legal or other action to collect any or all of the Obligations from the Borrower, the other Loan Parties, and any other person liable therefore and/or any Collateral, (ii) to foreclose or otherwise realize on any or all of the Collateral and/or as appropriate, set-off or apply to the payment of any or all of the Obligations, any or all of the Collateral, (iii) to take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Loan Documents or applicable law, and (iv) to reject any forbearance, financial restructuring or other proposal made by or on behalf of the Borrower, any other Loan Party or any creditor or equity holder. The Lender may exercise its rights, powers, privileges and remedies, including those set forth in clauses (i) through (iv) above at any time in its sole and absolute discretion without further notice. No oral representations or course of dealing on the part of the Lender or any of its officers, employees or agents, and no failure or

3

delay by the Lender with respect to the exercise of any right, power, privilege or remedy under any of the Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy. Except as specified herein, this letter does not attempt to summarize all (i) existing misrepresentations, breaches, Defaults and Events of Default existing under the Loan Documents, and (ii) rights and remedies of the Lender under the Loan Documents. Accordingly, this letter is not, and shall not be deemed to be, a waiver of, or consent to, any misrepresentation, breach, Default or Event of Default now existing or hereafter arising under the Loan Documents.

You are further advised that neither the Lender's acceptance of any amounts paid by any Loan Party that total less than all of the Obligations (a "Partial Payment") shall constitute, or be deemed or construed as, a waiver of any Default or Event of Default. In addition, any Partial Payment or the acceptance of any Partial Payment shall not constitute or be deemed or construed as a cure of any existing Default or Event of Default, a modification of any of the Loan Documents, or the terms of this letter, a reinstatement or satisfaction of the Obligations, or a waiver, modification, relinquishment or forbearance by The Lender of any of their respective rights and/or remedies under the Loan Documents, at law or in equity, all of which rights and remedies the Lender hereby expressly reserves.

This letter may be executed in images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

This letter shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of law that would result in the application of the laws of another jurisdiction.

*[Remainder of page intentionally left blank. Signature page follows.]*

Sincerely,

**LENDER:**

**8TH WONDER PICTURES, LLC**

By: _____

     Name: Andrew Townsend
     Title: Managing Member

## VERIFICATION

I, Andrew Townsend, declare:

I am the managing member of 8th Wonder Pictures, LLC, a Delaware limited liability company, which is the Plaintiff in the above-entitled action, and I am authorized to make this verification on its behalf.

I have read the foregoing Verified Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Austin , TX on January 26 , 2021.

Andrew Townsend

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 43784652v2
**VERIFICATION**

1

Case No.